## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

STATE OF MISSOURI,
STATE OF NEBRASKA,
STATE OF ALASKA,
STATE OF ARKANSAS,
STATE OF IOWA,
STATE OF MONTANA,
STATE OF NEW HAMPSHIRE,
STATE OF NORTH DAKOTA,
STATE OF SOUTH DAKOTA,
STATE OF WYOMING,

       *Plaintiffs*,

  v.

JOSEPH R. BIDEN, JR.,
in his official capacity as the President of
the United States of America;

THE UNITED STATES OF AMERICA;

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT;

KIRAN AHUJA in her official capacity as
director of the Office of Personnel
Management and as co-chair of the Safer
Federal Workforce Task Force;

GENERAL SERVICES
ADMINISTRATION;

ROBIN CARNAHAN in her official
capacity as administrator of the
General Services Administration and as
co-chair of the Safer Federal Workforce
Task Force;

OFFICE OF MANAGEMENT AND
BUDGET;

SHALANDA YOUNG in her official
capacity as Acting Director of the Office
of Management and Budget and as a
member of the Safer Federal Workforce

No. _____

1

Task Force;

SAFER FEDERAL WORKFORCE TASK
FORCE;

JEFFREY ZIENTS in his official capacity
as co-chair of the Safer Federal Workforce
Task Force and COVID-19 Response
Coordinator;

FEDERAL ACQUISITION
REGULATORY COUNCIL;

LESLEY A. FIELD, in her official capacity
as Acting Administrator for Federal
Procurement, Office of Management and
Budget;

JOHN M. TENAGLIA, in his official
capacity as Principal Director of Defense
Pricing and Contracting, Department of
Defense;

JEFFREY A. KOSES, in his official
capacity as Senior Procurement Executive
& Deputy Chief Acquisition Officer,
General Services Administration; and

KARLA S. JACKSON, in her official
capacity as Assistant Administrator for
Procurement, National Aeronautics and
Space Administration,

                    *Defendants*.

---

## COMPLAINT

1. Plaintiffs, the States of Missouri, Nebraska, Alaska, Arkansas, Iowa, Montana, New
Hampshire, North Dakota, South Dakota, and Wyoming, bring this action to challenge
Defendants' use of federal procurement statutes to create sweeping new power to issue decrees
over large swaths of the U.S. economy and take over areas of traditional state power.

2.   Through Executive Order 14042, President Biden has arrogated to the Executive Branch the unilateral power to mandate that all employees of federal contractors be vaccinated.  This power grab is sweeping in its scope.  Employees of federal contractors constitute one-fifth of the total U.S. workforce.  And the mandate goes so far as to demand vaccination even from employees who work entirely within their own home.  That is unconstitutional, unlawful, and unwise.

## PARTIES

3.   Plaintiff State of Missouri is a sovereign State of the United States of America.  Missouri sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

4.   Eric S. Schmitt is the 43rd Attorney General of the State of Missouri.  Attorney General Schmitt is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests, or claims any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary."  Mo. Rev. Stat. § 270.060.

5.   Plaintiff State of Nebraska is a sovereign State of the United States of America.  Nebraska sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

6.   Douglas J. Peterson is the Attorney General of Nebraska.  Attorney General Peterson is authorized to bring legal actions on behalf of the State of Nebraska and its citizens.

7.   Plaintiff State of Alaska is a sovereign State of the United States of America.  Alaska sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

8.   Treg R. Taylor is the Attorney General of Alaska.  Attorney General Taylor is authorized to bring legal actions on behalf of the State of Alaska and its citizens.

9.   Plaintiff State of Arkansas is a sovereign State of the United States of America.  Arkansas sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

10. Leslie Rutledge is the Attorney General of Arkansas.  Attorney General Rutledge is authorized to bring legal actions on behalf of the State of Arkansas and its citizens.

11. Plaintiff State of Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

12. The Attorney General of Iowa is authorized and required to prosecute legal actions on behalf of the State of Iowa and its citizens when requested to so by the Governor.

13. Plaintiff State of Montana is a sovereign State of the United States of America.  Montana sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

14. The Attorney General of Montana is authorized to bring legal actions on behalf of the State of Montana and its citizens.

15. Plaintiff State of New Hampshire is a sovereign State of the United States of America. New Hampshire sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

16. The Attorney General of New Hampshire is authorized to bring legal actions on behalf of the State of New Hampshire and its citizens.

17. Plaintiff State of North Dakota is a sovereign State of the United States of America.  North Dakota sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

18. Wayne Stenehjem is the North Dakota Attorney General.  Attorney General Stenehjem is authorized to bring legal actions on behalf of the State of North Dakota and its citizens.  N.D. Cent. Code 54-12-02.

19. Plaintiff State of South Dakota is a body politic created by the Constitution and laws of the State; as such, it is not a citizen of any state.  This action is brought by the State in its sovereign capacity in order to protect the interests of the State of South Dakota and its citizens as *parens*

*patriae*, by and through Jason R. Ravnsborg, the Attorney General of the State of South Dakota. The Attorney General is acting pursuant to his authority to appear for the State and prosecute any civil matter in which the State is a party or interested when, in his judgment, the welfare of the State demands.  S.D. Codified Laws §1-11-1(2).

20. Plaintiff State of Wyoming is a sovereign State of the United States of America.  Wyoming sues to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests.

21. Bridget Hill is the Attorney General of Wyoming.  Attorney General Hill is authorized to bring legal actions on behalf of the State of Wyoming and its citizens.  Wyo. Stat. Ann. § 9-1-603.

22. Collectively, the States of Missouri, Nebraska, Alaska, Arkansas, Iowa, Montana, New Hampshire, North Dakota, South Dakota, and Wyoming are referred to herein as the "Plaintiff States."

23. The Plaintiff States have the authority and responsibility to ensure that the United States does not evade its obligations under the Constitution and deprive their citizens of their rights by adopting a rule designed to evade traditional mechanisms of bicameralism and presentment and democratic processes.  The Plaintiff States thus bring this suit to obtain a declaration that the contractor vaccine mandate is invalid, enjoin its enforcement, and protect the rights the Defendants have violated.

24. The Plaintiff States also bring this suit to protect state interests that the contractor vaccine mandate unconstitutionally and unlawfully impairs.  The contractor vaccine mandate conflicts with state law, negatively affects the well-being of the residents of the Plaintiff States, and seeks to coopt States into enforcing federal policy—a policy that is unconstitutional.

25. Defendants are officials of the United States government and United States governmental agencies responsible for implementing the contractor vaccine mandate.

26. Defendant Joseph R. Biden, Jr., is the President of the United States of America.  He is sued in his official capacity.

27. Defendant United States Office of Personnel Management ("OPM") is an independent federal agency.

28. Defendant Kiran Ahuja is director of OPM and co-chair of the Safer Federal Workforce Task Force.  She is sued in her official capacity.

29. Defendant General Services Administration ("GSA") is an independent federal agency.

30. Defendant Robin Carnahan is administrator of GSA and co-chair of the Safer Federal Workforce Task Force.  She is sued in her official capacity.

31. Defendant Office of Management and Budget ("OMB") is an office within the Executive Office of the President of the United States.

32. Defendant Shalanda Young is Acting Director of the OMB and is a member of the Safer Federal Workforce Task Force.  She is sued in her official capacity.

33. Defendant Safer Federal Workforce Task Force was established on January 20, 2021 by Executive Order 13991.

34. Defendant Jeffrey Zients is co-chair of the Safer Federal Workforce Task Force and is the Biden Administration's COVID-19 Response Coordinator.  He is sued in his official capacity.

35. Defendant Federal Acquisition Regulatory Council ("FAR Council") is responsible for "manag[ing], coordinat[ing], control[ling], and monitor[ing] the maintenance of, issuance of, and changes in the Federal Acquisition Regulation."  41 U.S.C. § 1303(d).  The FAR Council issued guidance that is challenged by this suit.

36. Defendants Lesley A. Field, John M. Tenaglia, Jeffrey A. Koses, and Karla S. Jackson are members of the FAR Council by virtue of their roles in their respective agencies. Defendant Lesley

A. Field is the Acting Administrator for Federal Procurement of OMB. Defendant John M. Tenaglia is the Principal Director of Defense Pricing and Contracting of the Department of Defense. Defendant Jeffrey A. Koses is the Senior Procurement Executive & Deputy Chief Acquisition Officer of GSA. Defendant Karla S. Jackson is the Assistant Administrator for Procurement of NASA. They are sued in their official capacities.

## JURISDICTION AND VENUE

37. This Court has jurisdiction pursuant to 5 U.S.C. §§ 702-703 and 28 U.S.C. §§ 1331, 1361, and 2201.

38. This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201-2202, and its inherent equitable powers.

39. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Defendants are United States agencies or officers sued in their official capacities. Plaintiff State of Missouri is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Complaint occur within this district.

40. The Plaintiff States bring this action to redress harms to their sovereign interests, their quasi-sovereign interests, their proprietary interests, and their interests as *parentes patriae*; and to vindicate their interests under 5 U.S.C. § 702 and 41 U.S.C. § 1707.

## GENERAL ALLEGATIONS

### The Contractor Vaccine Mandate

41. On January 20, 2021, President Biden signed Executive Order 13991, 86 Fed. Reg. 7045, which established the Safer Federal Workforce Task Force ("Task Force") to provide "ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID–19 pandemic." 86 Fed.

Reg. at 7046. The Task Force is headed by three co-chairs: (1) the Director of OPM; (2) the Administrator of GSA; and (3) the COVID–19 Response Coordinator. The Executive Order also required that GSA "provide funding and administrative support for the" Task Force. *Id.*

42. On September 9, 2021, President Biden announced his "new plan to *require* more Americans to be vaccinated" by imposing "new vaccination *requirements*." Joseph Biden, Remarks at the White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (accessed Oct. 28, 2021) (emphasis added).

43. One of those mandates would "*require* all employers with 100 or more employees, that together employ over 80 million workers, to ensure their workforces are fully vaccinated or show a negative test at least once a week." *Id.* (emphasis added).

44. The President also announced plans to "*requir[e]* vaccinations" of "those who work in hospitals, home healthcare facilities, or other medical facilities—a total of 17 million healthcare workers." *Id.* (emphasis added).

45. He further declared that he would "sign an executive order that will now *require* all executive branch federal employees to be vaccinated" and "another executive order that will *require* federal contractors to do the same." *Id.* (emphasis added).

46. And finally, the President announced that he would "*require* all of nearly 300,000 educators in the federal paid . . . Head Start program" to get vaccinated. *Id.* (emphasis added).

47. On September 9, 2021, President Biden signed Executive Order 14042 ("EO 14042"), 86 Fed. Reg. 50,985 (Sept. 14, 2021).  EO 14042 required departments and agencies, including independent establishments, to require contractors and subcontractors to "comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal

Workforce Task Force, provided that the Director of the Office of Management and Budget approves the Task Force Guidance and determines that the Guidance … will promote economy and efficiency in Federal contracting."  § 2(a).

48. EO 14042 delegated the President's Authority under the Federal Property and Administrative Services Act, *see* 40 U.S.C. §§ 101, 121, to the OMB Director under 3 U.S.C. § 301 to "determine whether such Guidance will promote economy and efficiency in Federal contracting . . . ."  § 2(c).

49. EO 14042 said it was effective to new contracts, contract-like instruments, new solicitations for contracts or contract-like instruments, extensions or renewals of contracts or contract-like instruments if the extension or renewal occurred on or after October 15, 2021.  § 6.

50. Acting Director of OMB, Shalanda Young, concluded on September 24, 2021, that compliance with the Task Force's *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, which was also issued on September 24, 2021, would "improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."  86 Fed. Reg. 53,691–92 (Sept. 28, 2021).

51. The Task Force's *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (the "Guidance," attached as Exhibit 1) was never published in the Federal Register.    Rather,    it    is    available    on    the    Task    Force's    website    at: https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20 210922.pdf.  The Guidance defines and delimits the contractor vaccine mandate.

52. Neither the OMB nor the Task Force published the Guidance in the Federal Register for public comment, waited 60 days before the Guidance became effective, provided a waiver from

an authorized officer indicating that "urgent and compelling circumstances ma[d]e compliance with" notice and comment and the effective period impracticable, *see* 41 U.S.C. § 1707(d), or indicated that the Guidance and OMB's conclusion were exempt from notice-and-comment, *see* 5 U.S.C. § 553(b).

53. EO 14042 did not provide for any waiver of public comment or effectiveness date for the Guidance.

54. The Guidance, which includes clarifying FAQs, requires federal contractors and subcontractors to mandate "COVID-19 vaccination of covered contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation."  Ex. 1, at 1. The Guidance also requires a clause in covered contracts specifying that the contractor or subcontractor must comply with the contractor vaccine mandate.  *See* Ex. 1, at 3 (defining "covered contract").

55. The Guidance also imposes mandatory mask policies on contractors, requiring contractors to "ensure that all individuals, including covered contractor employees and visitors, comply with published CDC guidance for masking and physical distancing at a covered contractor workplace." Ex. 1, at 6.

### The FAR Council

56. EO 14042 provided direction to the FAR Council as well.

57. Congress established the FAR Council in 1988 "to assist in the direction and coordination of [g]overnment-wide procurement policy and [g]overment-wide procurement regulatory activities in the [f]ederal [g]overnment."  Office of Federal Procurement Policy Act Amendments of 1988, Pub. L. No. 100-679, § 4, 102 Stat. 4055, *later codified* at 41 U.S.C. § 1302(a).

58. The FAR Council consists of the Office of Federal Procurement Policy Administrator, the Secretary of Defense, the Administrator of NASA, and the Administrator of GSA.  41 U.S.C. § 1302(b)(1).  These officials are authorized to designate another agency official to serve on the FAR Council.  *Id*. § 1302(b)(2).

59. Subject to limited exceptions,[1] the FAR Council has the authority to issue "a single [g]overnment-wide procurement regulation."  *Id*. § 1303(a)(1).

60. No other agency is authorized to issue government-wide procurement regulations.  *Id*. § 1303(a)(2).

61. Section 1707 further protects Congress's reforms to government procurement practices by requiring that any "procurement policy, regulation, procedure, or form"—whether issued government-wide by the FAR Council or for one agency by that agency—be subject to notice and comment.  41 U.S.C. § 1707(a)-(b).  The relevant official may waive that requirement only if "urgent and compelling circumstances make compliance with the requirements impracticable."  *Id*. § 1707(d).

62. EO 14042 instructs the FAR Council to "amend the Federal Acquisition Regulation to provide for inclusion in federal procurement solicitations and contracts subject to this order" a clause stating that the contractor shall, for the duration of the contract, comply with Task Force Guidance.  EO 14042 further instructs agencies to seek to implement this clause in contracts not covered by the Federal Acquisition Regulation ("FAR").  86 Fed. Reg. 50,985–86.

---

[1] For example, the Office of Federal Procurement Policy Administrator may issue government-wide regulations if the Department of Defense, NASA, and GSA are unable to agree on or fail to issue regulations, 41 U.S.C. § 1121(d), and may remove a regulation if it is inconsistent with the Federal Acquisition Regulation, *id*. § 1303(a)(5).

63. On September 30, 2021, the FAR Council—purporting to comply with the executive order—issued its "[g]uidance" entitled "Issuance of Agency Deviations to Implement Executive Order 14042" ("FAR Council guidance").[2]  Ex. 2, at 1-2.  In issuing the FAR Council guidance, the FAR Council did not provide notice or opportunity for public comment.

64. In its guidance, the FAR Council "encourage[s] [agencies] to make . . . deviations" to the FAR, which should be "effective until the FAR is amended" by the FAR Council.  *Id.* at 3.

65. A deviation is a clause that is inconsistent with the FAR.  FAR § 1.401.  The FAR prescribes procedures for making individual deviations and class deviations.  *Id*. §§ 1.403-04.  Deviations are not an appropriate method for implementing a government-wide procurement policy, and "[w]hen an agency knows that it will require a class deviation on a permanent basis, it should propose a FAR revision."  *Id*. § 1.404.

66. The FAR Council guidance contains a draft deviation clause that cites EO 14042 as the single authority for the deviation and contains little substantive content other than requiring compliance with the Task Force Guidance, even if that Guidance is amended during performance of the contract.  FAR Council guidance at 3-5.

67. The FAR Council guidance "reminds" agencies that, under EO 14042, they are "required to include an implementing clause" in new contracts awarded on or after November 14, 2021, new solicitations issued on or after October 15, 2021, and options on existing contracts exercised on or after October 15, 2021.  *Id*. at 2.

---

[2]*See* Memorandum from FAR Council to Chief Acquisition Officers et al. re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30 2021), https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf.

## The Contractor Vaccine Mandate's Scope

68. The U.S. Department of Labor recognizes that "workers employed by federal contractors" comprise "approximately *one-fifth of the entire U.S. labor force*."[3]  This includes similarly large proportions of the labor force in each of the Plaintiff States.

69. The Guidance's definition section highlights the contractor vaccine mandate's broad scope. A "contractor or subcontractor workplace location" "means a location where covered contract employees work, including a covered contractor workplace or Federal workplace."  Ex. 1, at 3. "Covered contractor employee," in turn, "means any full-time or part time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace.  *This includes employees of covered contractors who are not themselves working on or in connection with a covered contract*."  *Id.* at 4 (emphasis added).  "Covered contractor workplace" "means a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is *likely* to be present during the period of performance for a covered contract.  A covered contractor workplace does not include a covered contractor employee's residence."  *Id.* at 4 (emphasis added).

70. On its face, the contractor vaccine mandate therefore applies to employees of a contractor or subcontractor who is a party to a federal contract, even if the work they do is wholly unrelated to the contract, and even if it is not certain they will ever be working in a location with an employee who is actually working on a federal contract.

71. The FAQs clarify that "in connection with" includes "[e]mployees who perform duties necessary to the performance of the covered contract, but who are not directly engaged in

---

[3] DOL, History of Executive Order 11246, Office of Contract Compliance Programs, https://www.dol.gov/agencies/ofccp/about/executive-order-11246-history (last visited Oct. 28, 2021) (emphasis added).

performing the specific work called for by the covered contract, *such as human resources, billing, and legal review*." Ex. 1, at 13 (emphasis added).  Thus, employees who never work directly on a federal contract; who never directly work with an employee working on a federal government contract; or who never work in the same building or location as an employee who works directly on a federal government contract (*e.g.*, completely back-room people), appear to be subject to the contractor vaccine mandate.

72. The FAQs also show the sweeping breadth of the "locations" to which the Guidance applies.  For example, the Guidance applies "to contractor or subcontractor workplace locations that are outdoors." Ex. 1, at 10.  The FAQs also say that even if a contractor's employee works in an entirely separate floor or area or even building or site, they are working in a "covered contractor workplace" "unless a covered contractor can *affirmatively* determine that none of its employees" in the separate area "will come into contact with a covered contractor employee." *Id.* (emphasis added); *see also id.* at 11.  "Contact," the FAQs continue, includes "interactions" in "common areas," such as "elevators," "stairwells," and "parking garages." *Id.* at 10, 11. And if an employee is working completely remotely, but working on a covered federal contract, they still "must comply with the vaccination requirement … even if the employee never works at either a covered contractor workplace or Federal workplace during the performance of the contract." *Id.* at 11.

73. Thus, the Guidance ensures that almost any employee of an organization with a federal contract is a "covered contractor employee" subject to the contractor vaccine mandate.

74. The contractor "must ensure that" all covered employees are "fully vaccinated" by "no later than December 8, 2021" or the "first full day of the period of performance on a newly awarded contract" or a renewed or extended contract.  Ex. 1, at 5.

75. The Guidance FAQs also clarify that the contractor vaccine mandate applies to small businesses.  Ex. 1, at 12.

76. The Guidance FAQs also show that the contractor vaccine mandate preempts any contrary State or local laws or ordinances.  Ex. 1, at 13.

77. The Guidance FAQs also establish that covered contractors must comply with "any new Guidance where the OMB Director approves the Guidance and determines that adherence to the Guidance will promote economy and efficiency in Federal contracting."  Ex. 1, at 13.  To put it another way, the Task Force may change the Guidance, including the contractor vaccine mandate, at any time, and that change will purportedly be binding.

### Exceptions to the Contractor Vaccine Mandate

78. The Guidance does not exempt from the contractor vaccine mandate employees who have had a prior COVID-19 infection.  Ex. 1, at 10.

79. The Guidance does provide an exemption from the contractor vaccine mandate for those with a disability that prevents them from being vaccinated or who seek an exemption "because of a sincerely held religious belief, practice, or observance."  Ex. 1, at 5.  The federal contractor is responsible for reviewing and considering "what, if any, accommodation it must offer."  *Id.*; *see also id.* at 7.

80. The Guidance's FAQs further clarify that federal contractors are "responsible for determining if a covered contractor employee must be provided an accommodation because … of a sincerely held religious belief, practice, or observance."  Ex. 1, 9–10.  "The contractor is responsible for considering, and dispositioning, such requests for accommodations regardless of the covered contractor employee's place of performance."  *Id.* at 10.

81. The Guidance—in a section requiring masks in covered contractor workplaces—provides that those who are "not fully vaccinated," which would include those who received religious exemptions, are subject to more onerous masking requirements.  Ex. 1, at 6.  Specifically, they must wear a mask "regardless of the level of community transmission" and outdoors in crowded settings or where there are "activities that involve sustained close contact with other people who are not fully vaccinated."  *Id.* at 6–7.  They must also socially distance when practicable.  *Id.* at 6. Vaccinated people need not do that.

**Enforcement of the Contractor Vaccine Mandate**

82. Under the Guidance, the employer (the contractor or subcontractor) is responsible for ensuring that a covered contractor employee is fully vaccinated.  *See* Ex. 1, at 5–6.  The contractor or subcontractor "must review its covered employees' documentation to prove vaccination status." *Id.*  Specifically, they "must require covered contractor employees to show or provide their employer with one" of several documents.  *Id.* at 6.

83. If an employee loses their vaccine documentation, the Guidance FAQs suggests that they reach out to State authorities.  *See* Ex. 1, at 9.

84. Federal contractors are responsible for ensuring that subcontractors comply with the contractor vaccine mandate.  The FAQs clarify that prime contractors are "responsible for ensuring that the required clause"—which mandates compliance with the Guidance—"is incorporated into its first-tier subcontracts," with subcontractors doing the same if there are lower-tier contractors. Ex. 1, at 13–14.

85. The Guidance "strongly encourage[s]" contractors to "incorporate similar vaccination requirements into their non-covered contracts and agreements with non-covered contractors whose

16

employees perform work at covered contractor workplaces" but are not otherwise involved with a federal contract.  Ex. 1, at 6.

**The Federal Contractor Vaccine Mandate Harms Plaintiff States**

86. The Guidance, which encompasses the federal contractor vaccine mandate, directly injures the Plaintiff States.

87. Multiple agencies and political subdivisions of the Plaintiff States are contractors with the federal government and are therefore subject to the contractor vaccine mandate, as delineated in the Guidance.   This inflicts direct injury on the Plaintiff States' interests in numerous ways, including but not limited to the following examples:

    a.   The State of Missouri has state agencies that are federal contractors and will be directly affected by the contractor vaccine mandate.

    b.   The contractor vaccine mandate also purportedly preempts Missouri laws and executive orders regarding the issuance of public health orders and the rights and liberties of its citizens.

    c.   The State of Nebraska has various state agencies that are federal contractors and will be directly affected by the contractor vaccine mandate.

    d.   The Nebraska Department of Health and Human Services is a contractor for the federal Centers for Disease Control and Prevention ("CDC").   That Nebraska agency currently has a contract with CDC to provide Vital Statistics Cooperative Program data and to perform special projects related to that program.  The amount of that contract exceeds the simplified acquisition threshold defined in Section 2.101 of the FAR.

    e.   The Nebraska Department of Agriculture is a contractor for the federal Department of Health and Human Services.   That Nebraska agency currently has an animal food

inspection contract with that federal agency.  The amount of that contract exceeds the simplified acquisition threshold defined in Section 2.101 of the FAR.

f.      The Nebraska Department of Education is a contractor for the federal Department of Education.  That Nebraska agency currently has a National Assessment of Educational Progress contract with that federal agency.  The amount of that contract exceeds the simplified acquisition threshold defined in Section 2.101 of the FAR.

g.      The Executive Office of the State of Nebraska is a contractor for the National Oceanic and Atmospheric Administration ("NOAA")—an agency under the federal Department of Commerce.  That Nebraska agency currently has a contract for NOAA Weather Radio maintenance services with that federal agency.  The amount of that contract exceeds the simplified acquisition threshold defined in Section 2.101 of the FAR.

h.      The State of Alaska has several state agencies—including the Department of Health and Human Services, Department of Public Safety, and Department of Corrections, among others—that are federal government contractors and will be directly affected by the contractor vaccine mandate.

i.      The State of Alaska also has several state instrumentalities—including the University of Alaska System and Alaska Railroad—that will be directly affected by the contractor vaccine mandate.

j.      The University of Alaska System operates world-class research facilities, the interruption of which will cause incalculable damage to the State of Alaska and the national scientific community.

k.      The University of Alaska System also operates the DOD-funded Geophysical Detection of Nuclear Proliferation University Affiliated Research Center, which detects,

locates, and assesses the threat potential of nuclear activities worldwide through research, development, testing, and evaluation of scientific and technological capabilities.   The disruption of this program would jeopardize national security and public safety.

l.     The contractor vaccine mandate attempts to override Alaskans' fundamental right to privacy as enshrined in Article I, Section 22 of the Alaska Constitution.  That fundamental right includes the right to make decisions about medical treatment.  The Alaska Supreme Court affirmed that right in *Huffman v. State*, 204 P.3d 339 (Alaska 2009), when it held that an individual's freedom to make medical decisions for themselves is a fundamental right protected under Article I, Section 22.

m.     The contractor vaccine mandate also ostensibly preempts an Alaska statute that broadly protects all Alaskans' rights to object to COVID-19 vaccines "based on religious, medical, *or other* grounds," and that forbids any person from "requir[ing] an individual to provide justification or documentation to support the individual's decision to decline a COVID-19 vaccine."  2021 Alaska Sess. Laws ch. 2, § 17 (emphasis added).

n.     The contractor vaccine mandate also ostensibly preempts Arkansas statutes, including Ark. Code 20-7-143, which prohibits public entities from requiring vaccines, and which is currently in effect; and Ark. Code 11-5-118, which governs private employers (including contractors operating in the state) and requires employees be given a testing option, and which has been enacted and will go into effect in January 2022.

o.     The contractor vaccine mandate also ostensibly preempts a recently enacted Montana statute that generally forbids employers in that State "to refuse employment to a person, to bar a person from employment, or to discriminate against a person in

19

compensation or in a term, condition, or privilege of employment based on the person's vaccination status." Mont. Code Ann. § 49-2-312(1)(b).

p.   The State of South Dakota has several State agencies—including the Department of Transportation, Department of Public Safety, and the Department of Corrections, among others—that are federal government contractors and will be directly affected by the contractor vaccine mandate.

q.   The University of Wyoming, which is a State entity, has a number of federal contracts, including cooperative agreements and subcontracts, with various federal agencies that are either up for a renewal or extension or expected to be awarded to the University in the near future.  The contractor mandate will directly affect this State entity.

r.   Because the Guidance requires contractors and subcontractors—which include agencies and political subdivisions of Plaintiff States—to enforce the contractor vaccine mandate among their employees and subcontractors, it directly infringes the State's sovereign authority.  Agencies and political subdivisions of the Plaintiff States now have a duty to enforce the *federal* contractor vaccine mandate.

s.   Because the Guidance requires contractors and subcontractors—which include agencies and political subdivisions of Plaintiff States—to enforce the contractor vaccine mandate among their employees and subcontractors, the Plaintiff States will face increased costs related to the enforcement.  *See also* Ex. 1, at 8 (requiring contractors to appoint a person to coordinate implementation and compliance with the Guidance).

t.   Because the Guidance requires contractors and subcontractors—which includes agencies and political subdivisions of the Plaintiff States—to enforce the contractor vaccine

mandate, it infringes on rights that the Tenth Amendment guarantees the Plaintiff States by commandeering state officers to enforce federal policy.

    u.    The breadth of the Guidance means that numerous employees of the Plaintiff States who are not involved in any federal contract will have to be vaccinated.  That will not only increase costs to the Plaintiff States, but will also make it harder to retain and attract employees, as current events involving private companies show that vaccine mandates have led to employees quitting or being fired in large numbers rather than getting vaccinated. Furthermore, if States choose to exercise their sovereign prerogative to not require vaccine mandates, they will face loss of federal funds.

    v.    Furthermore, the Guidance's religious exemptions purport to preempt state Religious Freedom Restoration Act (State RFRA) laws and free exercise rights protected by state constitutions.  Because the Guidance purports to preempt those laws, *see* Ex. 1, at 13, it injures the Plaintiff States' ability to comply with their own laws, their sovereign right to enact and enforce their laws, and their interest in protecting the free exercise of religion.

88. The contractor vaccine mandate, as embodied in the Guidance, harms the Plaintiff States beyond the direct harms that flow from the fact that certain agencies and political subdivisions of the Plaintiff States are contractors subject to the mandate, including but not limited to the following:

    a.    Because the Guidance claims to preempt all contrary State law, *see* Ex. 1, at 13, it injures the Plaintiff States' sovereign, quasi-sovereign, and *parens patriae* interests to set their own laws regarding workplace issues that would otherwise apply to contractors within the States' borders, as well as preempting state religious-liberty protections under state RFRAs and state constitutions as noted above.

21

b.   Because the Guidance claims to preempt all contrary State law, *see* Ex. 1, at 13, it injures the Plaintiff States' sovereign, quasi-sovereign, and *parens patriae* interests to set their own laws regarding public health orders.   *See, e.g.,* MO. REV. STAT. § 67.265 (restricting the ability of political subdivisions to issue health orders); Exec. Order No. 21-10 § 3 (Oct. 28, 2021) (Gov. Parson) (prohibiting state agencies from penalizing individuals or businesses for non-compliance with any federal COVID-19 vaccine mandate if the "non-compliance is the result of an individual's sincerely held religious belief or for medical reasons").

c.   Because the Guidance claims to preempt all contrary State law, *see* Ex. 1, at 13, it injures the Plaintiff States' sovereign, quasi-sovereign, and *parens patriae* interests to set their own laws regarding workforce vaccination policies under their "police power—a power which the state did not surrender when becoming a member of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 24–25 (1905).

d.   The Guidance requires employees to prove vaccination status with documentation, and on information and belief, agencies of the Plaintiff States often possess such documentation.   *See* Ex. 1, at 9.   A predictable consequence of the contractor vaccine mandate is thus to increase the number of people seeking documentation from the Plaintiff States regarding vaccination status.   *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).   On information and belief, that will increase costs to the Plaintiff States.

e.   On information and belief, a natural and predictable consequence of the vaccine mandate is that numerous employees may be fired, retire, or quit their jobs, including employees of businesses within the Plaintiff States.   This injures the Plaintiff States' quasi-sovereign and *parens patriae* interest in the economic well-being of their citizens.   It further

injures the Plaintiff States in that it will likely increase the burden on the Plaintiff States' unemployment insurance funds, and it will inflict economic disruption on the States' economies as a whole.

f.    On information and belief, a natural and predictable consequence of the federal contractor vaccine mandate is that employers who are critical to the supply chain, and are also federal contractors, will likely lose significant numbers of employees.  It is entirely predictable, therefore, that the contractor vaccine mandate will exacerbate current supply chain issues.  As a result, prices will continue to rise and cause direct injuries to the Plaintiff States as purchasers.  It will also harm their quasi-sovereign *parens patriae* interest in the economic well-being of their residents, who will suffer from further supply chain disruptions.  *See* Spencer Kimball, *Business Croups Ask White House to Delay Biden COVID Vaccine Mandate Until After the Holidays*, CNBC (Oct. 25, 2021), https://www.cnbc.com/2021/10/25/businesses-ask-white-house-to-delay-biden-covid-vaccine-mandate-until-after-holidays.html ("Worried that President Joe Biden's Covid vaccine mandate for private companies could cause a mass exodus of employees, business groups are pleading with the White House to delay the rule until after the holiday season.").

g.    The contractor vaccine mandate as embodied in the guidance discriminates between citizens of the Plaintiff States who are vaccinated and those who are not, and denies the latter employment opportunities available to the former.  The States have a quasi-sovereign and *parens patriae* interests in protecting their citizens from discriminatory policies.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 609 (1982) ("This Court has had too much experience with the political, social, and moral damage of

23

discrimination not to recognize that a State has a substantial interest in assuring its residents

that it will act to protect them from these evils.").

89. As sovereign states, the Plaintiff States have quasi-sovereign interests in protecting the

rights of their citizens and vindicating them in court.  The States may sue to challenge

constitutional violations that "affect the [States'] public at large."  *In re Debs*, 158 U.S. 561, 584

(1895).

90. Declaratory relief announcing that the federal contractor vaccine mandate, as embodied in

the Guidance, is unlawful, an injunction enjoining enforcement of that mandate, and an order

vacating the Guidance will remedy those harms to the Plaintiff States' interests.

## CLAIMS FOR RELIEF

## COUNT ONE – VIOLATION OF THE PROCUREMENT ACT
### (40 U.S.C. §§ 101 and 121)

91. All preceding Paragraphs of this Complaint are hereby incorporated by reference.

92. The purpose of the Federal Property and Administrative Services Act (Procurement Act)

"is to provide the Federal Government with an economical and efficient system for" enumerated

procurement activities.  40 U.S.C. § 101.  Those activities include "[p]rocuring and supplying

property and nonpersonal services," use and disposal of property, and records management.  *Id.*

93. To fulfill that purpose, the "President may prescribe policies and directives that the

President considers necessary to carry out" the Procurement Act.  40 U.S.C. § 121(a).  "The

policies must be consistent with" the Procurement Act.  *Id.*

94. The contractor vaccine mandate is not consistent with the Procurement Act because it is

not a necessary policy or directive "to provide the Federal Government with an economical and

efficient system for" procurement, including but not limited to for the following reasons.

a.  Far from increasing economy and efficiency in procurement, the contractor vaccine mandate will have deleterious effects on economy and inefficiency by causing the large-scale resignations of unvaccinated employees of federal contractors.  These disruptive consequences will directly oppose both "economy" and "efficiency."  A current survey from the Kaiser Family Foundation found that 72 percent of unvaccinated workers say that they will quit rather than submit to a vaccine mandate.  *See* Chris Isidore et al., *72% of unvaccinated workers vow to quit if ordered to get vaccinated*, CNN.com (Oct. 28, 2021), *at* https://www.cnn.com/2021/10/28/business/covid-vaccine-workers-quit/index.html.  Such mass resignations would impose drastic hardship on working families throughout the Plaintiff States and would also cause massive economic disruption for federal contractors and for the economy at large.  These concerns far outweigh any perceived benefits to economy and efficiency from the contractor mandate.  This is the antithesis of "efficiency and economy."

b.  The reach of the contractor vaccine mandate, as evidenced in the Guidance, is too broad to be consistent with the Procurement Act.  Even assuming that vaccinated employees do promote efficiency "by reducing absenteeism and decreasing labor costs," as OMB said, 86 Fed. Reg. 53,692, the Guidance applies to employees who work remotely and employees who have the most fleeting interactions with employees working on federal contracts.  Such breadth is unnecessary to prevent the spread of COVID-19, and so completely unconnected with any possible rationale relating to economy and efficiency.

25

    c.   The Guidance's application to subcontractors has no direct connection to federal procurement and thus lies outside the Procurement Act.

    d.   Because even vaccinated individuals can spread COVID-19, among other reasons, the contractor vaccine mandate, insofar as it seeks to promote economy and efficiency by limiting the spread of the virus, *see* EO 14042 § 1, is not appropriately tailored to achieve its goals.

    e.   The Guidance undermines economy and efficiency, and exceeds the Government's statutory authorization, in other ways as well.

95. The contractor vaccine mandate is not statutorily authorized by the Procurement Act. Nowhere in the Procurement Act is there a clear statement from Congress indicating that the Act permits rules like the contractor vaccine mandate, as embodied in the Guidance.  But such a rule is necessary where, as here, the federal action involves issues "of deep 'economic and political significance.'"  *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000))).  Likewise, a clear statement is required before a statute is interpreted to push the limits of Congress's authority under the Commerce Clause or disrupt the federal-state balance of authority between the federal government and the States—both of which the Guidance purports to do.  No such clear statement appears in this statute.

96. The contractor vaccine mandate's application to subcontractors has no direct connection to federal procurement, and thus does not fall within the purview of the Procurement Act.

97. For those reasons, the Guidance is inconsistent with the Procurement Act and is invalid.

### COUNT TWO – VIOLATION OF PROCUREMENT POLICY ACT
### (41 U.S.C. § 1707)

98. All preceding Paragraphs of this Complaint are hereby incorporated by reference.

99. Under the Office of Federal Procurement Policy Act (OFPPA), procurement policies must be published for public comment in the Federal Register for 60 days before taking effect if the policy "relates to the expenditure of appropriate funds" and either "has a significant effect beyond the internal operating procedures of the agency issuing the policy" or "has a significant cost or administrative impact on contractors."  41 U.S.C. § 1707(a)(1).

100.     The Guidance, including the contractor vaccine mandate contained therein, is a procurement "policy" and also a procurement "procedure" under 41 U.S.C. § 1707(a).

101.     The Guidance, including the contractor vaccine mandate contained therein, relates to the expenditure of appropriated funds; has a significant effect beyond internal operating procedures; and imposes a significant cost and administrative impact on contractors and offerors.

102.     Defendants failed to publish the Guidance in the Federal Register for public comment, as required by 41 U.S.C. § 1707.  Nor did Defendants provide the required 60-day comment period before it became effective.  *Id.*  This includes OMB's short statement that the Guidance promotes economy and efficiency in the procurement process.  Neither the Guidance itself, nor that statement, complied with the procedural requirements of § 1707.

103.     No authorized officer ever waived the requirements of the Procurement Policy Act as applied to the Guidance or to the vaccine mandate contained therein.

104.     Defendants failed to comply with the requirements of the Procurement Policy Act when issuing the Guidance, including the contractor vaccine mandate. The Guidance, including its vaccine mandate, is therefore unlawful.

**COUNT THREE – UNLAWFUL USURPATION OF STATES' POLICE POWERS**

105.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

106.      The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

107.      That power includes the "police power" that is "inherent in the states" and is "reserved from the grant of powers to the federal government by the Constitution." *United States v. Constantine*, 296 U.S. 287, 295–96 (1935).   The power to impose vaccine mandates—to the extent that it exists at all—can only be part of the police powers reserved to the States.

108.      The federal government does not possess the general power to impose the contractor vaccine mandate.  That power, to the extent it exists at all, remains with the Plaintiff States.

## COUNT FOUR – VIOLATION OF ANTI-COMMANDEERING DOCTRINE

109.      All preceding Paragraphs of this Complaint are hereby incorporated by reference.

110.      The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

111.      That amendment, along with basic structural features of the Constitution, deprives Congress of "the power to issue direct orders to the governments of the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018).  The Constitution thus does not tolerate the federal government dragooning State officers "into administering federal law." *Printz v. United States*, 521 U.S. 898, 928 (1997)

112.      The contractor vaccine mandate violates the anti-commandeering doctrine by requiring agencies and political subdivisions of the Plaintiff States to enforce the contractor vaccine mandate against their own employees—including, most egregiously, employees that have

nothing to do with federal contracts or those who are working remotely—and against their subcontractors.

## COUNT FIVE – PROCEDURAL VIOLATION OF THE APA
### (OMB Conclusion)

113.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

114.     OMB is a federal agency subject to the requirements of the Administrative Procedure Act ("APA").

115.     Under the APA, courts may "hold unlawful and set aside agency action … found to be … without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

116.     Assuming that OMB's conclusion that the Guidance would "promote economy and efficiency in Federal contracting," which caused that Guidance to apply to all agency contracts with federal contractors, is not subject to the Procurement Policy Act, it is an agency rule within the meaning of the APA.  *See* 5 U.S.C. § 551(4).

117.     That conclusion is a major agency action that could not be lawfully conducted without compliance with APA procedures, such as notice-and-comment rulemaking.

118.     OMB did not seek input from stakeholders or the public, and did not provide any public notice and comment period before concluding that the Task Force's Guidance would promote economy and efficiency in federal contracting.

119.     The adoption and promulgation of the Guidance, including the federal contractor vaccine mandate, is a major agency action that could not lawfully be conducted without compliance with APA procedures such as notice-and-comment rulemaking.

120.     OMB's conclusion that the Guidance would promote economy and efficiency, thus promulgating the Guidance as a binding rule on agencies and federal contractors, did not comply with APA procedural requirements and should be held unlawful and set aside.

29

## COUNT SIX – SUBSTANTIVE VIOLATION OF THE APA
### (OMB Conclusion)

121.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

122.     OMB is a federal agency subject to the requirements of the APA.

123.     OMB's adoption and promulgation of the Guidance on the basis that it would promote economy and efficiency in federal contracting was a major agency action that could not lawfully be conducted without compliance with the APA.

124.     Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5  U.S.C. § 706(2)(A).

125.     The APA also prohibits agency action that is "in excess of statutory jurisdiction, authority, limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

126.     Under the APA, federal administrative agencies are required to engage in "reasoned decision-making."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 379 (1998) (cleaned up).  In other words, "agency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem."  *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (cleaned up).  Failing to consider important costs of a new policy or the efficacy of a policy, for example, renders the policy arbitrary and capricious.

127.     In adopting the Guidance and determining that it would promote economy and judicial efficiency in federal contracting, OMB did not engage in reasoned decisionmaking.

128.     First, on information and belief, OMB failed conduct its own independent analysis but relied heavily on the Guidance.  The Guidance does not display reasoned decisionmaking, but instead ignored important aspects of the problem, including but not limited to economic impacts, cost to States, cost to citizens, labor-force and supply-chain disruptions, the current risks of

30

COVID-19, and basic distinctions among workers such as those with natural immunity to COVID-19 and those who work remotely or with limited in-person contacts, among other important aspects of the problem.

129.    Second, there is no evidence to conclude that OMB engaged in "decisionmaking" at all—whether reasoned or not.  OMB's conclusion that Guidance would "promote economy and efficiency in Federal contracting" contained no explanation at all, so it did not "rest[ ] on a consideration of the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 750 (2015).  For instance, OMB's reasoning ignores costs to the States, State agencies, citizens, and the economy, which is a "centrally relevant factor when deciding whether to regulate," *id*. at 752-53, especially when directed to determine whether the regulations would "promote economy and efficiency."

130.    There is also additional evidence that OMB failed to engage in reasoned decisionmaking.  Among other reasons:

   a.    OMB also did not consider the effect of large-scale resignations of unvaccinated employees of federal contractors, especially in an economy already experiencing high levels of inflation, labor shortages, and a supply-chain crisis.

   b.    OMB did not consider the effect this would have on States, which incur costs associated with enforcing the vaccine mandate within their agencies and political subdivisions that are federal contractors.

   c.    OMB did not provide an exemption to persons with natural immunity to COVID-19, even though natural immunity exists and is at least as effective as vaccination in preventing re-infection, transmission, and severe health outcomes.

   d.    OMB did not provide an exemption for contractors who work in their own homes or who are otherwise isolated from others while working.

e.  OMB failed to consider whether the Guidance's religious exemption was consistent with State RFRAs or the Federal RFRA.  Instead, OMB unlawfully delegated authority to private entities, *i.e.*, federal contractors, to dictate the scope of their own employees' religious exemptions, instead of protecting employees' religious freedom as required by federal law.

131.    On information and belief, the Guidance and OMB's approval of it failed to consider the fact that contractor vaccine mandate will have a disparate impact on minority and economically disadvantaged communities that have relatively low rates of vaccination, and will inflict disproportionately greater unemployment, job losses, and economic injury on those disadvantaged communities.

132.    OMB failed to consider the fact that its actions were contrary to law, as they were not authorized by the Procurement Act, the Procurement Policy Act, federal RFRA, or any other federal statute, and were also unconstitutional, as the Guidance violates the Tenth Amendment and was premised on an unconstitutional Executive Order.

133.    Ultimately, OMB's decision that the Guidance would improve efficiency by reducing absenteeism and decreasing labor costs is facially pretextual.  The OMB rule, in reality, is a blatant attempt to federalize public health.  *See* Ex. 2, at 3 (encouraging agencies "to apply [the Guidance] broadly" "[t]o maximize the goal of getting more people vaccinated and decrease the spread of COVID-19").

134.    Thus, OMB's promulgation of the Guidance, including the contractor vaccine mandate and masking rules, via its conclusion that it will promote economy and efficiency, is arbitrary, capricious, and unlawful under the APA and should be set aside.

## COUNT SEVEN – SUBSTANTIVE VIOLATION OF THE APA
## AGENCY ACTION NOT IN ACCORDANCE WITH LAW
## AND IN EXCESS OF AUTHORITY

### (OMB Conclusion)

135.　　　All preceding Paragraphs of this Complaint are hereby incorporated by reference.

136.　　　Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

137.　　　The OMB rule adopting the Task Force guidance is contrary to law for at least four reasons.

138.　　　*First*, the OMB rule violates 41 U.S.C. § 1303(a) because it is a government-wide procurement regulation, which only the FAR Council may issue.

139.　　　EO 14042 apparently seeks to circumvent § 1303 by delegating the President's Procurement Act power to the OMB Director.

140.　　　That attempt is unlawful because the President has no authority to issue regulations under § 1303—only the FAR Council may issue government-wide procurement regulations. *See Centralizing Border Control Policy Under the Supervision of the Attorney General*, 26 Op. OLC 22, 23 (2002) ("Congress may prescribe that a particular executive function may be performed only by a designated official within the Executive Branch, and not by the President.")

141.　　　*Second*, and relatedly, the OMB rule is contrary to law because the Procurement Act does not otherwise grant the President the power to issue orders with the force or effect of law. Congress authorized the President to "prescribe policies and directives that the President considers necessary to carry out" the Procurement Act.  40 U.S.C. § 121(a).  "[P]olicies and directives" describe the President's power to direct the exercise of procurement authority throughout the government.  It does not authorize the President to issue regulations himself.

33

142.     Congress knows how to confer the power to "prescribe regulations," as it expressly authorized the GSA Administrator to do so in the same section.  *Id*. § 121(c); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").  And Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realm of foreign affairs and national defense.  *See, e.g.,* 18 U.S.C. § 3496 ("The President is authorized to prescribe regulations governing the manner of executing and returning commissions by consular officers . . . ."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").

143.     *Third*, even if the Procurement Act authorized the President to issue orders with the force or effect of law, it would not authorize approval of the Task Force guidance.  The President appears to assume that the Procurement Act authorizes him to issue any order that he believes, as the Procurement Act's statement of purpose states, promotes "an economical and efficient" procurement system.  40 U.S.C. § 101; *see* 86 Fed. Reg. at 50,985 ("This order promotes economy and efficiency in [f]ederal procurement.").  But that mistakes a prefatory purpose statement for a grant of authority.  *D.C. v. Heller*, 554 U.S. 570, 578 (2008) ("[A]part from [a] clarifying function, a prefatory clause does not limit or expand the scope of the operative clause.").

144.     And even if the Procurement Act did authorize the President to issue binding procurement orders solely because they may promote economy and efficiency, the OMB rule does not adequately do so.  Providing the federal government with an "economic and efficient system for" procurement is not a broad enough delegation to impose nationwide social policy that Congress has not separately authorized.  Further, EO 14042 is divorced from the practical needs of procurement.  It will exclude otherwise competitive bidders, cause contractors to suffer labor

shortages, and is substantially overbroad in, for example, refusing to account for natural immunity and the low transmission risk for COVID-19 outdoors.

145.     *Fourth*, the OMB rule is inconsistent with the requirements of the Competition in Contracting Act, which requires federal agencies to provide for "full and open competition through the use of competitive procedures." 41 U.S.C. § 3301; *see* 40 U.S.C. § 121(a) (requiring "policies" issued by the President pursuant to the Procurement Act to be "consistent with this subtitle"); *id*. at § 111 (defining "this subtitle" in 40 U.S.C. § 121(a) as to also refer to division C (except §§ 3302, 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of title 41).

146.     Because the OMB rule violates § 1303(a), seeks to exercise a delegated power the President does not possess, relies on a misreading of FPASA, and violates § 3301, it is contrary to law.

## COUNT EIGHT – APA VIOLATIONS
## AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW AND IS IN EXCESS OF AUTHORITY
### (FAR Guidance)

147.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

148.     The Guidance issued by the FAR Council, while stylized as "guidance," is in reality binding on regulated parties and so reviewable. *See Iowa League of Cities v. EPA*, 711 F.3d 844, 862–63 (8th Cir. 2013).

149.     The Guidance does not explain what authority enables the FAR Council to create a government-wide procurement regulation mandating vaccines for contractors.  For the reasons set forth above, the Procurement Act does not provide that authority.

150.     The Guidance issued by the FAR Council is unlawful and in excess of statutory authority for all the reasons stated above with respect to the actions of OMB.

## COUNT NINE – APA AND STATUTORY VIOLATIONS
## ARBITRARY AND CAPRICIOUS AGENCY ACTION AND VIOLATION OF NOTICE-AND-COMMENT REQUIREMENTS

### (FAR Guidance)

151.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

152.     Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5  U.S.C. § 706(2)(A).

153.     The APA also prohibits agency action that is "in excess of statutory jurisdiction, authority, limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

154.     The APA also prohibits agency action that was conducted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), and it requires procedures such as notice-and-comment rulemaking, *see* 5 U.S.C. § 553.

155.     41 U.S.C. § 1707 likewise requires the FAR Council to engage in notice-and-comment rulemaking in this context.

156.     The FAR guidance is arbitrary and capricious for the same reasons that OMB's adoption of the Task Force guidance was, as described more fully in the counts above.

157.     The FAR guidance violates the APA because it was issued without engaging in procedures required by law, including notice-and-comment rulemaking procedures, as described more fully in the allegations above.

### COUNT TEN – SEPARATION OF POWERS

158.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

159.     Our Constitution creates a federal government of limited and enumerated powers, and this limitation applies to the Executive Branch.

160.     Any action of the Executive Branch must come from one of two sources of authority: (1) a valid delegation of authority by statute enacted by Congress, or (2) a direct exercise of one of the President's enumerated powers in Article II.  "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

161.      Where "[t]here is no statute that expressly authorizes the President to take" an action and no "act of Congress … from which such a power can fairly be implied," the action is not authorized by an act of Congress.  *Id.*

162.     In the absence of such an express or implied authorization by act of Congress, "if the President had authority to issue the order he did, it must be found in some provisions of the Constitution."  *Id.* at 587.

163.     Article II confers no authority on the President to exercise any legislative function without a delegation of authority by statute enacted by Congress.

164.     EO 14042 purports to bind federal agencies to require in all contracts a clause incorporating the Guidance, including the contractor vaccine mandate and mask requirements, based on OMB's conclusion that the Guidance would "promote economy and efficiency."  *See* EO 14042 § 2(a).  That includes parts of the Guidance applying to employees with little to no nexus to federal contracting programs.

165.     By purporting to bind agencies and contractors to the Guidance—including the contractor vaccine mandate and masking requirements—after a finding of economy and efficiency by OMB, EO 14042 unconstitutionally and unlawfully seeks to exercise a quintessentially legislative power that the Constitution vests exclusively in Congress under Article I, Section 1.

166.     To put it another way, the delegation that EO 14042 purported to give to OMB is the type of delegation that is inherently legislative, and so that delegation needed to go through bicameralism and presentment.

167.     Congress did not delegate the authority to dictate vaccine and mask mandates on federal contractors—which would include agencies and political subdivisions of States—to the President or OMB.  Indeed, consistent with the non-delegation doctrine, Congress likely could not have validly delegated such sweeping and indeterminate authority, with enormous potential impact on the U.S. economy, to a single federal agency—and certainly could not have done so without an extremely clear statement of congressional intent.  No such statement—and no such statute—exists here.

168.     Accordingly, EO 14042 violates the Constitution's separation of powers.

**COUNT ELEVEN – VIOLATION OF TENTH AMENDMENT AND FEDERALISM**

169.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

170.     The structure of the U.S. Constitution and the text of the Tenth Amendment protects federalism.

171.     The powers not delegated by the Constitution to the United States or prohibited by it to the States are reserved to the States.

172.     Defendants, through their vaccine mandate, have exercised power far beyond what was delegated to the federal government by constitutional mandate or congressional action.

173.     Neither Article II of the U.S. Constitution nor any act of Congress authorizes Defendants to implement their vaccine mandate.

174.     The power to impose vaccine mandates, to the extent that any such power exists, is a power reserved to the States.

38

175.     By interfering with the traditional balance of power between the States and the federal government, and by acting pursuant to *ultra vires* federal action, Defendants violated the Tenth Amendment and structural principles of federalism.

176.     Defendants' mandate was thus adopted pursuant to an unconstitutional exercise of authority and must be invalidated.

**COUNT TWELVE – UNCONSTITUTIONAL EXERCISE OF THE SPENDING POWER**

177.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

178.     The contractor vaccine mandate is an unconstitutional condition on the Plaintiff States' receipt (by and through their agencies and political subdivisions who are federal contractors) of federal funds.

179.     "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

180.     Federal contracts are an exercise of the Spending Clause, yet the challenged actions ask the Plaintiff States to agree to an ambiguous contract term—specifically, agreeing to comply with Guidance that can be changed at any time.

181.     Nor does the Procurement Act provide the requisite notice to States who are federal contractors or have agencies and political subdivisions that are federal contractors, like the Plaintiff States, that the contractor vaccine mandate would be a condition of their contract.

182.     "[C]onditions on federal funds must be related to the federal interest in particular national projects or programs." *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009).

183.     Because the contractor vaccine mandate is not necessary, nor necessarily effective, at preventing the spread of COVID-19, and, on information and belief, will lead to employees

either being fired or resigning, it is not rationally related to any federal interest in a particular project or program that is the subject of a federal contract.

184.     Because the contractor vaccine mandate, as embodied in the Guidance, covers employees who have no connection to the federal contract beyond just being coworkers with an employee who works on such a contract and being likely to come into contact with them, the mandate is not rationally related to any federal interest in a particular project or program that is the subject of a federal contract.

185.     "[C]onditions must not be prohibited by other constitutional provisions." *Van Wyhe*, 581 F.3d at 650.

186.     As described above, the contractor vaccine mandate is prohibited by the Tenth Amendment and Free Exercise Clause.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff States ask this Court to issue an order and judgment:

A. Declaring unconstitutional, pursuant to 28 U.S.C. § 2201, the Guidance, including the contractor vaccine mandate;

B. Declaring unconstitutional, pursuant to 28 U.S.C. § 2201, EO 14042 as violating the separation of powers;

C. Declaring unconstitutional and unlawful, pursuant to 28 U.S.C. § 2201, the FAR Council guidance;

D. Declaring, pursuant to 28 U.S.C. § 2201, that OMB's conclusion that the Guidance promotes economy and efficiency is unlawful under the Federal Procurement Act and the Procurement Policy Act;

E.  Declaring, pursuant to 28 U.S.C. § 2201, that OMB's conclusion that the Guidance promotes economy and efficiency is unlawful and arbitrary and capricious under the APA;

F.  Declaring, pursuant to 28 U.S.C. § 2201, that the Task Force Guidance, including the contractor vaccine mandate, is unlawful under the Federal Procurement Act and the Procurement Policy Act;

G.  Declaring, pursuant to 28 U.S.C. § 2201, that the Task Force Guidance, including the contractor vaccine mandate, is unlawful and arbitrary and capricious under the APA;

H.  Declaring, pursuant to 28 U.S.C. § 2201, that the Task Force Guidance, including the contractor vaccine mandate, is not a constitutional exercise of Congress's spending power;

I.  Declaring, pursuant to 28 U.S.C. § 2201, that the FAR Council guidance, including the contractor vaccine mandate, is unlawful under the APA;

J.  Declaring, pursuant to 28 U.S.C. § 2201, that the FAR Council guidance, including the contractor vaccine mandate, is arbitrary and capricious under the APA;

K.  Enjoining Defendants from imposing the Guidance, including the vaccine mandate and masking requirements, on federal contractors;

L.  Enjoining Defendants from imposing the FAR Council guidance, including the vaccine mandate and masking requirements, on federal contractors;

M.  Enjoining Defendants from issuing any COVID-19 requirements on federal contractors without first following the required notice-and-comment procedures of the Procurement Policy Act and APA;

N.  Set aside OMB's conclusion that the Task Force Guidance promotes economy and efficiency;

O.  Set aside the FAR Council's guidance; and

P.  Grant any and all other relief the Court deems just and proper.

41

Dated: October 29, 2021                        Respectfully submitted,


**DOUGLAS J. PETERSON**                         **ERIC S. SCHMITT**
**Attorney General of Nebraska**                **Attorney General of Missouri**

*/s/ James A. Campbell*                         */s/ Justin D. Smith*
James A. Campbell*                              Justin D. Smith, #63253MO
  *Solicitor General of Nebraska*                 *Deputy Attorney General of Missouri*
Office of the Nebraska Attorney General         Missouri Attorney General's Office
2115 State Capitol                              Post Office Box 899
Lincoln, NE 68509                               Jefferson City, MO 65102
(402) 471-2686                                  (573) 751-8807
Jim.Campbell@nebraska.gov                       Justin.Smith@ago.mo.gov
*Counsel for Plaintiffs*                         *Counsel for Plaintiffs*


*Admission application forthcoming*


**TREG R. TAYLOR**
**Attorney General of Alaska**
*/s/ Cori Mills*
Cori M. Mills
    *Deputy Attorney General of Alaska*
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501-1994
(907) 269-5100
Cori.Mills@alaska.gov
*Counsel for State of Alaska*

**LESLIE RUTLEDGE**
**Arkansas Attorney General**
*/s/ Vincent M. Wagner*
Vincent M. Wagner
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas  72201
(501) 682-8090
vincent.wagner@arkansasag.gov

42

JEFFREY S. THOMPSON
Solicitor General
SAMUEL P. LANGHOLZ
Assistant Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov
*Counsel for State of Iowa*

**AUSTIN KNUDSEN**
**Attorney General of Montana**
KRISTIN HANSEN
Lieutenant General
DAVID M.S. DEWHIRST
Solicitor General
CHRISTIAN B. CORRIGAN
Assistant Solicitor General
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406-444-2026
David.Dewhirst@mt.gov
Christian.Corrigan@mt.gov
*Counsel for State of Montana*

**JOHN M. FORMELLA**
**New Hampshire Attorney General**
*/s/ Anthony J. Galdieri*
Anthony J. Galdieri
Solicitor General
NEW HAMPSHIRE DEPARTMENT OF JUSTICE
33 Capitol Street
Concord, NH 03301
Tel: (603) 271-3658
Anthony.J.Galdieri@doj.nh.gov
*Counsel for State of New Hampshire*

**WAYNE STENEHJEM**
**Attorney General of North Dakota**
*/s/ Matthew A. Sagsveen*
Matthew A. Sagsveen
Solicitor General
State Bar ID No. 05613
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
masagsve@nd.gov
*Counsel for State of North Dakota*

**JASON R. RAVNSBORG**
**South Dakota Attorney General**
*/s/ David M. McVey*
David M. McVey
Assistant Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD  57501-8501
Phone: 605-773-3215
E-Mail: david.mcvey@state.sd.us
*Counsel for State of South Dakota*

**BRIDGET HILL**
  **Wyoming Attorney General**
*/s/ Ryan Schelhaas*
Ryan Schelhaas
  Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov
*Attorneys for the State of Wyoming*