**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| STATE OF MISSOURI, <br> STATE OF NEBRASKA, <br> STATE OF ALASKA, <br> STATE OF ARKANSAS, <br> STATE OF IOWA, <br> STATE OF MONTANA, <br> STATE OF NEW HAMPSHIRE, <br> STATE OF NORTH DAKOTA, <br> STATE OF SOUTH DAKOTA, <br> STATE OF WYOMING, <br><br>       *Plaintiffs*, <br><br>   v. <br><br> JOSEPH R. BIDEN, et al., <br><br>       *Defendants*. | No. 4:21-cv-01300 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
<u>PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 2

    I.    Creation of the Safer Federal Workforce Task Force. ....................................... 2

    II.    President Biden's September 9, 2021, Speech Announces Federal Vaccine Mandates. ..... 2

    III.    Executive Order 14042's Vaccine Mandate for Federal Contractors. ............................ 4

    IV.    The Task Force's Guidance Adopts a Sweeping Vaccine Mandate. ............................ 8

    V.    OMB's Perfunctory "Notice of Determination" on the Task Force Guidance. ............... 11

    VI.    The FAR Council Drafts a Contract Clause to Adopt the Task Force Guidance .......... 12

    VII.    The Federal Contractor Vaccine Mandate's Disruptive Impact. .................................... 14

ARGUMENT ............................................................................................................. 15

    I.    The Plaintiff States Are Likely To Succeed on the Merits of Their Claims. .................... 15

        A.    The Contractor Vaccine Mandate Exceeds the President's Statutory Authority Under the Procurement Act. ........................................................................................ 16

        B.    The Contractor Vaccine Mandate Is Arbitrary and Capricious. ................................ 25

        C.    The Contractor Vaccine Mandate Violates the Procurement Policy Act. .................. 31

        D.    The Contractor Mandate Exceeds Congress's Enumerated Powers and Unconstitutionally Infringes on the Authority of the States. ................................. 33

    II.    The Balancing of Harms and the Public Interest Support an Injunction. ........................ 37

        A.    Absent an Injunction, Plaintiff States Will Suffer Irreparable Harm to Their Sovereign, Quasi-Sovereign, and Proprietary Interests. ....................................... 37

        B.    Blocking the Enforcement of the Unlawful and Unconstitutional Mandate Will Inflict No Cognizable Harm on the Federal Government. ................................................ 42

        C.    The Public Interest Strongly Favors an Injunction. .................................................. 42

CONCLUSION .......................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ............................................................................................ 39

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,*
    141 S. Ct. 2485 (2021) (per curiam ......................................................... 24, 25, 42

*Alden v. Maine,*
    527 U.S. 706 (1999) ............................................................................................... 43

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) ............................................................................................... 40

*Alphapointe v. Dep't of Dep't of Veterans Affairs,*
    416 F. Supp. 3d 1 (D.D.C. 2019) ........................................................................ 25

*Bailey v. United States,*
    516 U.S. 137 (1995) ............................................................................................... 32

*Bennet v. Spear,*
    520 U.S. 154 (1997) ........................................................................................ 26, 27

*Bond v. United States,*
    564 U.S. 211 (2011) ............................................................................................... 43

*Bond v. United States,*
    572 U.S. 844 (2014) ........................................................................................ 21, 22

*Building & Const. Trades Council of the Metro. Dist. v. Assoc. Builders & Contractors of Massachusetts/Rhode Island, Inc.,*
    507 U.S. 218 (1993) ............................................................................................... 17

*Chamber of Commerce of the U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ....................................................................... 17, 18

*Coal. for Econ. Equity v. Wilson,*
    122 F.3d 718 (9th Cir. 1997) ................................................................................ 39

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,*
    640 F.2d 109 (8th Cir. 1981) (en banc ................................................................ 15

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) .......................................................................................... 31

*Dep't of Homeland Security v. Regents of Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ................................................................................. *passim*

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
   485 U.S. 568 (1988) ......................................................................................... 24

*Elrod v. Burns,*
   427 U.S. 347 (1976) ......................................................................................... 40

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ..................................................................................... 28

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ......................................................................................... 29

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) ............................................................................... 27, 28

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ......................................................................................... 23

*FERC v. Mississippi,*
   456 U.S. 742 (1982) ......................................................................................... 43

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ............................................................................... 21, 37, 43

*Harrison v. PPG Indus., Inc.,*
   446 U.S. 578 (1980) ......................................................................................... 26

*Huffman v. State,*
   204 P.3d 339 (Alaska 2009) ............................................................................ 38

*Hyatt v. OMB,*
   908 F.3d 1165 (9th Cir. 2018) ......................................................................... 25

*Jacobson v. Massachusetts,*
   197 U.S. 11 (1905) ............................................................................... 1, 22, 34

*KH Outdoor, LLC v. City of Trussville,*
   458 F.3d 1261 (11th Cir. 2006) ....................................................................... 42

*King v. Burwell,*
   576 U.S. 473 (2015) ......................................................................................... 23

*Land Shark Shredding, LLC v. United States,*
   842 F. App'x 589 (Fed. Cir. 2021) .................................................................. 25

*League of Women Voters of U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................. 42

*Make Liberty Win v. Ziegler,*
    478 F.Supp.3d 805 (W.D. Mo. 2020) ................................................... 42

*Maryland v. King,*
    567 U.S. 1301 (2012) ............................................................................ 39

*Meyer v. Bush,*
    981 F.2d 1288 (D.C. Cir. 1993) ........................................................... 25

*Mgmt. Ass'n for Private Photogrammetric Surveyors v. United States,*
    492 F. Supp. 2d 540 (E.D. Va. 2007) ................................................... 26

*Michigan v. EPA,*
    576 U.S. 743 (2015) ........................................................................ 30, 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................... 27, 28, 30

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ................................................................. 42

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S.  (2007) ................................................................................... 28

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ..................................................... 34, 35, 36, 37

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) ........................................................................... 39

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932) ............................................................................. 43

*New York v. United States,*
    505 U.S. 1448 (1992 ................................................... 33, 34, 37, 43

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................. 42

*Org. for Black Struggle v. Ashcroft,*
    978 F.3d 603 (8th Cir. 2020) ............................................................... 39

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ................................................................................. 35

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
    734 F.3d 406 (5th Cir. 2013) ............................................................... 39

*Printz v. United States*,
 521 U.S. 898 (1997) .................................................................................... 36

*Privacy Info Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence*,
 466 F. Supp. 3d 100 (D.D.C. 2020) ............................................................ 26

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
 141 S. Ct. 63 (2020) .................................................................................... 33

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947) .................................................................................... 27

*Sierra Club v. Andrus*,
 581 F.2d 895 (D.C. Cir. 1974) .................................................................... 25

*Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. U.S. Corps of Eng'rs*,
 888 F.3d 906 (8th Cir. 2018) ................................................................ 26, 27

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*,
 531 U.S. 159 (2001) .................................................................................... 23

*Sosa v. Alvarez-Machain*,
 542 U.S. 692 (2004) .................................................................................... 17

*Soucie v. David*,
 448 F.2d 1067 (D.C. Cir. 1971) .................................................................. 25

*Thunder Basin Coal Co. v. Reich*,
 510 U.S. 200 (1994) .................................................................................... 40

*United States v. Bass*,
 404 U.S. 336 (1971) ................................................................................ 21, 22

*Util. Air Regulatory Grp. v. EPA*,
 573 U.S. 302 (2014) .................................................................................... 23

*Van Wyhe v. Reisch*,
 581 F.3d 639 (8th Cir. 2009) ...................................................................... 35

*Watkins Inc. v. Lewis*,
 346 F.3d 841 (8th Cir. 2003) ................................................................ 15, 37

*Whitman v. Am. Trucking Ass'ns*,
 531 U.S. 457 (2001) .................................................................................... 26

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 US 579 (1952) ...................................................................................... 16

*Zucht v. King*,
   260 U.S. 174 (1922)..........................................................................................34

**Constitutions**

U.S. Const. art. I, § 8, cl. 1 .........................................................................................35

U.S. CONST. amend. X. .................................................................................................34

**Statutes**

3 U.S.C. § 301 ...................................................................................................... 6, 16

5 U.S.C. § 553................................................................................................... 12, 33

5 U.S.C. § 702 ...........................................................................................................25

5 U.S.C. § 706 ...........................................................................................................27

18 U.S.C. § 3496 .......................................................................................................17

32 U.S.C. § 110 .........................................................................................................17

40 U.S.C. § 101 .........................................................................................................16

40 U.S.C. § 121 ................................................................................................... 18, 19

41 U.S.C. § 1301 .......................................................................................................19

41 U.S.C. § 1302 ................................................................................................. 12, 20

41 U.S.C. § 1303 ...........................................................................................20, 21, 26

41 U.S.C. § 1707 ................................................................................................*passim*

Ark. Code 11-5-118 ...................................................................................................39

Ark. Code 20-7-143 ...................................................................................................39

Mo. Rev. Stat. § 1.302 ...............................................................................................38

Mo. Rev. Stat. § 67.265 .............................................................................................38

Mont. Code Ann. § 49-2-312 .....................................................................................39

Pub. L. No. 100-679, § 4, 102 Stat. 4055 ........................................................... 12, 20

**Regulations**

Section 2.101 of the Federal Acquisition Regulation ............................................ 7, 14

**Other Authorities**

Joseph Biden, Remarks at the White House (Sept. 9, 2021) ................................................ *passim*

Chris Isidore & Virginian Langmaid, *72% of unvaccinated workers vow to quit if ordered to get vaccinated*, CNN.COM (Oct. 28, 2021) ..................................................................... 15, 19, 28

Kaiser Family Foundation Survey (Oct. 28, 2021) .....................................................41

Office of Contract Compliance Programs, Dep't of Labor, History of Executive Order 11246

(last visited Nov. 4, 2021)..................................................................................................14

Callie Patteson, *Biden Chief Apparently Admits Vaccine Mandate "Ultimate Work-Around"*,

N.Y. POST (Sept. 10, 2021)............................................................................................31

Press Briefing by Press Secretary Jen Psaki, July 23, 2021, White House ...................................2

## INTRODUCTION

For over a century, the U.S. Supreme Court has recognized that policies on compulsory vaccination lie within the police powers of the States, and that "[t]hey are matters that do not ordinarily concern the national government." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). Until quite recently, the Biden Administration agreed, stating on July 23 of this year that mandating vaccines is "not the role of the federal government."  But on September 9, 2021, that position underwent a dramatic about-face.  The President announced several sweeping vaccine mandates, including a mandate requiring vaccination of employees for all federal contractors and subcontractors—a mandate that encompasses one-fifth of the entire American workforce.  This mandate is unconstitutional, unlawful, and unwise.  The federal Government lacks authority under its enumerated powers to issue the mandate, and its attempt to do so unconstitutionally infringes on the States' powers expressly reserved by the Tenth Amendment; the Executive Branch lacks statutory authority to issue this mandate, which it shoe-horned into statutes that govern efficiency in federal procurement and say nothing about federalizing public-health policy; and the mandate is arbitrary and capricious because the federal agencies implementing it gave literally no consideration to important aspects of the problem—such as the fact that 72 percent of unvaccinated workers say they will forego their jobs rather than succumb to such a mandate.  Indeed, the mandate's justification is manifestly pretextual, as the President openly announced that its actual justification is to federalize COVID-19 health policy as part of a nationwide plan to increase vaccination rates, not to improve efficiency in federal procurement.  And the policy was unlawfully issued without required notice-and-comment.  The policy threatens to inflict enormous disruption and irreparable injury on the Plaintiff States, as well as working families throughout the nation. The Court should enjoin this illegal action.

## STATEMENT OF FACTS

### I.    Creation of the Safer Federal Workforce Task Force.

On January 20, 2021, President Biden signed Executive Order 13991, 86 Fed. Reg. 7045, which established the Safer Federal Workforce Task Force ("Task Force") to provide "ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID–19 pandemic."  86 Fed. Reg. at 7046.  The Task Force is headed by three co-chairs: (1) the Director of the Office of Personnel Management (OPM); (2) the Administrator of General Services Administration (GSA); and (3) the COVID–19 Response Coordinator.  The Executive Order also required that GSA "provide funding and administrative support for the" Task Force.  *Id.*

But what the Task Force did not do was issue a vaccine mandate.  For the first six months of the Administration, neither the Task Force nor any other federal agency sought to impose vaccine mandates on the American population.  As recently as July 23, 2021, the White House announced that mandating vaccines is "not the role of the federal government."  Press Briefing by Press Secretary Jen Psaki, July 23, 2021, White House, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-presssecretary- jen-psaki-july-23-2021/.

### II.    President Biden's September 9, 2021, Speech Announces Federal Vaccine Mandates.

On September 9, 2021, amid flagging poll numbers due to the crisis in Afghanistan and on the southern border, the Administration's policy on federal vaccine mandates underwent a dramatic about-face.  President Biden gave a speech announcing his "six-point Plan" to "turn the tide on COVID-19."   Joseph Biden, Remarks at the White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ ("Biden Speech").   The speech announced several federal vaccine mandates, including the federal contractor mandate challenged here.  *Id.*

2

In his speech, President Biden laid principal responsibility for the ongoing pandemic with unvaccinated Americans, saying that he is "frustrated with the nearly 80 million Americans who are still not vaccinated." *Id.* He stated that "[t]his is a pandemic of the unvaccinated," and that the "nearly 80 million Americans [who] are not vaccinated … can cause a lot of damage—and they are." *Id.* He blamed the unvaccinated for health-care shortages: "The unvaccinated overcrowd our hospitals, are overrunning the emergency rooms and intensive care units, leaving no room for someone with a heart attack, or [pancreatitis], or cancer." *Id.* With respect to the unvaccinated, he stated, "our patience is wearing thin." *Id.* He also stated, "For the vast majority of you who have gotten vaccinated, I understand your anger at those who haven't gotten vaccinated." *Id.*

President Biden repeatedly emphasized that the vaccines provide robust protection from severe health outcomes. He "emphasize[d] that the vaccines provide very strong protection from severe illness from COVID-19. … [T]he world's leading scientists confirm that if you are fully vaccinated, your risk of severe illness from COVID-19 is very low." *Id.* "In fact, based on available data from the summer, only one of out of every 160,000 fully vaccinated Americans was hospitalized for COVID per day." *Id.* He stated that, "as the science makes clear, if you're fully vaccinated, you're highly protected from severe illness, even if you get COVID-19." *Id.* "In fact, recent data indicates there is only one confirmed positive case per 5,000 fully vaccinated Americans per day." *Id.* President Biden advised Americans, if you are vaccinated, "[y]ou're as safe as possible." *Id.*

Despite his repeated acknowledgement of the effectiveness of vaccines, the President nevertheless deemed it necessary to "protect vaccinated [persons] from unvaccinated." *Id.* In the speech, President Biden announced the first plank of his plan, which is to "require more Americans

to be vaccinated" in order to "combat those blocking public health." *Id.* The purpose of his plan is to "reduce the number of unvaccinated Americans." *Id.* To that end, according to the President, "[f]irst, we must increase vaccinations among the unvaccinated with new vaccination requirements." *Id.* President Biden stated: "The bottom line: We're going to protect vaccinated workers from unvaccinated co-workers. We're going to reduce the spread of COVID-19 by increasing the share of the workforce that is vaccinated in businesses all across America." *Id.*

To that end, the President announced several new vaccine mandates—a mandate from OSHA for employers that employ more than 100 employees, a mandate for health-care workers at facilities receiving federal funds, a mandate for federal employees, and a mandate for employees of federal contractors and subcontractors. *Id.* As relevant here, the President stated: "I will sign an executive order that will now require all executive branch federal employees to be vaccinated— all. And I've signed another executive order that will require federal contractors to do the same." *Id.* "If you want to work with the federal government and do business with us, get vaccinated. If you want to do business with the federal government, vaccinate your workforce." *Id.* At no point in his speech the President mention—or even hint—that the mandates had anything to do with promoting "efficiency and economy" in federal procurement.

The President also expressed a dismissive view of States that have adopted contrary public-health policies in our system of federalism. He stated: "Let me be blunt. My plan also takes on elected officials and states that are undermining you and these lifesaving actions." *Id.* Speaking scornfully of "governor[s]" who oppose such federal mandates, he said, "if these governors won't help us beat the pandemic, I'll use my power as President to get them out of the way." *Id.*

## III.   Executive Order 14042's Vaccine Mandate for Federal Contractors.

On the same day, September 9, 2021, President Biden signed Executive Order 14042 ("EO 14042"), 86 Fed. Reg. 50,985 (Sept. 14, 2021) (attached as Exhibit A). EO 14042 instructs

departments and agencies, including independent establishments, to require their contractors and subcontractors to "comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force, provided that the Director of the Office of Management and Budget approves the Task Force Guidance and determines that the Guidance … will promote economy and efficiency in Federal contracting." *Id.* § 2(a).

Section 1 of EO 14042 recites that it was intended to promote "economy and efficiency" in federal procurement, stating: "This order promotes economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument…." *Id.* § 1.  According to the order, "[t]hese safeguards will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." *Id.*   "Accordingly, ensuring that Federal contractors and subcontractors are adequately protected from COVID-19 will bolster economy and efficiency in Federal procurement." *Id.*   Other than these bare recitals, the order provides no further discussion of how it would promote "efficiency and economy." *Id.*

Section 2(a) of EO 14042 directs all "[e]xecutive departments and agencies" to "ensure that contracts and contract-like instruments … include a clause that the contractor and any subcontractors (at any tier) shall incorporate into lower-tier contracts." *Id.* § 2(a).  "This clause shall specify that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force … , provided that the Director of the Office of Management and Budget … approves the Task Force Guidance and determines that the Guidance, if adhered to by

contractors or subcontractors, will promote economy and efficiency in Federal contracting." *Id.* "This clause shall apply to any workplace locations (as specified by the Task Force Guidance) in which an individual is working on or in connection with a Federal Government contract or contract-like instrument…." *Id.*

Section 2(b) of EO 14042 directs the Task Force, "[b]y September 24, 2021," to "provide definitions of relevant terms for contractors and subcontractors, explanations of protocols required of contractors and subcontractors to comply with workplace safety guidance, and any exceptions to Task Force Guidance that apply to contractor and subcontractor workplace locations and individuals in those locations working on or in connection with a Federal Government contract or contract-like instrument." *Id.* § 2(b). "Prior to the Task Force publishing new Guidance related to COVID-19 for contractor or subcontractor workplace locations," the President instructed, "the [OMB] Director shall, as an exercise of the delegation of my authority under the Federal Property and Administrative Services Act, *see* 3 U.S.C. 301, determine whether such Guidance will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." *Id.* § 2(c). "Upon an affirmative determination by the Director, the Director's approval of the Guidance, and subsequent issuance of such Guidance by the Task Force, contractors and subcontractors working on or in connection with a Federal Government contract or contract-like instrument … *shall adhere to the requirements of the newly published Guidance*, in accordance with the clause described in subsection (a) of this section." *Id.* (emphasis added).

Section 3 of EO 14042 provides instructions to the FAR Council to prepare a new contract "clause" incorporating the Task Force's Guidance to implement OMB's directive.  Section 3 also says that "[t]he Federal Acquisition Regulatory Council, to the extent permitted by law, shall amend the Federal Acquisition Regulation to provide for inclusion in Federal procurement

solicitations and contracts subject to this order the clause described in section 2(a) of this order….”
*Id.* § 3(a). It further provides that the FAR Council “shall, by October 8, 2021, take initial steps to implement appropriate policy direction to acquisition offices for use of the clause by recommending that agencies exercise their authority under subpart 1.4 of the Federal Acquisition Regulation.” *Id.* § 3(a). “By October 8, 2021, agencies shall take steps, to the extent permitted by law, to exercise any applicable authority to ensure that contracts and contract-like instruments … that are not subject to the Federal Acquisition Regulation and that are entered into on or after October 15, 2021 … include the clause described in section 2(a) of this order.” *Id.* § 3(b).

Section 5 of EO 14042, entitled “Applicability,” specifies that the Order “shall apply to any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument,” in four broad categories, including procurement and construction contracts, contracts for services covered by the Service Contract Act, concessions, and contracts in connection with federal lands and services. *Id.* § 5(a). It exempts grants, contracts with Indian Tribes under the Indian Self-Determination and Education Assistance Act, “contracts or subcontracts whose value is equal to or less than the simplified acquisition threshold, as that term is defined in section 2.101 of the Federal Acquisition Regulation,” employees who work outside the U.S. and its outlying areas, and “subcontracts solely for the provision of products.” *Id.* § 5(b).

Section 6 of EO 14042, “Effective date,” states that the Order applies immediately to new contracts and new extensions or renewals on existing contracts, where the relevant contract or extension will be executed on or after “October 15, 2021, consistent with the effective date for the

action taken by the Federal Acquisition Regulatory Council pursuant to section 3(a) of this order." *Id.* § 6(a)(i).

## IV.   The Task Force's Guidance Adopts a Sweeping Vaccine Mandate.

On September 24, 2021, the Safer Federal Workforce Task Force ("Task Force") released its *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (attached as Exhibit B) ("Task Force Guidance" or "Guidance").   The Task Force Guidance was never published in the Federal Register.   Rather, it is available on the Task Force's website at: https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20 210922.pdf.   Nor did OMB or the Task Force call for public comment, wait 60 days before the Guidance became effective, or provide a waiver from an authorized officer indicating that "urgent and compelling circumstances ma[d]e compliance with" notice and comment and the effective period impracticable.   *See* 41 U.S.C. § 1707(d).

The Task Force Guidance announces that "[o]ne of the main goals of [the President's] plan is to get more people vaccinated."   Ex. B, at 1.   The Guidance notes that EO 14042 "directs executive departments and agencies … to ensure that covered contracts and contract-like instruments include a clause ('the clause') that the contractor and any subcontractors (at any tier) shall incorporate into lower-tier subcontracts."   *Id.*   "This clause shall specify that the contractor or subcontractor shall, for the duration of the contract, comply with all guidance for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force, provided that the Director of the Office of Management and Budget ('OMB') approves the Task Force Guidance and determines that the Guidance, if adhered to by covered contractors, will promote economy and efficiency in Federal contracting."   *Id.*

The Task Force Guidance provides no new justification for the sweeping vaccine mandate for federal contractors.   Instead, it just parrots the reasoning of EO 14042 on how a vaccine

mandate would promote economy and efficiency: "These safeguards will decrease the spread of SARS-CoV-2, the virus that causes COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors performing work for the Federal Government." *Id.*  No further justification for the mandate was provided.  *See id.*

Under the Task Force Guidance, "Federal contractors and subcontractors with a covered contract will be required to conform to the following workplace safety protocols," the first of which is "COVID-19 vaccination of covered contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation." *Id.*  The Guidance notes that, because OMB approved the Guidance, its directives are mandatory: "Covered contractors shall adhere to the requirements of this Guidance." *Id.* at 2.  "Covered contractors must ensure that all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation.  Covered contractor employees must be fully vaccinated no later than December 8, 2021." *Id.* at 5.

Per the Guidance, the vaccine mandate extends to virtually any employee of a covered contractor with any remote or tangential connection to federal contracts.  The Guidance provides that "covered contractor employee" "means any full-time or part-time employee of a covered contractor working on or in connection with a covered contract *or* working at a covered contractor workplace. *This includes employees of covered contractors who are not themselves working on or in connection with a covered contract*." *Id.* at 3 (emphasis added).  A "covered contractor workplace" means a "location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract." *Id.* at 4.  If there is any chance that a covered employee may have contact with non-covered employees, including fleeting contact in "elevators, stairwells, … and parking garages," the entire "workplace"—the whole building, facility, etc.—is

covered by the mandate.  *Id.* at 10.  A covered contractor must review its covered employees' documentation to prove vaccination status.  *Id.* at 5.

The Guidance specifically requires vaccination of employees who have natural immunity to COVID-19 from a prior infection:  "[C]overed contractor employees who have had a prior COVID-19 infection are required to be vaccinated."  *Id.* at 10.  It also requires vaccination of workers who work outdoors:  "[T]his Guidance applies to contractor or subcontractor workplace locations that are outdoors."  *Id.* at 10.  Likewise, workers who work remotely from home are also covered by the mandate:  "An individual working on a covered contract from their residence is a covered contractor employee, and must comply with the vaccination requirement for covered contractor employees, even if the employee never works at either a covered contractor workplace or Federal workplace during the performance of the contract."  *Id.* at 11.

Every level of subcontractor must comply with the mandate: "The requirements in the order apply to subcontractors at all tiers, except for subcontracts solely for the provision of products. The prime contractor must flow the clause down to first-tier subcontractors; higher-tier subcontractors must flow the clause down to the next lower-tier subcontractor, to the point at which subcontract requirements are solely for the provision of products."  *Id.* at 12.

Almost any work that relates in any way to the federal contract, no matter how administrative or tangential, is considered to be "in connection with" the covered contract: "Employees who perform duties necessary to the performance of the covered contract, but who are not directly engaged in performing the specific work called for by the covered contract, such as human resources, billing, and legal review, perform work in connection with a Federal Government contract."  *Id.* at 13.

The Task Force Guidance explicitly applies to State employers, and it expressly preempts state laws and regulations:  "These requirements are promulgated pursuant to Federal law and supersede any contrary State or local law or ordinance."  *Id.* at 13.  The Task Force Guidance purports to prevent States and local governments from protecting their citizens from vaccine mandates, noting that it "appl[ies] in States or localities that seek to prohibit compliance with any of the workplace safety protocols set forth in this Guidance."  *Id.* at 13.

## V.  OMB's Perfunctory "Notice of Determination" on the Task Force Guidance.

The same day, September 24, 2021, the Acting Director of OMB published a brief "notice of determination" in the Federal Register entitled *Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042*.  86 Fed. Reg. 53,691– 92 (attached as Exhibit C).  The notice, spanning about one column of one page of the Federal Register, states that, "[a]s explained in Executive Order No. 14042 …, compliance with COVID-19-related safety protocols improves economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."  *Id.*  Noting that she had been instructed to do so by Section 2(c) of EO 14042, the Acting Director stated, "Based on my review of the Safer Federal Workforce Task Force's COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, scheduled for issuance on September 24, 2021, … I have determined that compliance by Federal contractors and subcontractors with the COVID–19-workplace safety protocols detailed in that guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."  86 Fed. Reg. 53,692.

That was the total sum of the Acting Director's analysis.  She, like the Task Force, simply parroted the justification for the federal contractor mandate that the Executive Order provided.  *See*

*id.*  No period of notice, and no opportunity for public comment, preceded OMB's "notice of determination."  *Id.*  Nor did OMB's "notice of determination" provide good cause for that failure, *see* 5 U.S.C. § 553(d)(3), or contain a waiver from an authorized officer indicating that "urgent and compelling circumstances ma[d]e compliance with" notice and comment and the effective period impracticable, *see* 41 U.S.C. § 1707(d).

**VI.    The FAR Council Drafts a Contract Clause to Adopt the Task Force Guidance.**

Congress established the Federal Acquisition Regulatory Council ("FAR Council") in 1988 "to assist in the direction and coordination of Government-wide procurement policy and Goverment-wide procurement regulatory activities in the Federal Government."  Office of Federal Procurement Policy Act Amendments of 1988, Pub. L. No. 100-679, § 4, 102 Stat. 4055, *later codified* at 41 U.S.C. § 1302(a).  The FAR Council consists of the Office of Federal Procurement Policy Administrator, the Secretary of Defense, the Administrator of NASA, and the Administrator of GSA.  41 U.S.C. § 1302(b)(1).  Subject to limited exceptions, the FAR Council has exclusive authority to issue "a single [g]overnment-wide procurement regulation, to be known as the Federal Acquisition Regulation."  *Id*. § 1303(a)(1).

As noted above, EO 14042 instructs the FAR Council to "amend the Federal Acquisition Regulation to provide for inclusion in federal procurement solicitations and contracts subject to this order" a clause stating that the contractor shall, for the duration of the contract, comply with Task Force Guidance.  EO 14042 further instructs agencies to seek to implement this clause in contracts not covered by the Federal Acquisition Regulation ("FAR").  86 Fed. Reg. 50,985–86.

On September 30, 2021, the FAR Council—purporting to comply with the executive order—issued a memorandum entitled "Issuance of Agency Deviations to Implement Executive

Order 14042" ("FAR Council Memorandum") (attached as Exhibit D).[1]   In issuing the FAR

Council Memo, the FAR Council did not provide notice or opportunity for public comment.

The FAR Council Memorandum states that "[t]he purpose of this memorandum is to

provide agencies that award contracts under the Federal Acquisition Regulation (FAR) with initial

direction for the incorporation of a clause into their solicitations and contracts to implement

guidance issued by the Safer Federal Workforce Task Force (Task Force) pursuant to Executive

Order 14042." *Id.* at 1.   Again parroting the Executive Order's justification for the mandate, the

FAR Council Memorandum recites that EO 14042 "directs agencies to ensure that the parties that

contract with the Federal Government provide adequate COVID-19 safeguards to their workers

performing on or in connection with the contract to decrease the spread of COVID-19, reduce

worker absence, lower labor costs, and improve the efficiency of contractors and subcontractors

at sites where they are performing work." *Id.*

The FAR Council Memorandum summarizes the Task Force Guidance, and then notes that

Section 3(a) of EO 14042 directs the FAR Council "to develop a contract clause requiring

contractors and subcontractors at any tier to comply with all guidance for contractor and

subcontractor workplace locations published by the Task Force." *Id.* at 2.   Pursuant to that

direction, the memorandum provides a contract clause entitled "Ensuring Adequate COVID-19

Safety Protocols for Federal Contractors." *Id.* at 4.   The clause is short, consisting of only two

substantive provisions, and requires contractors and subcontractors to comply with the Task Force

Guidance (regardless of what it says, and even if it changes over time).   The first provision states,

*in toto*: "The Contractor shall comply with all guidance, including guidance conveyed through

---

[1]Also available at https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf.

Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https:/www.saferfederalworkforce.gov/contractors/." *Id.* at 5  The second provision states, *in toto*: "The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts at any tier that exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation 2.101 on the date of subcontract award, and are for services, including construction, performed in whole or in part within the United States or its outlying areas." *Id.*

Both the FAR Council Memorandum and the Task Force Guidance emphasize that the Government can change the terms of the Task Force Guidance at any time, with all contractors and subcontractors subject to the new terms.  The Task Force Guidance states that covered contractors must comply with "any new Guidance where the OMB Director approves the Guidance and determines that adherence to the Guidance will promote economy and efficiency in Federal contracting."  Ex. B, at 12–13.  The FAR Council's contract clause likewise states that "[t]he Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract…."  Ex. D, at 5.

**VII.    The Federal Contractor Vaccine Mandate's Disruptive Impact.**

The federal contractor vaccine mandate will affect a large portion of the labor force.  The U.S. Department of Labor recognizes that "workers employed by federal contractors" comprise "approximately *one-fifth of the entire U.S. labor force*."  Office of Contract Compliance Programs, Dep't of Labor, History of Executive Order 11246 (last visited Nov. 4, 2021), https://www.dol.gov/agencies/ofccp/about/executive-order-11246-history (emphasis added).  This includes similarly large proportions of the labor force in each of the Plaintiff States.  These large proportions matter because a vaccine mandate is likely to lead to mass an exit of a significant

number of those employees.  A recent survey by the Kaiser Family Foundation found that *72 percent* of unvaccinated workers say they will quit their jobs if they are subjected to such a mandate. Chris Isidore & Virginian Langmaid, *72% of unvaccinated workers vow to quit if ordered to get vaccinated*, CNN.COM (Oct. 28, 2021), https://www.cnn.com/2021/10/28/business/covid-vaccine-workers-quit/index.html.  "If the surveyed unvaccinated workers follow through on their threats to quit, it would lead to somewhere between 5% to 9% of workers leaving their jobs, depending upon what rules they face." *Id.*

Those numbers portend massive disruptions in the economy, with ripple effects throughout the Plaintiff States, and exacerbation of the pre-existing supply-chain crisis.  The Plaintiff States and their agencies face similar disruptive consequences directly from the mandate.  *See*, *e.g.*, Exs. F ¶¶ 7–11, J ¶¶ 3, 5, K ¶¶ 7–8, 11–13, N ¶¶ 4–8, O ¶¶ 7–11.  And individual citizens by the millions will face the untenable choice between giving up their ability to make private medical decisions on the one hand, and losing their jobs on the other.

## ARGUMENT

The Court considers four factors in determining whether to grant a preliminary injunction: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to other litigants; and (4) the public interest." *Watkins Inc. v. Lewis*, 346 F.3d 841, 44 (8th Cir. 2003) (citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).  All four factors favor Plaintiff States.

## I.    The Plaintiff States Are Likely To Succeed on the Merits of Their Claims.

The Plaintiff States are likely to succeed on the merits of their claims that (1) the contractor vaccine mandate exceeds OMB's and the FAR Council's statutory authority; (2) the contractor vaccine mandate is substantively arbitrary and capricious under the Administrative Procedure Act;

(3) the contractor vaccine mandate is procedurally invalid because it issued without any notice and comment; and (4) the contractor vaccine mandate is unconstitutional because it exceeds the limits of Congress's enumerated powers and infringes on traditional areas of state authority.

### A. The Contractor Vaccine Mandate Exceeds the President's Statutory Authority Under the Procurement Act.

"The President's power, if any, to issue [an executive] order must stem either from an act of Congress or the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 US 579, 585 (1952). The directives in EO 14042 ostensibly stem from the President's authority under the Federal Property and Administrative Services Act ("Procurement Act"), 40 U.S.C. § 101 *et seq.*, and the President's ability to delegate his powers to certain federal officials, 3 U.S.C. § 301. *See* 86 Fed. Reg. 50,985 (issuing EO 14042 "[b]y the authority vested in me as President by the Constitution and the laws of the United States of America, including the [Procurement Act] and [3 U.S.C. § 301]"). But EO 14042 exceeds the President's powers under the Procurement Act, and the President cannot delegate this power to other federal officials.

The purpose of the Procurement Act "is to provide the Federal Government with an economical and efficient system for" four enumerated procurement activities:  (1) "[p]rocuring and supplying property and nonpersonal services," (2) "[u]sing available property," (3) "[d]isposing of surplus property," and (4) "[r]ecords management."  40 U.S.C. § 101(1)–(4). To fulfill those purposes, the "President may prescribe policies and directives that the President considers necessary to carry out" the Procurement Act. *Id*. § 121(a). Such "policies must be consistent with" the Procurement Act. *Id*. The federal contractor vaccine mandate is not.

### 1. EO 14042 exceeds the President's power because the federal contractor vaccine mandate is a "regulation," not a "policy or directive."

"[P]olicies and directives" in the Procurement Act describe the President's power to direct the exercise of procurement authority throughout the government. They do not authorize the

President to issue regulations himself.  Congress knows how to confer the power to "prescribe regulations," as it expressly authorized the GSA Administrator to do so in the same section, but it failed to give the President that same power.  *Compare id*. § 121(a) (President) *with id*. § 121(c) (GSA Administrator); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").  Congress has given the President the power to "prescribe regulations" in other contexts, typically in the realm of foreign affairs and national defense.  *See*, *e.g.*, 18 U.S.C. § 3496 ("The President is authorized to prescribe regulations governing the manner of executing and returning commissions by consular officers . . . ."); 32 U.S.C. § 110 ("The President shall prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard.").  Thus, the Procurement Act does not give the President the authority to issue regulations.

Yet that is exactly what the President did here.  The government acts as a regulator when "it performs a role that is characteristically a governmental rather than a private role."  *See Building & Const. Trades Council of the Metro. Dist. v. Assoc. Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 229 (1993).  For instance, the President acts as a regulator when he "seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers" based not on his views about "procurement policy" but on his views about "labor policy."  *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1337 (D.C. Cir. 1996) (holding that a governmental entity would be acting as a regulator if it "require[d] all construction contractors doing business with the [government] to enter into collective bargaining agreements . . . containing [NLRA] § 8(e) pre-hire agreements").

17

In this case, the President is acting as a regulator because he is setting a broad policy governing the behavior of thousands of American companies and affecting millions of American workers.  *See id.*  He is requiring all federal contractors to agree to a particular contractual provision promising to follow Task Force Guidance, which in practice imposes a vaccine mandate on employees of federal contractors.  That is regulation—pure and simple—and it is not part of the President's Procurement Act powers.[2]  That is doubly so since the vaccine mandate is a regulation based not on the President's views about what is the best procurement policy, but on the President's views about public health.  *See id.*  It is thus far, far afield from any power the President has under the Procurement Act.

### 2.    The federal contractor vaccine mandate is inconsistent with the Procurement Act's purpose and outside of its scope.

But even if EO 14042 could be considered a "policy or directive," it would be unlawful because the federal contractor vaccine mandate is neither "necessary" nor "consistent with" the Procurement Act.  40 U.S.C. § 121(a).  While the Procurement Act "does vest broad discretion in the president" to "prescribe policies and directives 'as he shall deem necessary to effectuate the provisions' of the Act," it does not give the President "unlimited authority to make decisions he believes will likely result in savings to the government."  *Reich*, 74 F.3d at 1330.  Rather, "[t]he procurement power *must* be exercised consistently with the structure and purposes of the statute that delegates that power."  *Id.* at 1330–31.  Thus, there must be a "nexus between the [policy or directive] and likely savings to the government."  *Id.* at 1331.  Additionally, presidential orders issued under the Procurement Act are invalid if in conflict with other federal laws.  *See, e.g., id.* at

_____

[2]Because the President does not have this power, he also does not have the authority to delegate this power to the Task Force or OMB, as he purported to do in EO 14042.

1324, 1333, 1338–39 (holding that the Procurement Act did not permit a President to issue an executive order contrary to the NLRA).

Here, the Court should find that the vaccine mandate exceeds the President's Procurement Act powers because there is no nexus between the vaccine mandate and likely savings to the government and because the vaccine mandate conflicts with and is in tension with other federal laws.  Indeed, to conclude to the contrary would conflict with the Act's meaning.

> **a) There is no nexus between the vaccine mandate and likely savings to the government, and so the vaccine mandate is inconsistent with the Procurement Act's plain text.**

The vaccine mandate has no clear nexus to cost savings to the federal government.  On the contrary, the vaccine mandate is likely to lead to a massive loss of federal contractor employees.  According to a recent survey, ***72 percent*** of unvaccinated workers say that they will quit if their employers decide to mandate the vaccine.  *See* Isidore & Langmaid, *supra*.  Such mass resignations will impose drastic hardship on working families throughout the Plaintiff States and cause massive economic disruption for federal contractors and for the economy at large.  They will inevitably cause staffing shortages for federal contractors and exacerbate supply-chain woes.  As a result, costs of federal contracts would rise and efficiency would fall.  Thus, the vaccine mandate is the antithesis of "economy and efficiency" and has no nexus with likely savings to the government.  The mandate is thus outside the scope of the Procurement Act.  *See* 40 U.S.C. § 121(a) (requiring the President's policies and directives to be "consistent with this subtitle").

> **b) Because the vaccine mandate conflicts with other federal law, the vaccine mandate cannot be within the President's powers under the Procurement Act.**

The vaccine mandate also conflicts with the Procurement Policy Act and so exceeds the President's powers under the Procurement Act.  *See* 41 U.S.C. §§ 1301-1303.  Specifically, EO 14042 violates the Procurement Policy Act by delegating to OMB and the Task Force the power

to make a government-wide procurement regulation when that power belongs to the FAR Council alone.

Congress established the FAR Council in 1988 "to assist in the direction and coordination of [g]overnment-wide procurement policy and [g]overment-wide procurement regulatory activities in the [f]ederal [g]overnment." Office of Federal Procurement Policy Act Amendments of 1988, Pub. L. No. 100-679, § 4, 102 Stat. 4055, *later codified* at 41 U.S.C. § 1302(a).

The FAR Council is charged with "issu[ing] and maintain[ing]" a "single, [g]overment-wide procurement regulation" known as the Federal Acquisition Regulation ("FAR"). 41 U.S.C. § 1303(a)(1). That power is exclusive to the FAR Council—no other agency may issue government-wide procurement regulations. *See id*. § 1303(a)(2) ("Other regulations relating to procurement issued by an executive agency shall be limited to . . . regulations essential to *implement* Government-wide policies and procedures within the agency[ ] and [ ] additional policies and procedures required to satisfy the *specific and unique needs of the agency*." (emphasis added)). Yet EO 14042 does exactly that. In violation of the Procurement Policy Act, the order delegates to OMB and the Task Force the power to make a government-wide procurement regulation when that power belongs to the FAR Council alone. *See* EO 14042 § 2(a) (delegating to OMB and the Task Force the role of developing and approving the vaccine mandate for use in federal contracts). And it permits the FAR Council to circumvent traditional procedural requirements for issuing procurement regulations, *see* 41 U.S.C. § 1707(d), in favor of issuing rules through "guidance," *see* EO 14042 § 3(a).

Moreover, EO 14042, and the FAR Guidance which implements it, allows the Task Force to change the vaccine mandate whenever it wishes, *see* EO 14042 § 2(a) (requiring compliance with the "guidance … published by" the Task Force); Ex. D, at 5 (requiring compliance with the

Task Force's guidance "as amended during the performance of this contract"), without the agreement of or even notice to the FAR Council and without the notice-and-comment period required by the Procurement Policy Act, *see* 41 U.S.C. §§ 1303(a), 1707(a)–(b).  To put it another way, EO 14042 and the FAR Guidance vests in the Task Force authority that, by law, belongs only to the FAR Council.  Again, that circumvents the statutory scheme which Congress created in the Procurement Policy Act.

Thus, EO 14042, the OMB conclusion that it purports to authorize, and the FAR Guidance violate the Procurement Policy Act and so cannot be a lawful exercise of authority under the Procurement Act.

### c) Clear-statement rules of statutory construction favor reading the Procurement Act's presidential powers as excluding the power to unilaterally implement a vaccine mandate.

Besides the text of the Procurement Act and the fact that the vaccine mandate violates other federal law, other tools of statutory interpretation establish that the Procurement Act does not authorize the federal contractor vaccine mandate.

*First*, interpreting the Procurement Act to permit the President to impose a vaccine mandate would disrupt the traditional federal state-balance absent a clear statement that Congress intended to give the President public health powers through the Procurement Act.  "Among the background principles of construction . . . are those grounded in the relationship between the Federal Government and the States under our Constitution."  *Bond v. United States*, 572 U.S. 844, 857–58 (2014).  To protect that relationship, "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'"  *Id.* at 858 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting another source)).  "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."  *United States v. Bass*, 404 U.S. 336, 349

(1971) ("[W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction.").  "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision."  *Id.*

The States' police powers are those that "state[s] did not surrender when becoming a member of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). "[T]he police power of a state must be held to embrace . . . such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety." *Id*.  This includes laws concerning compulsory vaccination.  *Id*. at 12, 14, 37-38 ("The safety and the health of the people of Massachusetts are, in the first instance, for that commonwealth to guard and protect.  They are matters that do not ordinarily concern the national government.  So far as they can be reached by any government, they depend, primarily, upon such action as the state, in its wisdom, may take . . . .").

Interpreting the Procurement Act to permit the President to implement a vaccine mandate for one-fifth of all workers, many of whom work intrastate, would thus dramatically intrude upon the police power of the States.  That implicates this clear-statement rule.  *See Bond*, 572 U.S. at 858 ("We have applied this background principle when construing federal statutes that touched on several areas of traditional state responsibility.").  But there is no such clear statement.  Thus, reading the Procurement Act to allow the contractor vaccine mandate would mean that the Procurement Act "displace[s] the public policy of [the States], enacted in [their] capacit[ies] as sovereign[s]" *id*. at 865 (internal quotations omitted), "[a]bsent a clear statement of that purpose." *id*. at 866.  That it cannot do.

*Second*, the Supreme Court requires a clear statement before presuming that Congress has invoked the outer limits of one of its enumerated powers.  "Where an administrative interpretation of a statute invokes the outer limits of Congress' power," the Supreme Court "expect[s] a clear indication that Congress intended that result."  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001) ("*SWANCC*").  "This requirement stems from [the Court's] prudential desire not to needlessly reach constitutional issues and [its] assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."  *Id.* at 172-73.  The same reasoning applies to the interpretation of statutes delegating powers to the President (rather than an agency).

Here, interpreting the Procurement Act as empowering the President to enact a vaccine mandate for one-fifth of the workforce would "invoke[] the outer limits of Congress' power" under the Spending Clause or the Commerce Clause.  *See id.* at 172.  Indeed, it would exceed those limits.  *See infra* Part D.  Because there is no clear statement permitting that reading, doing so violates this well-established principle of interpretation.

*Third*, the sensitive federalism issues involved here, not to mention the billions of dollars and economic effects of mandating federal contractors vaccinate their employees, demand no less than a clear statement that the executive branch can do what it did here.  *See King v. Burwell*, 576 U.S. 473, 486 (2015) (noting the need for clear delegations for issues "of deep 'economic and political significance'") (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000))).  As it stands, "the sheer scope of the … claimed authority … counsel[s] against" reading the Procurement Act to permit mandatory vaccination of those whose only connection to a federal contract is working

23

in the same location as an employee who is working directly on such a contract.  *See Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam).

*Fourth*, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  "The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  *Id.*  "This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution.  The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it."  *Id.*

Interpreting the Procurement Act to allow the President to implement a federal contractor vaccine mandate would "raise serious constitutional problems."  *Edward J. DeBartolo*, 485 U.S. at 575.  As discussed in Part D, it would violate the Constitution in at least four ways: (1) it would impose ambiguous conditions on the use of federal relief funds, in violation of the Spending Clause; (2) it would impose conditions on federal spending that are unrelated to the purposes of the federal program at issue, namely procurement; (3) it would violate the Tenth Amendment by commandeering the States' administrative apparatus for federal purposes; and (4) it would fail to regulate commerce and instead demand action, in violation of the Commerce Clause.  Therefore, this Court should construe the Procurement Act narrowly—as not permitting the vaccine mandate—to avoid those serious constitutional problems.

\* \* \*

The upshot: nowhere does the Procurement Act permit what the Defendants attempt to do here.  "It would be one thing if Congress had specifically authorized the action that [they have] taken.  But that has not happened."  *Ala. Ass'n of Realtors*, 141 S. Ct. at 2486.  The Procurement Act does not authorize the vaccine mandate.

### B.      The Contractor Vaccine Mandate Is Arbitrary and Capricious.

Second, the Plaintiff States are likely to succeed on their claim that the contractor vaccine mandate is substantively arbitrary and capricious under the Administrative Procedure Act (APA).[3]

#### 1.   OMB and the FAR Council are "agencies" subject to judicial review under the APA.

As an initial matter, both OMB and the FAR Council are "agencies" subject to the APA. *See* 5 U.S.C. § 702.  "[T]he APA … confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions."  *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971).  OMB is an "agency" under the APA and the *Soucie* test—as the D.C. Circuit has concluded in a closely related context.  *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1974), *rev'd on other grounds*, 442 U.S. 347 (1979); *see also Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993); *cf. Hyatt v. OMB*, 908 F.3d 1165, 1170–74 (9th Cir. 2018) (entertaining an APA challenge to an OMB action).  And to the extent that OMB merely rubber-stamped the determinations of the Task Force, leaving the Task Force to make binding determinations about the nature and scope of the vaccine mandate, the Task Force is an "agency" as well, for the same reasons as OMB.  *Soucie*, 448 F.2d at 1073.

---

[3] Because this is a challenge to "regulation[s] governing a procurement," the Plaintiff States properly brought this case as an APA challenge in federal district court.  *Land Shark Shredding, LLC v. United States*, 842 F. App'x 589, 593 (Fed. Cir. 2021); *see also Alphapointe v. Dep't of Dep't of Veterans Affairs*, 416 F. Supp. 3d 1, 7 (D.D.C. 2019).

The FAR Council also meets that requirement.   By law, the Council may make government-wide regulations relating to procurement and oversee procurement regulations issued by other agencies.  *See* 41 U.S.C. § 1303(a)(1)–(3); *Mgmt. Ass'n for Private Photogrammetric Surveyors v. United States*, 492 F. Supp. 2d 540, 544 (E.D. Va. 2007) (calling the FAR Council "the administrative body charged with administering and overseeing the application of the Federal Acquisition Regulation").   Those powers "are central to whether an entity wields substantial independent authority" and is an agency under the APA.  *Elec. Privacy Info Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence*, 466 F. Supp. 3d 100, 109 (D.D.C. 2020).   Since the FAR Council possesses them, it is an agency subject to the APA.

## 2.      The contractor vaccine mandate is a "final agency action."

Nor can there be any dispute that OMB's conclusion and the FAR Guidance are final agency action.  To be final, an agency's action must meet two requirements: "First, [it] must mark the consummation of the agency's decisionmaking process … [a]nd second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennet v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations omitted).

OMB's conclusion that "compliance by Federal contractors and subcontractors with the" contractor vaccine mandate "will improve economy and efficiency," 86 Fed. Reg. at 53,629, is the agency's "last word" on the issue.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 586 (1980)).  So, too, is FAR's guidance; the FAR Council "developed" (past tense) its guidance and then issued it to agencies via the guidance. Ex. D, at 2.  Nothing indicates that either agency will change its mind; there is nothing "tentative or interlocutory" about their decisions.  *Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. U.S. Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018).

Both decisions also determine rights and obligations, and are ones "from which legal consequences will flow." *Bennett*, 520 U.S. at 178.  Specifically, the decisions "alter the legal regime" to which federal contractors, subcontractors, and agencies with whom they contract are "subject." *Id.*  By operation of EO 14042, those decisions mean that agencies "shall" require contractors and subcontractors "to comply with" with the vaccine mandate.  Exec. Order No. 14,042 § 2(a); *see also* Ex. D, at 2 (noting that the clause the FAR Council provided requires contractors or subcontractors "to comply with all guidance" from the Task Force).  Those certainly determine "obligations" and "compel legal consequences" and "affirmative action." *Sisseton-Wahpeton Oyate*, 888 F.3d at 915.

### 3.    The contractor vaccine mandate is arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  Courts must ensure "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*  "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  It must also consider the reliance interests of those affected by the regulation, including the States. *See Dep't of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913–15 (2020).  And the agency must consider less-disruptive policies in the light of those interests. *Id.*  Moreover, the agency may not offer pretextual or *post hoc* explanations of its actions. *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947).  The contractor vaccine mandate fails to satisfy any of those criteria for reasoned decision-making.

*First*, the mandate is arbitrary and capricious because the agency did not "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Prometheus Radio*, 141 S. Ct. at 1158.  In fact, neither OMB, nor the Task Force, nor the FAR Council provided *any* explanation for the decision to impose a vaccine mandate on one-fifth of the Nation's workforce. As discussed above, each agency merely parroted—in virtually the same words—the Executive Order's perfunctory statement that a contractor vaccine mandate "will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." EO 14042 § 1. *Compare id.*, *with* Ex. B, at 1 (Task Force Guidance), *with* 86 Fed. Reg. at 53,692 (OMB Notice), *with* Ex. D, at 1 (FAR Council Memorandum).  No agency provided any discussion of its reasoning or justification beyond that perfunctory and conclusory statement. That failure is arbitrary and capricious, *per se*.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all. . . . [C]onclusory statements do not suffice to explain [an agency's] decision.").

*Second*, the mandate is arbitrary and capricious because it "failed to consider important aspects of the problem" before the agencies.  *Regents of the Univ. of Calif.*, 140 S. Ct. at 1910 (quoting *Motor Vehicle Manufacturers' Assn.*, 463 U.S. at 43); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 664, 658 (2007) (an agency decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem").  Several important aspects of the problem should have been obvious to the agencies, including but not limited to: (1) the risk of negative economic impacts and economic disruption from the prospect of large-scale resignations and terminations of employees, *see*, *e.g.*, Isidore & Langmaid, *supra*;

(2) the hardships to individual citizens who lose their jobs and to their families; (3) the threat of disruption to state agencies and State governments; (4) the impact on state sovereignty from preempting state statutes and regulations that prohibit vaccine mandates; (5) distinctions between workers with natural immunity, which also provides robust protection against COVID-19 infection and transmission, and those without natural immunity, *see* Ex. E., ¶¶ 8–26 (discussing the differences); (6) the fact that COVID-19 affects different people differently and transmits differently in different settings; (7) the situation of workers who work in environments with negligible risk of transmission, such as those who work at home or in outdoor environments; and many others.  Other than merely announcing the policy, the Task Force Guidance, the OMB Notice, and the FAR Council Memorandum give literally no consideration to any of these important aspects of the problem.  To engage in reasoned decisionmaking, they were required to at least consider these issues and explain their reasoning, but they did not do so.

*Third*, the mandate is arbitrary and capricious because it failed to consider less restrictive alternatives within the ambit of the federal government's preexisting policy, which eschewed vaccine mandates altogether.  "When an agency rescinds a prior policy, its reasoned analysis must consider the alternatives that are within the ambit of the existing policy."  *Regents*, 140 S. Ct. at 1913; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (when changing policies, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy").  Many less restrictive alternatives were evident— including, for example, exempting workers with natural immunity due to prior COVID-19 infection, exempting workers who telework or work remotely, excluding workers who work in outdoor environments, and/or imposing varying requirements based on community incidence of COVID-19 transmission, among many others.  The agencies gave no indication that they

29

considered these or any other alternatives that would have been less restrictive than the sweeping vaccine mandate adopted.  In fact, they discussed no alternatives at all, but merely accepted and implemented the policy based on nothing more than EO 14042's bare assertion that it would be efficient and economical.

*Fourth*, the mandate is arbitrary and capricious because the agencies failed to address costs to the States, including their "legitimate reliance" on the absence of a federal mandate, which allowed them to control their own workforces and set their own policies regarding vaccine mandates.  *See Regents of Univ. of Calif.*, 140 S. Ct. at 1913.  Indeed, the Defendants completely ignore the costs and injuries to the States, which are a "centrally relevant factor when deciding whether to regulate."  *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015). Neither the Task Force Guidance, nor the OMB Notice, nor the FAR Council Memorandum reflects any awareness that the government is imposing requirements on the States at all, which is reason alone to find them arbitrary and capricious.  *State Farm*, 463 U.S. at 43.  Indeed, not one of the Defendants considered any reliance current and future federal contractors had on the lack of mandate; that is, reliance by the parties *most directly affected* by the new rule.

*Fifth*, the sole justification provided for the mandate—*i.e.*, promoting economy and efficiency in federal procurement by reducing absenteeism and labor costs for federal contractors—is blatantly pretextual.  The mandate did not originate from any determination by the Task Force, OMB, or the FAR Council that federal contracting faced challenges in economy and efficiency due to COVID-19-related absenteeism.  On the contrary, the mandate originated in a speech by the President that said literally nothing about economy and efficiency in federal contracting, and instead focused entirely on imposing a comprehensive federal policy to mandate vaccination in as many Americans as possible.  *See* Biden Speech, *supra*.  As the White House

Chief of Staff tweeted at the time, using mandates like the federal contractor mandate was the "ultimate work-around" for the absence of any legal authority to impose a federal national vaccine mandate.  Callie Patteson, *Biden Chief Apparently Admits Vaccine Mandate "Ultimate Work-Around"*, N.Y. POST (Sept. 10, 2021), https://nypost.com/2021/09/10/ronald-klain-retweets-vaccine-mandate-ultimate-work-around/.  In other words, the vaccine mandate has nothing to do with economy and efficiency, but everything to do with federalizing the public-health response to the COVID-19 pandemic.  Such pretextual reasons are manifestly insufficient under the APA. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2576 (2019) ("Accepting contrived reasons would defeat the purpose of the enterprise [of judicial review.]").  Indeed, the agencies' mantra reciting the "economy and efficiency" rationale is a quintessential "*post hoc* rationalization" for the policy that the President had already chosen and imposed for unrelated reasons.  *See Regents of the Univ. of California*, 140 S. Ct. at 1909 (holding that it is a "foundational principle of administrative law" to reject an agency's "impermissible *post hoc* rationalizations" for agency action) (quoting *Michigan v. EPA*, 576 U.S. at 758).

### C.    The Contractor Vaccine Mandate Violates the Procurement Policy Act.

In Count 2, Plaintiff States allege that Defendants violated the Procurement Policy Act, 41 U.S.C. § 1707, by bypassing notice and comment.  Compl. ¶¶ 98–104.  Under that Act, Section 1707 requires that "a procurement policy, regulation, procedure, or form" must go through notice and comment if it (1) "relates to the expenditure of appropriated funds," and (2) has either "a significant effect beyond the internal operating procedures of" the issuing agency or "a significant cost or administrative impact on contractors or offerors."  41 U.S.C. § 1707(a)–(b).

The first requirement is satisfied because federal contracts plainly involve the expenditure of appropriated funds.  And the second requirement is satisfied because Defendants' mandate—by dictating the personal vaccine choices for millions of Americans (including many who do not

even work on federal contracts)—has a significant effect beyond the internal operating procedures of the federal government.  In addition, the mandate imposes significant costs and administrative effects on Plaintiff States and other contractors.  Some state agencies will lose federal contracts, be forced to alter their affected programs, or both.  *See* Exs. F–O (noting some agencies subject to mandate).  Other state agencies will modify or renew their contracts and thus be conscripted into administering the federal government's draconian vaccine policy.  *See id.*  Either way, States will face significant costs and administrative impacts.

The only remaining question in deciding whether Section 1707 applies is whether the OMB Notice and the FAR Guidance are procurement "polic[ies], regulation[s], procedure[s], or form[s]."  41 U.S.C. § 1707(a)(1).  They are.  As explained above, both are final agency actions and thus qualify as "regulations" under Section 1707.  But even if they are not "regulations," they are surely "policies" or "procedures."  Congress's choice to separately use the terms "policy," "regulation," and "procedure" side by side indicates its intent to cover a broad class of government pronouncements (including all manner of guidance).  *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.").  Black's Law Dictionary defines "policy" to mean "[a] standard course of action that has been officially established by an organization," and it defines "procedure" to mean "[a] specific method or course of action." *Policy* and *Procedure*, BLACK'S LAW DICTIONARY (11th ed. 2019).  The OMB Conclusion, by approving the Task Force Guidance, and the FAR Guidance, by implementing the Task Force Guidance, establish an official course of

action and specific methods for imposing a COVID-19 vaccine mandate through the procurement process.  Thus, they constitute procurement "policies" or "procedures" under Section 1707.

Notably, Defendants' notice-and-comment failure cannot be excused by the exception in Section 1707(d), which applies when "urgent and compelling circumstances make compliance with the requirements impracticable."  41 U.S.C. § 1707(d).  Federal officials invoke that provision only by designating the action as "temporary" and providing a 30-day comment period.  41 U.S.C. § 1707(e).  Defendants have not done so here.  And even if they had, there is no reason to think that notice and comment was impracticable.  Neither the COVID-19 pandemic nor the availability of vaccines is a recent development.  Defendants have therefore violated Section 1707 by failing to provide notice and comment.[4]

### D.   The Contractor Mandate Exceeds Congress's Enumerated Powers and Unconstitutionally Infringes on the Authority of the States.

In Counts 3, 4, 11, and 12, the Plaintiff States assert that Defendants have unlawfully usurped their police powers, commandeered them to implement federal policies, violated the Tenth Amendment, and exceeded the federal spending power and other enumerated powers.  Doc. 1, ¶¶ 105–12, 169–86.  Plaintiffs are likely to prevail on these federalism-related arguments.

"[E]ven in a pandemic, the Constitution cannot be put away and forgotten."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020).  The Constitution "leaves to the several States a residuary and inviolable sovereignty, reserved explicitly to the States by the Tenth Amendment."  *New York v. United States*, 505 U.S. 144, 188 (1992) (cleaned up).  As that Amendment

---

[4] To the extent this Court concludes that Defendants' actions do not involve procurement or contracting, APA notice-and-comment requirements would apply.  *See* 5 U.S.C. § 553(a)(2) (exempting from APA notice-and-comment requirements matters "relating to . . . contracts").  In that event, Plaintiffs would be likely to prevail under Counts 5 and 9, where they assert that the OMB Conclusion and the FAR Guidance contravene the APA by failing to conduct notice-and-comment rulemaking. *See* Compl. ¶¶ 113–20, 154.

says, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. CONST. amend. X.

[T]he police power of a state" includes, above all, the authority to adopt regulations seeking to "protect the public health," including the topic of mandatory vaccination.  *Jacobson*, 197 U.S. at 24–25; *see also Zucht v. King*, 260 U.S. 174, 176 (1922) ("[I]t is within the police power of a *state* to provide for compulsory vaccination") (emphasis added).  The States "did not surrender" these powers "when becoming . . . member[s] of the Union."  *Jacobson*, 197 U.S. at 25.  Thus, in our constitutional order, "[t]he safety and the health of the people . . . are, in the first instance, for [the States] to guard and protect."  *Id.* at 38.  These matters "do not ordinarily concern the national government."  *Id.*  So to the extent that health measures like vaccine mandates "can be [implemented] by any government, they depend, primarily, upon such action as the state, in its wisdom, may take."  *Id.*

By seeking to impose their vaccine mandate on millions of state and private employees who comprise roughly one-fifth of the national workforce, Defendants usurp powers that belong to the States.  As far as Plaintiffs can tell, never before has the federal government attempted to mandate vaccines on state and private employees—much less millions of them.  Often "the most telling indication of a severe constitutional problem is the lack of historical precedent" for it.  *NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (Roberts, C.J.) (quoting another source).  That is certainly true here because Defendants' unprecedented mandate "invades the province of state sovereignty reserved by the Tenth Amendment."  *New York*, 505 U.S. at 155.

Nothing in the Constitution gives the federal government the power it seeks to exercise. While Congress has the authority to contract under the Spending Clause, U.S. Const. art. I, § 8, cl. 1, that power does not support Defendants' mandate for three reasons.

*First*, Defendants' mandate fails to "unambiguously" establish the contractual terms. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  In fact, the new contract provision that Defendants demand requires contractors, including States, to "comply with all guidance … as amended during the performance" of the contract "published by the … Task Force."  Ex. D, at 5.  Imposing such open-ended contractual requirements defies the clarity that the Spending Clause requires.  *See NFIB*, 567 U.S. at 584 ("[T]he spending power … does not include surprising participating States with post-acceptance … conditions.").

*Second*, Defendants' mandate is so broad that much of it is not "related to the federal interest in particular national projects or programs."  *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009).  Reaching far beyond employees working on federal contracts, the mandate covers employees who merely support employees working on federal contracts (such as by working on human resource issues) or who might simply encounter employees working on federal contracts in a common area at work.  Ex. B, at 10–11.  The breadth of that demand far exceeds any reasonable connection to a federal interest in federal programs.

*Third*, the federal government cannot use the spending power to "commandeer[] a State's … administrative apparatus for federal purposes," *NFIB*, 567 U.S. at 577 (Roberts, C.J.), or "conscript state [agencies] into the national bureaucratic army," *id.* at 585.  Yet that is exactly what Defendants are doing.  The mandate applies to contracts between the federal government and state agencies, and Defendants compel those agencies to implement the federal government's vaccination policy far beyond the confines of federal contracts to state employees who do not work

on any such contracts.  State agencies will now become administrators of federal COVID-19 vaccine mandates.  *See Printz v. United States*, 521 U.S. 898, 914 (1997).

It is not reasonable or even possible for the States to immediately forego all their federal contracts, which span many of Plaintiffs' state agencies.  Compl. ¶ 87.  The mandate covers "extensions or renewals" or "options" on "existing contracts."  Ex. D, at 2.  And the Task Force's Guidance "strongly encourage[s]" federal agencies to add the mandate to "existing contracts and contract-like instruments" even before renewals occur.  Ex. B, at 5.  Indeed, many of Plaintiffs' agencies have already begun receiving requests to modify existing contracts, and many have been given short time periods in which to respond.  *See* Exs. G–L, O.  Because many of these contracts are vital to the Plaintiffs, ending them would force the Plaintiffs to abruptly stop or alter important governmental programs, which would be difficult and painful to do.  Affording States only a matter of weeks to choose between implementing an unlawful vaccine mandate or relinquishing longstanding federal contracts essential to existing state programs is an obvious attempt to coerce. Defendants' unlawful actions will thus directly commandeer States into administering federal vaccination policy in violation of the Spending Clause.

Just as the Spending Clause does not authorize Defendants' mandate, neither does the Commerce Clause.  Art. I, § 8, cl. 3.  The mandate does not "regulate Commerce."  *Id.*  Rather, it demands action—in the form of compulsory vaccines—from millions of people.  *NFIB*, 567 U.S. at 555 ("The Framers gave Congress the power to *regulate* commerce, not to *compel* it").  But the Commerce Clause is not a license to act "whenever enough [people] are not doing something the [federal] Government would have them do."  *Id.* at 553.  Moreover, Defendants' mandate does not merely require *activities* in the workplace; it intrudes upon a deeply *personal* health decision— whether to get vaccinated—that transcends commerce and work issues.  "Any police power to

regulate individuals as such, as opposed to their activities, remains vested in the States" and has

not been given to the federal government.  *Id.* at 557.  Defendants have thus exceeded their

authority by attempting to impose their mandate.

Protecting federalism is no empty gesture.  "[A] healthy balance of power between the

States and the Federal Government will reduce the risk of tyranny and abuse from either front."

*Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  Here, Defendants are usurping the States' power

in an overbearing quest to mandate COVID-19 vaccines throughout the nation.  Vindicating the

Plaintiffs' federalism claims will "secure[] to citizens the liberties"—namely, the ability to make

important health decisions for themselves—"that derive from the diffusion of sovereign

power."  *New York*, 505 U.S. at 181.

## II.     The Balancing of Harms and the Public Interest Support an Injunction.

The remaining *Dataphase* factors include "(2) the threat of irreparable harm to the movant

in the absence of relief; (3) the balance between that harm and the harm that the relief would cause

to other litigants; and (4) the public interest."  *Watkins, Inc.*, 346 F.3d at 44.  Those factors also

favor the States.

### A. Absent an Injunction, Plaintiff States Will Suffer Irreparable Harm to Their Sovereign, Quasi-Sovereign, and Proprietary Interests.

The States will face great irreparable harm if the federal contractor mandate is not enjoined.

*Id.*  This harm includes injuries to their sovereign, quasi-sovereign, and proprietary interests.

These injuries not only establish irreparable harm but also demonstrate that the States have

standing to bring their claims.

*First*, the States face direct sovereign injuries from the federal contractor mandate.  As

noted above, President Biden announced in his speech a clear intention to supersede and preempt

any State policies that differ from his preferred federal policies, vowing that if any States disagree

with his federal policy, "I'll use my power as President to get them out of the way." Biden Speech, *supra*. Consistent with this avowal, the Task Force Guidance expressly preempts any state or local policy that differs from or opposes the federal contractor mandate: "These requirements are promulgated pursuant to Federal law and supersede any contrary State or local law or ordinance." Ex. B, at 13. Therefore, if it is allowed to go into effect, the contractor mandate will expressly supersede state statutes, executive orders, regulations, and other policies that oppose vaccine mandates or provide State-level protection to individuals to make their own choices about vaccination. *See id.*

This includes numerous statutes and other state-level policies of the Plaintiff States. For example, Missouri has a statute that prohibits public health orders, including vaccine mandates, if they are not approved by the governing bodies of political subdivisions, Mo. Rev. Stat. § 67.265, which may be partially preempted if the vaccine mandate goes into effect. In addition, Missouri has a very robust state Religious Freedom Restoration Act, Mo. Rev. Stat. § 1.302, which the contractor vaccine mandate preempts by authorizing employers to determine the scope of religious exemptions to the mandate. *See* Ex. B, at 5, 9–10.

Other Plaintiff States face similar interference with the implementation of state law. For example, Alaska's state constitution recognizes a fundamental right to privacy which includes the right to make decisions about medical treatment. *See Huffman v. State*, 204 P.3d 339 (Alaska 2009) (holding held that an individual's freedom to make medical decisions for themselves is a fundamental right protected under Article I, Section 22 of the Alaska Constitution). The contractor vaccine mandate also ostensibly preempts an Alaska statute that broadly protects all Alaskans' rights to object to COVID-19 vaccines "based on religious, medical, or *other* grounds," and that forbids any person from "requir[ing] an individual to provide justification or documentation to

38

support the individual's decision to decline a COVID-19 vaccine."  2021 Alaska Sess. Laws ch. 2, § 17 (emphasis added).  Similarly, the contractor vaccine mandate ostensibly preempts Arkansas statutes, including Ark. Code 20-7-143, which is currently in effect and prohibits public entities from requiring vaccines, and Ark. Code 11-5-118, which will go into effect in January and requires private employers (including contractors) give employees a testing option in lieu of vaccination. The contractor vaccine mandate also ostensibly preempts a recently enacted Montana statute that generally forbids employers in that State "to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status." Mont. Code Ann. § 49-2-312(1)(b).

Preempting, and thus effectively invalidating, duly enacted State statutes inflicts *per se* irreparable injury on the States as sovereigns.  "Prohibiting the State from enforcing a statue properly passed … would irreparably harm the State." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020); *see Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) ("[T]he inability to enforce its duly enacted plan clearly inflicts irreparable harm on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time" a State is blocked "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).  When the State is blocked from implementing its statutes, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).  The vaccine mandate injures the Plaintiff States' sovereign interest in exercising their own

police power.  And it does so in an area—public health—where the traditional authority of the States is paramount and the federal Government possesses no enumerated power.

*Second*, the States face significant injuries to their quasi-sovereign or *parens patriae* interests in protecting the rights of substantial segments of their population.  As noted above, "workers employed by federal contractors" comprise "approximately one-fifth of the entire U.S. labor force."  Office of Compliance Contract Programs, *supra*.  This includes millions of workers in the Plaintiff States.  *See id.*  As the Supreme Court has recognized, the States have "a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).  The State's interest applies when a policy affects a "sufficiently substantial segment of its population," especially where an alleged injury to the health and welfare of [the States'] citizens … is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."  *Id.*  As noted above, several States have enacted statutes to protect their citizens from vaccine mandates.  The States have a quasi-sovereign interest in preventing the manifest irreparable injury to their millions of citizens who face a Hobson's choice between making their own decisions or losing their jobs.  The imposition of such a choice on millions of citizens of the Plaintiff States, "for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

*Third*, the States face irreparable injury to their proprietary interests.  As Justice Scalia has observed, "a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."  *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring).  The States will incur direct pocketbook injuries because the Task Force

Guidance directs employees to obtain documentation of vaccination from state and local public-health agencies.  *See* Ex. B, at 9.

In addition, the States face economic disruption from widespread resignations due to the unpopular vaccine mandates, which will exacerbate the supply-chain crisis, disrupt their economies, and interfere with their revenue collection efforts.  As noted above, 72 percent of unvaccinated workers indicate that they will give up their jobs rather than complying with a vaccine mandate.  *See* Kaiser Family Foundation Survey (Oct. 28, 2021), https://www.kff.org/coronavirus-covid-19/press-release/1-in-4-workers-say-their-employer-required-them-to-get-a-covid-19-vaccine-up-since-june-5-of-unvaccinated-adults-say-they-left-a-job-due-to-a-vaccine-requirement/.  In addition, the States *qua* federal contractors and employers face disruption in their day-to-day operations as they are confronted with the prospect of losing significant numbers of employees.  In Missouri, for example, it is widely anticipated that vaccine mandates will result in widespread resignations and critical staffing shortages in the health-care sector,[5] and Missouri's agencies anticipate similar disruption in their own workforces.  *See* Exs. F, N–O.  Other Plaintiff States face similar issue.  *See*, *e.g.*, Exs. J–L.  If allowed to go into effect, many States and their agencies will experience staffing shortages and disruption of services from the vaccine mandate—which will injure their sovereign and proprietary interests.

---

[5] *See, e.g., 'Dangling by a thread': Nursing home industry warns of staff exodus over vaccine mandates*, MO. INDEP. (Sept. 15, 2021), *at* https://missouriindependent.com/2021/09/15/dangling-by-a-thread-nursing-home-industry-warns-of-staff-exodus-over-vaccine-mandates/;  *Missouri Health Care Association says vaccine mandate will worsen staffing shortage*, FOX 2 NEWS (Sept. 14, 2021), *at* https://fox2now.com/news/missouri/missouri-health-care-association-says-vaccine-mandate-will-worsen-staffing-shortage/; *Missouri hospital fears staff may quit over Biden vaccine mandate*, KAN. CITY STAR (Oct. 14, 2021), *at* https://www.kansascity.com/news/coronavirus/article254948037.html; *see also, e.g., As Vaccine Deadlines Approach, Hospitals Fear Staffing Shortages Will Occur*, NPR.org (Sept. 27, 2021), *at* https://www.npr.org/sections/coronavirus-live-updates/2021/09/27/1041047608/vaccine-deadlines-hospitals-fear-staffing-shortages (detailing similar concerns nationwide).

**B.**    **Blocking the Enforcement of the Unlawful and Unconstitutional Mandate Will Inflict No Cognizable Harm on the Federal Government.**

On the flip side, preventing the enforcement of an unlawful mandate will inflict no cognizable injury on the federal Government.  The Government has no valid interest in violating the law by "the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law"); *Make Liberty Win v. Ziegler*, 478 F.Supp.3d 805, 812 n.6 (W.D. Mo. 2020) (holding that "a governmental entity 'has no legitimate interest in enforcing an unconstitutional ordinance'") (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)).

**C.**    **The Public Interest Strongly Favors an Injunction.**

Finally, the public interest strongly favors an injunction against the enforcement of the Administration's unlawful and unconstitutional mandate.  When the party opposing relief is the Government, the third factor "merge[s]" with the public-interest factor.  *Nken v. Holder*, 556 U.S. 418, 436 (2009).  Here, where the Government faces no cognizable harm from an injunction, the public interest favors its entry.  Indeed, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490; *see League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

The public interest also strongly favors vindicating the traditional balance of power between the federal government and the States, which Defendants' unlawful mandate threatens to disrupt.  The allocation of governmental powers within the federal system undergirds the

Constitution's charter for responsive, accountable, and limited government. "The federal system rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 564 U.S. 211, 220-21 (2011) (quoting *Alden v. Maine*, 527 U.S. 706, 758 (1999)). "[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Id.* at 221 (quoting *New York*, 505 U.S. at 181). "Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions." *Id.* Moreover, "federalism enhances the opportunity of all citizens to participate in representative government." *FERC v. Mississippi*, 456 U.S. 742, 789 (1982) (O'Connor, J., concurring in part and dissenting in part). By preserving room for experimentation in the States, federalism also supports policy innovation that can address many of society's most pressing problems. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 310-11 (1932) (Brandeis, J., dissenting). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458.

The federal contractor vaccine mandate directly implicates those principles of federalism. It involves unprecedented federal overreach in purporting to dictate the private medical decisions of millions of Americans—in an area that falls within the States' traditional zone of authority. It deliberately seeks to displace state authority and replace it with federal power in an area where the federal government has no enumerated power or mandate in the Constitution to act. In America, the public interest favors federalism, and it favors freedom. The Court should enjoin Defendants' unlawful mandate.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction, and enter an injunction preventing Defendants from taking any action to implement or enforce the unlawful federal contractor vaccine mandate.

Dated: November 4, 2021

**DOUGLAS J. PETERSON**
**Attorney General of Nebraska**

*/s/ James A. Campbell*
James A. Campbell*
  *Solicitor General of Nebraska*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2686
Jim.Campbell@nebraska.gov
*Counsel for Plaintiffs*


*\*Admission application forthcoming*

Respectfully submitted,

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ Justin D. Smith*
Justin D. Smith, #63253MO
  *Deputy Attorney General of Missouri*
Michael E. Talent, #322220CA
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(573) 751-0304
Justin.Smith@ago.mo.gov
*Counsel for Plaintiffs*

**TREG R. TAYLOR**
**Attorney General of Alaska**
*/s/ Cori Mills*
Cori M. Mills
    *Deputy Attorney General of Alaska*
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501-1994
(907) 269-5100
Cori.Mills@alaska.gov
*Counsel for State of Alaska*

**LESLIE RUTLEDGE**
**Arkansas Attorney General**
*/s/ Vincent M. Wagner*
Vincent M. Wagner
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas  72201
(501) 682-8090
vincent.wagner@arkansasag.gov

JEFFREY S. THOMPSON
Solicitor General
SAMUEL P. LANGHOLZ
Assistant Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov
*Counsel for State of Iowa*

45

**AUSTIN KNUDSEN**
**Attorney General of Montana**
KRISTIN HANSEN
Lieutenant General
DAVID M.S. DEWHIRST
Solicitor General
CHRISTIAN B. CORRIGAN
Assistant Solicitor General
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406-444-2026
David.Dewhirst@mt.gov
Christian.Corrigan@mt.gov
*Counsel for State of Montana*

**JOHN M. FORMELLA**
**New Hampshire Attorney General**
*/s/ Anthony J. Galdieri*
Anthony J. Galdieri
Solicitor General
NEW HAMPSHIRE DEPARTMENT OF JUSTICE
33 Capitol Street
Concord, NH 03301
Tel: (603) 271-3658
Anthony.J.Galdieri@doj.nh.gov
*Counsel for State of New Hampshire*

**WAYNE STENEHJEM**
**Attorney General of North Dakota**
*/s/ Matthew A. Sagsveen*
Matthew A. Sagsveen
Solicitor General
State Bar ID No. 05613
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
masagsve@nd.gov
*Counsel for State of North Dakota*

**JASON R. RAVNSBORG**
**South Dakota Attorney General**
*/s/ David M. McVey*
David M. McVey
Assistant Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD  57501-8501
Phone: 605-773-3215
E-Mail: david.mcvey@state.sd.us
*Counsel for State of South Dakota*

**BRIDGET HILL**
  **Wyoming Attorney General**
*/s/ Ryan Schelhaas*
Ryan Schelhaas
  Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov
*Attorneys for the State of Wyoming*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 4, 2021, a true and correct copy of the foregoing and any attachments were filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system and to be served on those parties that have not appeared who will be served in accordance with the Federal Rules of Civil Procedure by mail or other means agreed to by the party.

*/s/ Justin D. Smith*