# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |
|---|---|
| STATE OF MISSOURI, et al., | |
| *Plaintiffs*, | |
| v. | No. 4:21-cv-01300 |
| JOSEPH R. BIDEN, JR., et al., | |
| *Defendants*. | |

**<u>DECLARATION OF PATRICK HACKLEY</u>**

1.      My name is Patrick Hackley.  I am the Director of the Division of Forests and Lands of the New Hampshire Department of Natural and Cultural Resources (the "Department"). I am also a resident of New Hampshire and over the age of majority. I have personal knowledge of the facts in this declaration, and those facts are true and correct to the best of my knowledge.

2.      I submit this declaration in conjunction with Plaintiffs' Motion for Preliminary Injunction.

3.      The Department recently received a Notice to Lessor from the USDA, Forest Service dated October 19, 2021.  The subject of the notice is "Lease Contract Modification – New Clause for Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors." Attached hereto as **Exhibit A** is a true and correct copy of that Notice to Lessor.

4.      A lease amendment was enclosed with the Notice of Lessor.  A true and correct copy of that lease amendment is attached hereto as **Exhibit B**.

1

5.      The Notice to Lessor strongly encourages the Department to accept this lease contract modification and states that the modification is mandatory before the USDA, Forest Service will be able to renew the contract.

6.      The Notice to Lessor also requests that the Department sign and return the lease contract modification no later than November 14, 2021.

7.      The Notice to Lessor refers to the lease agreement between the Department and the USDA, Forest Service for communications equipment and antenna space in designated areas at Mount Washington in Mount Washington State Park for a five (5) year period from October 1, 2017 through September 30, 2022.  Attached thereto as **Exhibit C** is a true and correct copy of the fully executed lease agreement.

8.       Payment on the agreement is monthly pursuant to a State issued invoice.  See Exhibit C, Pg. 3 of 12.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this the 4th day of November, 2021.


/s/ Patrick Hackley
Patrick Hackley

Director of the Division of Forests and Lands of the New Hampshire Department of Natural and Cultural Resources

2

# EXHIBIT

# A

**Forest Service**          **Washington Office**          1400 Independence Avenue, SW
                                                            Washington, D.C. 20250

---

**File Code: 6400**                                    **Date:** 10/19/2021

**Subject:**  Lease Contract Modification - New Clause for Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors

NOTICE TO LESSOR,

The USDA, Forest Service (FS) appreciates the hard work and dedication of our contractors and the health and safety of our employees, contractors and their families is our top priority. In order to ensure the health and safety of the Federal workforce and contractor community, the President signed *Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors.* The requirements in the Executive Order are being implemented via a FAR deviation. The clause in the FAR deviation will be incorporated into FS contracts via a bilateral modification.

We strongly encourage you to accept this contract modification. The modification is *mandatory* before we will be able to renew, extend the period of performance of your contract, or exercise an option.

Based on the urgency of this issue, please return the signed amendment as soon as possible, but no later than **November 14, 2021**. Once it is received the Lease Contracting Specialist will sign for the Government and return a fully executed amendment for your records.

For more information, please visit the GSA COVID website https://gsa.gov/covid19 and The Safer Federal Workforce Task Force website https://www.saferfederalworkforce.gov/

Sincerely,

ADAM
FISCHER          Digitally signed by ADAM
                 FISCHER
                 Date: 2021.10.19
                 10:47:12 -05'00'

Adam Fischer

Leasing Contracting Officer

**Enclosure: Lease Amendment**



America's Working Forests – Caring Every Day in Every Way          Printed on Recycled Paper



# EXHIBIT

# B

| UNITED STATES DEPARTMENT OF AGRICULTURE<br>FOREST SERVICE | LEASE AMENDMENT No. 1256A118L2202PLA004 |
|---|---|
| **LEASE AMENDMENT** | LEASE CONTRACT No. 1256A118L2202 |
| **ADDRESS OF PREMISES** Lat: 44.270183<br>Long: -71.303931 | |

**THIS AMENDMENT** is made and entered into between New Hampshire Department of Natural and Cultural Resources

whose address is: 172 Pembroke Rd., Concord, NH 03302
hereinafter called the Lessor, and the **UNITED STATES OF AMERICA**, hereinafter called the Government:
**WHEREAS** the parties hereto desire to amend the above Lease to add FAR Clause 52.223-99, Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors (OCT 2021) (DEVIATION).

NOW THEREFORE, these parties for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, covenant and agree that the said Lease is amended, effective _10/19/2021_ as follows:

52.223-99 ENSURING ADEQUATE COVID-19 SAFETY PROTOCOLS FOR FEDERAL CONTRACTORS (OCT 2021) (DEVIATION)

(a) *Definition.* As used in this clause -

*United States or its outlying areas* means—

(1) The fifty States;

(2) The District of Columbia;

(3) The commonwealths of Puerto Rico and the Northern Mariana Islands;

(4) The territories of American Samoa, Guam, and the United States Virgin Islands; and

(5) The minor outlying islands of Baker Island, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Islands, Navassa Island, Palmyra Atoll, and Wake Atoll.

This Lease Amendment contains 2 pages.

All other terms and conditions of the lease shall remain in force and effect.
IN WITNESS WHEREOF, the parties subscribed their names as of the below date.

**FOR THE LESSOR:**                                      **FOR THE GOVERNMENT:**

Signature: _____         Signature: _____
Name: _____              Name: _Adam Fischer_____
Title: _____             Title: Lease Contracting Officer
Entity Name: _____        Date: _____
Date: _____

_____

**WITNESSED FOR THE LESSOR BY:**

Signature: _____
Name: _____
Title: _____
Date: _____

**Lease Amendment Form 12/12**

(b) *Authority.* This clause implements Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, dated September 9, 2021 (published in the Federal Register on September 14, 2021, 86 FR 50985).

(c) *Compliance.* The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https://www.saferfederalworkforce.gov/contractors/.

(d) *Subcontracts.* The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts at any tier that exceed the simplified acquisition threshold, as defined in Federal Acquisition Regulation 2.101 on the date of subcontract award, and are for services, including construction, performed in whole or in part within the United States or its outlying areas.

(End of clause)

INITIALS: _____  &  _____
               LESSOR              GOV'T

# EXHIBIT

# C



STATE OF NEW HAMPSHIRE
DEPARTMENT of NATURAL and CULTURAL RESOURCES
**Division of Forests and Lands**

172 PEMBROKE ROAD    CONCORD, NEW HAMPSHIRE  03301
PHONE: 271-2214   FAX: 271-6488   WWW.NHDFL.ORG

April 09, 2019

His Excellency, Governor Christopher T. Sununu
  and the Honorable Executive Council
State House
Concord, New Hampshire 03301

### REQUESTED ACTION

1) Pursuant to RSA 227-H:9, authorize the Department of Natural and Cultural Resources (DNCR) to enter into a **RETROACTIVE** Lease Agreement (Lease) with the United States Department of Agriculture, Forest Service (USFS) of Campton, New Hampshire for communications equipment and antenna space in designated areas at Mount Washington in Mount Washington State Park for a five (5) year period from October 1, 2017 through September 30, 2022, effective upon Governor and Executive Council approval.

2) Further authorize DNCR to accept an initial annual rental payment of $9,240.00. In each subsequent year of the lease, the rent will be adjusted using the Consumers Price Index (CPI) detailed in the terms of the Lease and will be deposited into accounting unit #03-35-35-351510-37420000-402040 "Mt Washington Commission".

### EXPLANATION

The USFS is an agency of the United States Government in good standing with the State of New Hampshire and has been a tenant at Mount Washington since 2003. They have occupied the site as an at will tenant since October 1, 2017, while DNCR worked with them to renegotiate this lease. We began lease negotiations in August 2016. This has taken an extensive amount of time due to significant staff turnover and reorganization within the USFS. The USFS will pay all back rent once the lease has been approved.

The Lease is subject to DNCR's "Policy on Use and Management of DNCR Communication Facilities" attached as Exhibit A and all installed communication equipment shall meet the guidelines set forth by DNCR's "Technical Requirements for the Use of Communication Sites" attached as Exhibit B.

The Attorney General's office has reviewed and approved the Lease as to form, substance, and execution.

Respectfully submitted,

Brad W. Simpkins
Director

Philip A. Bryce
Director, Division of Parks and Recreation

Concurred,

Sarah L. Stewart
Commissioner

## LEASE AGREEMENT
UNITED STATES DEPARTMENT OF AGRICULTURE, FOREST SERVICE
### MOUNT WASHINGTON
MOUNT WASHINGTON STATE PARK
SARGENT'S PURCHASE, NEW HAMPSHIRE

| CRITICAL DATES / TERM / RENT | |
|---|---|
| (for State use only) | |
| **DEFINITION** | **DATE** |
| **Term Effective Date:** Governor and Council approval date | 5/15/2019 |
| **Billing Commencement Date:** beginning invoice date for rent owed, set by Lease terms to be monthly, quarterly, or annual | 10/1/2017 |
| **Term & Initial Annual Rent:** 5 years beginning at $9,240.00, subject to an annual Consumer Price Index Adjustment. | |

THIS LEASE AGREEMENT ("the Lease"), is made and entered into by and between the State of New Hampshire acting through its Department of Natural and Cultural Resources, having a mailing address of 172 Pembroke Road, Concord, New Hampshire 03301 ("the State"), under authority of RSA 227-H:9, and United States Department of Agriculture, Forest Service, an agency of the United States Government being located in the White Mountain National Forest, Campton, NH  03223("the Lessee"). The State and the Lessee together shall be "the Parties".

NOW, THEREFORE the Parties agree as follows:

PURPOSE:  The purpose of the Lease is to provide for the use and possession by the Lessee of certain areas within and upon the real property and improvements thereon (the "Property") known as the top of Mount Washington, located in Mount Washington State Park , according to the terms and conditions set forth below.

-WITNESSETH THAT-

I.   LEASED PREMISES

the State, for and in consideration of the covenants and agreements hereinafter contained and made on the part of the Lessee, does hereby lease to the Lessee:

a)  Designated space within the Yankee Building
b)  Designated spaces on the rooftop of the Yankee Building for antennas

The above described land and rights shall hereinafter be called the "Leased Premises."

No additional facilities shall be allowed without prior written permission of the State.

II.   ENTRY AND USE OF LEASED PREMISES

The Lessee shall be permitted to enter and use the Leased Premises as a wireless communication

site. The Lessee shall not be permitted to use the Leased Premises for any other purpose except by prior written approval of the State.  The State shall have the right to request identification of any and all individuals representing the Lessee who seek access to the Property under the terms of the Lease and to deny access to the Property by certain individuals identified, if necessary.

The State shall be notified forty eight (48) hours before the start of work, or planned maintenance, at the Leased Premises during normal business hours, Monday thru Friday between 8 a.m. and 4 p.m., however; unexpected/emergency repairs may be made immediately, with notice of such actions being made to the State within twenty four (24) hours.

Access Notifications should be made via phone, text message, or email to:

Justin Bellen
Communications Technician
NH Division of Forests and Lands
172 Pembroke Road
Concord NH  03301
Office: (603)271-2654
Cell   : (603)892-5620
justin.bellen@dncr.nh.gov

III.   AUTHORIZED FACILITIES

The Lessee is authorized to have the following equipment on the Property

        Please reference the attached Exhibit D for facilities

The equipment listed herein shall be referred to as the Lessee's "facilities."

No additional facilities shall be allowed without written permission of the State. The approval by the State of replacement of facilities in kind shall not be unreasonably withheld or delayed.

IV.   ACCESS LIMITATION

Access to the Mount Washington during the summer season shall be coordinated with the State and shall be at the Lessee's own expense. The Lessee, to the greatest extent possible, shall schedule non-emergency access at dates and times that cause the least amount of conflict with the public recreational use of the Property. Where possible, at its sole discretion and if space permits, the State will endeavor to provide the Lessee with transport on scheduled State transportation free of charge.

The State shall provide the Lessee with transportation during the winter season on an "available space" basis. Trips scheduled during normal shift changes shall be at a rate of $100.00 per seat. For unscheduled or emergency trips, the Lessee shall pay $500 per trip, plus the current hourly rate for State Park Staff Site Support labor. The State, at its sole discretion, may waive these fees if it deems appropriate.

The Lessee will be held responsible for damage to State land resulting from improper motorized access to Mount Washington State Park by the Lessee, or their agents.

Access contact:
Mt. Washington State Park Manager (MWSP) (603) 466-3347
Dept. of Natural and Cultural Resources (DNCR) Communications Technician (603) 271-2214

V.    TERM

The term of this lease shall be October 1, 2017 through September 30, 2022, effective upon approval by the Governor and Executive Council. The State agrees that it will negotiate a new lease with Lessee in good faith at the conclusion of the term.

VI.    BENEFICIAL SERVICES

Not Applicable

VII.    RENT – OR CONSIDERATION

| Description | Annual Dollars | Monthly Dollars |
|---|---|---|
| Calculated Initial Year Rent | $9,240.00 | $770.00 |
| Beneficial Service Credit | 0 | 0 |
| Final Initial Year Rent | $9,240.00 | $770.00 |

Payment shall be monthly pursuant to a State issued invoice and shall commence on the first of the month following full installation of all the Facilities pursuant to EXHIBIT D, verified by the State's Communications Technician, and approved to begin/resume operation according to the Lease ("Billing Commencement Date").

**Federal Tenants Only** Upon agreement of the parties, the Lessee may pay rent by electronic funds transfer and in such event, the State agrees to provide to the Lessee bank routing information for such purpose upon request of the Lessee.

VIII.    ANNUAL ESCALATION

Each year on October 1st, the current Lease amount will be adjusted by applying the Consumer Price Index (CPI) calculated escalator. The cost of living index will be measured by the U. S. Department of Labor, Revised Consumer Price Index for All Urban Consumers, U.S. City Average, all items figure, (1982-84=100) published by the Bureau of Labor Statistics.  Payment will be made with the monthly installment of fixed rent.  Rent adjustments will be effective on

October 1 of each year.  In August the Forest Service will determine the CPI percentage change to be applied to the lease during the following Federal Fiscal Year (October 1 through September 30).  The amount of adjustment will be determined by multiplying the base rental rate by the percent of change in the cost of living index referenced above.  The percent change will be computed by comparing the index figure published for August of each year with the index figure published for August of the previous year. The resulting percentage will be applied to all payments made during the next 12 month period beginning October 1 through September 30th.  For example, in the year 2020 the Forest Service would use the index published for August of 2019 and that figure would be compared with the index published for August of 2020 to determine the percent change for payments to be made between 1-Oct-2020 and 30-Sep-2021.

In the event of any decreases in the cost of living index occurring during the term of the occupancy under the lease, the rental amount will be reduced accordingly.  The amount of such reductions will be determined in the same manner as increases in rent provided under this clause.

IX.    CONDITIONS TO ENTRY AND WORK ON THE LEASED PREMISES

The Lessee shall take precautions to minimize the impact of any work on the Property. The Lessee must coordinate any entry or activity on the Property in advance with the State's Communications Technician. The Lessee agrees to comply with all local, state and federal laws, rules and ordinances applicable to the work, and further agrees to exercise due care in the performance of all work on the Property.  The Lessee shall be responsible for determining the location of all underground utilities prior to the commencement of any work.  The Lessee, its contractors, agents, employees or assigns shall not make or cause to be made any governmental filings regarding the Property without the prior written consent of the State.  Notwithstanding any other provisions in the Lease, the provisions of this Section shall survive the expiration or termination of the Lease.  The Lessee shall restore the Property to its existing condition, reasonable wear and tear excepted, including removal of all its equipment, and shall indemnify and hold harmless the State from all loss, costs, injury or damage to persons including death, or property arising out of the Lessee's employees, agents, assigns or contractor's actions with respect to entry upon the Property pursuant to this right of entry.

X.    TAXES

Unless otherwise exempt from these obligations, the Lessee shall pay, in addition to any other payments provided hereunder, all taxes and all fees, assessments and other costs or expenses now or hereafter imposed by any government authority, directly in connection with the Lessee's equipment or use of the Leased Premises. In addition, to the extent permitted by law, the Lessee shall pay that portion, if any, of the personal property taxes or other taxes directly attributable to the Lessee's equipment. Unless it is exempt from such taxation, the Lessee shall pay any increase in real estate taxes levied against the Leased Premises and the Lessee's equipment directly attributable to the Lessee's use and occupancy of the Lease Premises pursuant to the application of RSA 72:23 I, which provides for taxation of certain State properties used or occupied by persons or entities other than the State. If Lessee contends that it is exempt from such taxation, Lessee will provide the State with documentation substantiating the exemption upon the reasonable request of the State.

If required to by law, the Lessee shall make payment of such taxes, fees, and assessments to the State or such government authority as has invoiced taxes, fees, and assessments, within thirty (30) days of the date of invoice.  Failure of the Lessee to pay the duly and legally assessed real estate

and/or personal property taxes, fees and assessments when due shall be cause to terminate the Lease by the State provided written notice has been given the Lessee by the party assessing the tax and sixty (60) days have elapsed from the date of the receipt of notice by the Lessee and no payment has been made.

XI.   RIGHT TO LEASE - COMPLIANCE WITH LAW

The State represents that it has the full right, title, interest, power and authority to enter into the Lease and to let the Leased Premises for the term herein granted.  The Lessee shall comply with all applicable federal and state laws, rules and regulations in connection with the operation of the Lease.

XII.   QUIET ENJOYMENT-INSPECTION

The Lessee, upon the payment of the rent herein provided, and upon the performance of all of the terms of the Lease, shall peaceably and quietly have, hold and enjoy the Leased Premises without any hindrance, disturbance, interference or interruption from the State or from any persons claiming by, through and under the State.

Provided however, the Lessee agrees that the State or any of its duly authorized agents may with reasonable notice to the Lessee, inspect any and all the Lessee Property located on the Leased Premises during usual business hours; and

The Lessee understands and hereby accepts that other leasehold tenants occupy the Property which may result in possible inconvenience when another lessee is doing work coincidentally onsite.

XIII.   MUTUAL NON-INTERFERENCE  -  CONFLICTS WITH RECREATIONAL USERS

The Lessee agrees to install radio equipment of the type and frequency which will not cause measurable interference to the State, other lessees of the premises or neighboring landowners.  In the event the equipment of the Lessee causes such interference, and after the State has notified the Lessee of such interference, the Lessee will take all steps necessary to correct and eliminate the interference.  Continued interference problems caused by the equipment of the Lessee shall be just cause for termination of the Lease subject to the provisions of Section XXVIII

The State agrees that the State and any other tenants of the Property who currently have or in the future take possession of the Property will be permitted to install only such radio equipment that is of the type and frequency which will not cause measurable interference to the Lessee. In the event any such equipment of the State or of another tenant at the Property causes such interference, the State will see that the interfering party takes all steps necessary to correct and eliminate the interference.

The State covenants and agrees that it will not permit or allow the erection, installation or construction of any buildings, or structures, on any portion of its remaining land at the Property that will shield or obstruct or otherwise interfere with the reception or transmitting of radio signals over the paths established by the Lessee; however, the Lessee agrees to comply with all reasonable requests in writing of the State or any of its agents as to particular situations which may arise to permit the erection, installation or construction of such structures.  In no event however, shall the Lessee's compliance with such requests relieve the State of its obligation to see that the State or any

other interfering party take all steps necessary to correct and eliminate any interference caused thereby. In addition, all reasonable precautions will be taken by the Lessee to ensure that there will be no conflict with the State's use, which can include the public's use of the Property including, but not limited to, obstructing access to the summit or viewpoints from the summit.

XIV.    ASSIGNMENT/SUBLEASE

The Lessee may not assign or transfer its rights under the Lease or sublease any portion of the Leased Premises to any third party without the express written permission of the State, which permission shall not be unreasonably denied.

In the event of a greater than fifty (50) percent change of ownership of Lessee, the State shall have the option of continuing the Lease or terminating with ninety (90) days notice to the Lessee.

XV.     COMMUNICATION SITE POLICY-TECHNICAL REQUIREMENTS

The Lease is granted subject to the State of New Hampshire Department of Natural and Cultural Resources "Policy on Use and Management of DNCR Communication Facilities" adopted November 7, 1989, and last revised in July 2017, a copy of which is attached herewith, made a part hereof, and is marked Exhibit "A".

All communications equipment and appurtenances shall be installed in compliance with the "State of New Hampshire Department of Natural and Cultural Resources Technical Requirements for Use of Communication Sites" adopted June 30, 1995, and last revised in July, 2017, a copy of which is attached herewith, made a part hereof, and is marked Exhibit "B".

XVI.    RISK OF LOSS - FIRE - CASUALTY

All property of every kind installed by the Lessee on the Leased Premises shall be at the sole risk of the Lessee and the State shall not be liable to the Lessee or any other person for any injury, loss, damage, or inconvenience occasioned by any cause whatsoever to Lessee installed property.

Should the existing Equipment Building on the Property be substantially damaged by fire, other casualty or act of God, then the State shall notify the Lessee as soon as it is able as to whether or not the State intends to rebuild the Equipment Building and the likely time frame within which the rebuilding would be accomplished. During such rebuilding the Lessee shall, at its option, have the right to erect suitable temporary structures to effectuate the broadcast of the signal of the Lessee. If

the State elects not to rebuild the Equipment Building then the Lessee may, at its option, elect either to terminate the Lease or to rebuild on the same site, substitute structures of similar design and size as existed prior to the damage with the approval of the State, which shall not be unreasonably withheld.

The State shall not be obligated to rebuild or replace any building wholly or substantially destroyed by fire, flood, weather event, act of God, or other casualty.  The State shall not be liable to Lessee for any injury, loss, damage, or inconvenience occasioned by any cause whatsoever to the Property, including but not limited to any loss of income for any function, program or contract that may not take place for whatever reason due to an emergency or unforeseeable situation.

XVII.   <u>INSTALLATION AND MAINTENANCE - COST</u>

All improvements installed by the Lessee at the Property for its sole benefit shall be at the expense of the Lessee, and subject to prior written approval by the State.  During the term of the Lease, the Lessee will maintain such improvements installed by the Lessee on the Property in a safe and reasonable condition, and neat in appearance so as to minimize visual impact.  The materials and design for the installation at the Property shall comply with all applicable federal, state and local laws, rules and approvals.  The Lessee shall have all construction plans relating to the project at the Property approved by applicable federal, state and local governmental authorities having jurisdiction over construction and installation of cell facilities on the Property ("Governmental Authorities") prior to the commencement of such construction and installation.

It is understood and agreed that the ability of the Lessee to use the Property is contingent upon its obtaining, after the execution date of the Lease, all of the certificates, permits and other approvals that may be required by any Governmental Authority as well as a satisfactory building structural analysis, so as to permit the use by the Lessee of the Property as contemplated by the Lease.  The State shall cooperate with the Lessee in its effort to obtain all required Governmental Authority approvals, and shall take no action which would adversely affect the status of the Property with respect to the proposed use thereof by the Lessee.  In the event that any of such applications should be finally rejected or any certificate, permit, license or approval issued to the Lessee is canceled, expires, lapses, or is otherwise withdrawn or terminated by the relevant Governmental Authority, or, in the event that the Lessee determines that the Property site is no longer technically compatible for the use contemplated by the Lease, or that the Lessee, in its sole discretion, will be unable to use the Property for its intended purposes, the Lessee shall have the right to terminate the Lease subject to 90-day written notice to the State.  Notice of the exercise by the Lessee of its right to terminate shall be given to the State in writing by certified mail, return receipt requested, and shall be effective upon the mailing of such notice by the Lessee.  All rentals paid to said termination date shall be retained by the State. Upon such termination, the Lease shall become null and void and, except as expressly provided in the Lease, the parties shall have no further obligations including the payment of money, to each other.  The Lessee shall remove any and all of its property from the Property prior to termination of the Lease under this paragraph.

XVIII.   <u>CONDITIONS - RENT ABATEMENT</u>

The obligations of the Lessee hereunder, including the obligations to pay rent, are expressly conditioned upon and subject to the following:

a)  The continued authorization of the Lessee to use the Facilities for the purposes intended by

the Lessee pursuant to all necessary approvals from Governmental Authorities relating to such use; and

b) The continued retention by the State of good, clear, and marketable title to the Property underlying the Leased Premises, and such title remaining free from encumbrances and restrictions which would interfere with the use of the Leased Premises intended by the Lessee or would impair the ability of the Lessee to pledge the leasehold estate as collateral to secure debt financing.

If any of the foregoing conditions should fail to remain satisfied, the Lessee shall have no obligation to pay rent until such condition is once again satisfied or waived, and rent which would otherwise be due during the intervening time pending satisfaction of such condition is hereby excused and forgiven.

XIX.   LEASE RUNNING WITH THE LAND

The covenants, terms, conditions, provisions and understandings in the Lease shall be construed as covenants running with the land and are binding upon and inure to the benefits of the respective successors and assigns of the parties herein.

XX.   ENTIRE AGREEMENT

The Lease expresses the entire agreement between the parties, and supersedes all prior understandings.

XXI.   NOTICES

All notices, demands, requests and other communications required by the Lease shall be in writing and shall be considered properly given if sent by United States registered or certified mail, postage prepaid, to:

a) The State:
   The State of New Hampshire
   Department of Natural and Cultural Resources
   172 Pembroke Road
   Concord, New Hampshire 03301
   Attention: Administrator, Land Management Bureau

or at such other address of the State from time to time may have designated by written notice to the Lessee. Such notice shall be deemed properly given upon the posting in the United States mail.

b) The Lessee:
   United States Department of Agriculture, Forest Service
   White Mountain National Forest
   71 White Mountain Drive
   Campton, NH, 03223

(or designee)
Attn:

or at such other address as the Lessee from time to time may have designated by written notice to the State. Such notice shall be deemed properly given upon the posting in the United States mail.

XXII.    AMENDMENT - EXTENT OF INSTRUMENT - CHOICE OF LAWS - ETC.

The terms of the Lease may be modified or amended by written agreement between the Lessee and the State. The Lease is to be construed according to the laws of New Hampshire, is to take effect as a sealed instrument, is binding upon, inures to the benefits of, and shall be enforceable by the parties hereto and their respective successors and assigns.

XXIII.    SOVEREIGN IMMUNITY

The Lease does not abridge or limit, nor shall it be interpreted as abridging or limiting the sovereign or official immunity to which the State and its representatives and agents are lawfully entitled.

XXIV.    SEVERABILITY

If any term of the Lease or any application thereof shall be invalid or unenforceable, the remainder of the Lease and any application of such term shall not be affected thereby.

XXV.    NO WAIVER OR BREACH

No assent, by either party, whether express or implied to a breach of a covenant, condition or obligation by the other party, shall act as a waiver of a right of action for damages as a result of such breach, or shall be construed as a waiver of any subsequent breach of the covenant, condition or obligation.

XXVI.    NOTICE OF LEASE

The State agrees to execute a Notice of the Lease Agreement, substantially in the form of that attached hereto as Exhibit "C", which the Lessee shall record with the appropriate recording officer. The date set forth in the Notice of Lease is for recording purposes only and bears no reference to commencement of either term or rent payments.

XXVII.    STATE PARK STAFF SITE SUPPORT

The Lessee agrees to reimburse the State in no less than half (1/2) hour increments for State Park staff time, requested or previously arranged by the Lessee, spent inspecting, managing, maintaining or repairing the Leased Premises or Facilities at the rate of **Fifty One Dollars and Thirty Five Cents ($51.35) per hour.** Each call-out shall be no less than a two (2) hour minimum. Use of State Park staff shall be at the sole discretion of the appropriate State Park Manager.

Any work performed by State Park staff at the request of the Lessee shall be invoiced by the State and paid by the Lessee within thirty (30) days of receipt. If payment is not made within 30 days, all future requests for assistance may not be acted upon until such time as payment is made. All work

performed by State Park staff pursuant to this Section shall be upon the request of the Lessee, and the State assumes no liability.

XXVIII.   DEFAULT  -  THE LESSEE'S RIGHT TO CURE  -  TERMINATION - RESTORATION

In the event there is a default by the Lessee with respect to any of the provisions of the Lease or its obligations under it, including the payment of rent, the State shall give the Lessee written notice of such default.  After receipt of such written notice, the Lessee shall have fifteen (15) days in which to cure any monetary default and thirty (30) days in which to cure any non-monetary default, provided the Lessee shall have such extended period as may be required beyond the thirty (30) days if the nature of the cure is such that it reasonably requires more than thirty (30) days whose length of time shall be agreed upon by the parties, and the Lessee commences the cure within the thirty (30) day period and thereafter continuously and diligently pursues the cure to completion.  The State may not maintain any action or effect any remedies for default against the Lessee unless and until the Lessee has failed to cure the same within the time periods provided in this paragraph.  The failure of the Lessee to act to cure the default within the specified time periods shall be just cause for termination of the Lease.

The Lessee shall have the unilateral right to terminate the Lease at any time by giving ninety (90) day written notice to the State of the exercise by the Lessee of this option.

The State shall have a unilateral right of termination only in an instance where the continued presence of the facilities represents a health, safety or operational risk which cannot be reasonably addressed by alternative measures. The State shall provide ninety (90) days notice to Lessee that a termination is necessary due to that risk, unless some shorter time period is deemed reasonably necessary by the State to avoid damage to people, property or equipment. The State shall have an affirmative duty to relocate the facilities in a suitable alternative area, if available. The Lessee shall not be entitled to any damages as a result of any such termination.

The Lessee, upon termination of the Lease, shall, within sixty (60) days of termination, remove all of its equipment, personal property and all fixtures from the Property and repair any damage caused by its use of the Leased Premises or the removal of its equipment, reasonable wear and tear excepted. If such time for removal causes the Lessee to remain on the Leased Premises after termination of the Lease, the Lessee shall pay rent at then-existing monthly rate or on the existing monthly pro rata basis if based upon a longer payment term, until such time as the removal of the equipment, personal property and all fixtures are completed.

XXIX.   HOLDOVER

At the sole discretion of the State, the Lessee's facilities may remain in holdover at the conclusion of the term of this Lease. The State will set rental rates for any such holdover period consistent with its' then existing policies and procedures. The State may terminate this holdover period at any time and for any reason upon ten (10) days written notice to the Lessee.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties hereto have caused the Lease to be executed the day and year first above written.

THE STATE OF NEW HAMPSHIRE
DEPARTMENT OF NATURAL AND CULTURAL
RESOURCES

By: _____
Sarah L. Stewart
Commissioner

THE STATE OF NEW HAMPSHIRE
COUNTY OF MERRIMACK

The foregoing instrument was acknowledged before me this 17ᵗʰ day of April 2019 2018, by Sarah L. Stewart , in her capacity as Commissioner of the Department of Natural and Cultural Resources

_____
NOTARY PUBLIC/JUSTICE OF PEACE
My Commission expires: 3-22-22

LISA M. CONNELL
NOTARY PUBLIC
State of New Hampshire
My Commission Expires
March 22, 2022

UNITED STATES DEPARTMENT OF
AGRICULTURE, FOREST SERVICE

By: _____
<<SignerName>>   Sarah Petroff
<<Title>>   Leasing Contracting Officer
Duly Authorized

THE STATE OF Montana
COUNTY OF Missoula

The foregoing instrument was acknowledged before me this 21 day of March 2018, 9 by, <<SignerName>> in <<his/her>> capacity as <<Title>> of United States Department of Agriculture, Forest Service

LINDSEY A CHRISTIAN OBERQUELL
NOTARY PUBLIC for the
State of Montana
SEAL
Residing at Missoula, MT
My Commission Expires
January 09, 2022

_____
NOTARY PUBLIC/JUSTICE OF PEACE
My Commission expires: 1/9/22

Approved as to form, substance and execution

Date  4/23/19                          By: _____

                                            Assistant Attorney General

Approved by Governor and Council
Date  5/15/2019                        Agenda Item No. 64

The following Exhibits are attached hereto and incorporated herein by reference:

"A"     State of New Hampshire Department of Natural and Cultural Resources Policy on Use and
        Management of DNCR Communication Facilities revised 7/24/2017
"B"     State of New Hampshire Department of Natural and Cultural Resources Technical
        Requirements for Use of Communication Sites revised 7/24/2017
"C"     Notice of Lease
"D"     Equipment List

**EXHIBIT A**

STATE OF NEW HAMPSHIRE
DEPARTMENT OF NATURAL AND CULTURAL RESOURCES



## POLICY ON USE AND MANAGEMENT OF
## DNCR COMMUNICATION FACILITIES

Adopted  Nov. 7  1989
Revised  April 15, 1998
Reviewed January 2, 2008
Revised   January 1, 2014
Formatting/Name Revised  July 24, 2017

Jeffrey J. Rose, Commissioner
172 Pembroke Road
Concord, N.H. 03301
State of New Hampshire
Department of Natural and Cultural Resources

## POLICY ON USE AND MANAGEMENT OF
## DNCR COMMUNICATIONS FACILITIES

### INTRODUCTION

In 1964, the State of New Hampshire, recognizing the future needs for public communication sites and the potential proliferation of antenna towers, microwave dishes, transmitter buildings and other apparatus on New Hampshire's high peaks and ridges, established a policy limiting radio/electronics installations on Department of Natural and Cultural Resources (DNCR) administered land.   At that time, the primary concerns were providing sites for future public communication needs and mitigating the visual impact of installations.   New communication installations and renewals of existing permits were limited to public agencies.   Requests for new communications installations by agencies not supported with public funds were considered only where installations would provide a measure of public service or public safety.

In the 1980's, three additional concerns developed regarding communication facilities on state-owned summits.   First was a concern for protecting the aesthetics and natural condition of the State's high peaks and ridges.   Second was a concern regarding electronic interference and signal deterioration caused by the growing number of transmission and reception installations. Although there currently isn't a way to quantify the threshold below which a transmission signal becomes unacceptably weakened by neighboring users, each addition of equipment at a site has a negative effect.   As the number of installations increased, so had the concern over maintaining signal integrity since most of the communications users at state-owned mountaintops were there for the purposes of public health and safety, law enforcement, national defense, and public information.

The third concern was the potential negative impact to public health from intense communications signals.   The mountaintops were originally acquired and maintained for the visiting public and it was important to limit radio frequency radiation to levels safe for continued public use of the area.

In 2012, a review of the policy was prompted by DNCR's growing responsibility for over 167,000 acres of public land and an ever increasing demand to install or expand communications facilities on DNCR lands to enhance public safety and security, and to fulfill the public interest for commercial broadband internet access.   In 2013, the Policy was revised to; a) provide new guidelines and processes for establishing new or expanded communication sites in locations beyond just mountaintops; b) allow for commercial communications applications and corresponding lease fees; and c) ensure that impacts from new or expanded communications flteilities to the land's traditional uses and purposes were minimized and mitigated.

As the result of a "Internal Control Review" of the Communications Program by the Office of Legislative Budget Assistant – Audit Division, a "Communications Program Manual" was developed.   The Manual dovetails with the Policy and established procedures and protocols, including accountability of equipment and sites through a newly acquired database – ComSite,

2

and the billing and collecting of Program revenues through the State's new billing system ·· LAWSON/NHFirst.

## I. DEFINITIONS:

"Commissioner" shall mean the Commissioner of the Department of Natural and Cultural Resources (DNCR).

"Permit" shall mean any form of agreement, including licenses, special use permits, or leases issued by the Commissioner for use of a DNCR communication site.

"Private user" shall mean any person or business entity, including a non-profit organization, which is not a "public user" or "quasi-public user."

"Public user" shall mean a federal, state, county, or municipal agency or some governmental association thereof.

## II. GOAL:

The ultimate goal for state-owned locations used for communications facilities, including mountaintops, is to have such areas cleared of all appurtenances and machinery, with the possible exception of observation platforms. This goal cannot be realized until the technology of electronic communications has advanced to where antennas and other electrical paraphernalia are outmoded. Until that time, the overall management objective for communications sites will be to give priority to transmission sites for communications critical to the public health, safety and welfare, while minimizing the aesthetic and environmental impacts of these communications facilities.

## III. POLICY:

It is the policy of the Department of Natural and Cultural Resources to permit, when no other feasible alternative is available, controlled development of state-owned land under its jurisdiction for electronic communications necessary to public health, safety and welfare; and to facilitate, wherever possible, in the consolidation of commercial electronic communication networks across the state.

## IV. GUIDELINES AND CONSIDERATIONS:

A. Values to Be Protected:  Management of the communications sites on DNCR lands is intended to protect three distinct values deemed essential to the public interest:

1. *Aesthetics/natural condition and public use:*  To maintain the natural and scenic character of an area.  Communication facilities shall be installed so as to have the least physical disturbance or modification of the natural environment and minimal impact to the public enjoyment of these environments.

3

2. *Public health, safety and welfare:*  To consider communications projects necessary and desirable to maintain or improve the health, safety and welfare interests of the public at large, as well as to reasonably safeguard the health and safety of visitors to communication sites.

3. *Electronic integrity:*  To uphold the non-interference of communications signals and frequencies between communications systems and/or associated electrical devices.

B. <u>Communication Site Designation:</u>  In order to articulate the use of DNCR properties for communications activities, the following site designations are hereby established for the purpose of describing existing assets and limitations that each site category may possess.  All current and future sites will be classified by these designations:

1. *Multiple Use Sites ("MU")* may allow for the full range of communication uses, so long as those uses are compatible with site conditions, typical management activities, traditional public use, and deed covenants, if any; and strive to minimize the aesthetic and environmental impacts.  MU Sites typically contain electric power from off-site, phone capability, and usually have generator back-up capabilities.   Infrastructure specific to communications can be erected at these sites (tower, building, etc.) provided such installations are in compliance with and meet the objectives of the other sections of this policy.

2. *Limited Use Sites ("LU")*  have one or more limitations that prohibit the expansion of a LU Site. Limitations may include, but are not limited to: access issues; protection of special aesthetic or natural site conditions; lack of a power source, telephone, or fiber resources; public health or safety concerns; interference with other communication sites; or incompatibility with other primary uses of a particular site.  These sites shall have restrictions placed upon them based upon their limiting factors.

3. *Restricted Use Sites ("RU")*  are restricted communication sites and shall be limited to only those uses that are deemed a critical need for public health, safety or welfare; where the benefits derived from having the communication site outweigh the potential detriments to the values to be protected.  Examples of restricted uses include those related to fire and rescue, law enforcement, emergency medical services, and/or emergency management.   Such sites shall not be used for commercial activities or "for profit" purposes.  Measures shall be taken to ensure that no alternatives sites exist, and that aesthetic and environmental impacts will be minimized or mitigated.

C. <u>Approved, Designated DNCR Sites:</u> The following specific DNCR sites are hereby designated by the Commissioner as "Communication Sites."   The letter designation after each site indicates its current designation.

Belknap Mountain, Belknap Mountain State Forest (MU)

Blue Job Mountain, Blue Job State Forest (MU)

Cannon Mountain, Franconia Notch State Park (MU)

Cardigan Mountain, (RU)

Federal Hill, Federal Hill Fire Tower (LU)

Hampton Beach State Park, (RU)

Holden Hill, Coleman State Park (MU)

Hyland Hill, Hyland Hill State Forest (MU)

Jordan Hill, Walker State Forest (RU)

Kearsarge Mountain, Kearsarge Mountain State Forest (MU)

Magalloway Mountain (RU)

Milan Hill, Milan Hill State Park (MU)

Oak Hill, Oak Hill Fire Tower (MU)

Pack Monadnock Mountain, Miller State Park (MU)

Pitcher Mountain, Pitcher Mountain Fire Tower (MU)

Prospect Mountain, Weeks State Park (LU)

Mt. Sunapee, Mt. Sunapee State Park (MU)

Wantastiquet Mountain, Wantastiquet Mountain State Forest (MU)

Warner Hill, Warner Hill Fire Tower (MU)

Development of communications facilities at these sites shall be restricted to specific areas, as determined by the Commissioner.

## V. APPLICATION FOR COMMUNICATIONS SITE USE:

A. Application for a communication site use will be filed with the Commissioner, Department of Natural and Cultural Resources and shall include the following information:

1. Demonstrated need for public health and safety, or for the public welfare interests served by commercial-service communications.

2. Complete plans and specifications of the proposed installation including, but not limited to, buildings, towers, power lines, accessory structures, fuel tanks, generators, method(s) of access to the site and access improvements.

3. Detailed specifications including type, frequency, size and proposed location of

receiving and/or transmission unit(s) and antenna(s).

4. Analysis of compatibility with existing facilities and equipment (intermod and structural analysis) and power requirements.

5. Written documentation that the installation meets the current ANSI standards for controlled and uncontrolled human exposure to radio frequency electromagnetic fields. Cumulative effects of the proposed installation together with the existing facilities shall be considered.

6. Power and access availability without major new development.

B. <u>Applications for New Communications site designations</u> will be filed with the Commissioner, Department of Natural and Cultural Resources and shall include the following process.

1. A description of alternative sites considered, including other DNCR-designated communication sites and locations on private property, and the results from an investigation that demonstrates why the alternative sites are not feasible.

2. Compatibility with long-range multiple use plans.

3. Aesthetic compatibility with surrounding environment.

4. Impact on aesthetic/natural and recreational resources, and efforts to minimize or mitigate such impacts.

5. Deed and/or property use restrictions.

<u>Regional and Local Review</u>: In accordance with RSA 674:54 II, all applications for new communication site designations shall be sent to the Board of Selectmen/City Council of the municipality and to the appropriate Regional Planning Commission in which the proposed site is located to provide an opportunity for public hearing(s), subject to the following:

1. DNCR will provide a public notification in a newspaper in general circulation in the area stating that a proposal for a new communication site designation has been sent to the municipality.

2. DNCR will provide written notification to: (1) persons who have interests of record in the site; (2) persons who have written use agreements for the site on file with DNCR; (3) landowners across which the State has deeded or written access rights to the site; and (4) donors of land which contains the site.

3. DNCR personnel and the applicant shall participate in any hearing(s) requested by the municipality or by the Regional Planning Commission.

4. DNCR shall respond in writing to any written comments made by the municipality relative to the application and received within 30 days after the hearing.  Responses shall identify any modifications made in response to comments from the municipality or a written explanation as to why the implementation of the comments would be contrary to the proposed public project.

5. Upon completion of the processes described in this section, applications for a new communication site shall be submitted to Governor and Executive Council for final approval.

6. Applications from public and private users shall be submitted to the local governing body by the applicant for approval under the municipality's Site Plan Review Regulation.

7. Application(s) for use permits or leases for new communication sites shall follow the same procedures as existing designated sites.

8. Application(s) for a new site, or modification or expansion of an existing site may be reviewed by the Communication Site Advisory Committee, as deemed necessary by the Commissioner.

9. Once a site has been officially designated, new users on the site can be processed by the DNCR communications office without review by the Advisory Committee, providing the new user doesn't significantly modify or alter the site, such as but not limited to adding buildings, extending the tower height or other buildings or structures, in which case it shall be reviewed by the Advisory Committee.

## VI. CONSOLIDATION:

A. Towers and buildings:  on each communication site will be consolidated and shared by site users in a manner striving for the following goals:

1. A single, expandable, low profile transmitter building serviced by a single, non-overhead utility line.

2. As few multiple-use, broadband antennae as are technically feasible, affixed to a single tower.  Such consolidation will be planned on a site-by-site basis according to building design, cable and power layout, and vegetation distribution; and accomplished through cooperative funding among users, contributions, or bonding.

3. Additions to, and modifications or relocation of, existing structures and equipment shall be compatible with the designated site plan for consolidation of facilities through shared use.

## VII. ADVISORY COMMITTEE:

A. <u>Communication Site Advisory Committee</u> is established as an adjunct to the Commissioner's office. Technical advisors may serve as deemed necessary or desirable by the Committee. Committee membership shall include the following individuals or their designee:

> Director, Division of Forests and Lands
>
> Director, Division of Parks and Recreation
>
> Director, Division of State Police
>
> Executive Director, New Hampshire Fish & Game Department
>
> President/Forester, Society for the Protection of New Hampshire Forests
>
> Executive Director, Local Government Center

B. <u>Purpose:</u>  The Advisory Committee is established for the purpose of advising the Commissioner on the following matters:

1. Designation of new communication sites, or modification to tower height, building size and/or expansion of existing sites if deemed necessary by the Commissioner.

2. Developing Plans for consolidation of facilities.

3. Policies, rules, and regulations for communication site management may be reviewed periodically

4. Recommended changes to policy, rules and regulations for communications site management may be made by Advisory Committee, Communications Site Committee, Communications Section Chief, or the Department and approved by the Commissioner.

## VIII. MODIFICATION OR EXPANSION OF EXISTING SITES:

A. <u>New or Expansion Proposals</u>: Proposals for new or enlarged installations at designated communication sites, which are demonstrated to be in the overall interest of public health or safety will be given the highest priority.  New users may be permitted subject to the following:

1 . Can be accomplished without compromising the values to be protected under Section IV. A, and

2. Would result in a net improvement in onsite facility aesthetics, primarily through consolidation, or

3. Would result in enhanced public recreation access or opportunities, or

4.  Would provide the tower or building space needed to accommodate "public users," as determined by the Commissioner.

8

## IX. INTERFERENCE:

A. <u>New Installations</u>:  New installations/users  shall not interfere with existing installations,  users and functions.  Where irreconcilable conflicts arise between "public user," and "private user" installations over electronic interference, space, power supply, or location, the "public" or "quasi-public" user shall take precedence and displace the "private user."  Order of displacement is: 1) private users; 2) quasi-public  users engaged in low power broadcasting; 3) other quasi-public  users.  Within each category, newest installations  shall be displaced first.

B. <u>Electronic  Interference</u>:  In the case of a complaint of electronic interference or other conflicts created by a new installation, it shall be the responsibility  of the proponent  of the new installation to submit plans for resolving the complaint or potential  problem.  The plans shall be consistent  with the site consolidation effort.   The complainant  and new installation proponent  shall attempt to resolve the matter.   Unresolved  issues and the proponent's  plans shall be submitted to the Communication  Office within 10 working days of the complaint for review and recommendation  for action by the Commissioner.

## X. OTHER INSTALLATION REQUIREMENTS:

A. Additional  considerations  shall include:

1. Communication  tower(s) on DNCR communication  sites shall be the minimum  height necessary to meet technical requirements  of the equipment  installed and the service area, but under no circumstances shall tower structure exceed 180 feet in height.

2. All DNCR communication  sites shall meet the current American National  Standards Institute (ANSI) requirements  for controlled and uncontrolled  human exposure to radio frequency electromagnetic fields.

3. Permits/leases  for site use are not transferable  and facilities (buildings, tower and equipment) may not be sub-leased.

4. Requests for changes or modification  of a permitted  installation  shall be submitted  in writing for approval by the Commissioner.

5. Site users shall comply with all applicable  federal, state and local laws, ordinances and rules.

6. All equipment  installations  shall be accomplished  in compliance with the latest edition of the "State of New Hampshire  Department  of Natural and Cultural Resources Technical Requirements  For use of Communication  Sites," and all grounding of equipment  will meet Motorola's R-56 requirements.

7. Intermod Study is required of all new prospective users or a change of frequency by a current user.

8.  Structural analysis may be required by new users and upgrades by current users.

9.  An RF Study is required by all new users at all sites. Sites that are manned by volunteers or paid personnel require the RF Study to specifically reference and address the effects and risk to personnel from RF exposure.

## XI. TENANT CATEGORIES (basis for annual rent):

The following table depicts the tenant categories and provides the degree of annual rent to be charged in order to occupy a DNCR communication site:

| CATEGORY | ANNUAL RENT BASIS |
|---|---|
| NH State Entity | Beneficial Services (No Charge Tenants as of 1/1/2013) |
| Federal Entity | Administrative Fee ($1,000 as of 1/1/2013) |
| Government/Quasi-Government, Municipalities, County, Other State | Administrative Fee ($1,000 as of 1/1/2013) |
| Commercial | Fair Market Rent |
| Other | Fair Market Rent |

## XII. FEES:

A.  Fair Market Value Rent:  All new or renewed non-state tenant contracts (leases, permits, licenses) shall be assessed an annual fair market value rent (the Market Rent) or annual administrative fee( the Administrative Fee: based on beneficial services arrangements and/or other considerations) for each communications site, which shall be set by the Commissioner.

1.  Items to be considered in determining the Market Rent or Administrative Fee will include:

   *  Administration costs to the state.
   *  User classification (public, quasi-public, private) and type of installation.
   *  Prorated share of facilities maintenance.
   *  Inventory of the equipment installed at the site.
   *  Benefits accruing to the state as a result of joint installation.
   *  Costs associated with installations at alternative locations on private property.
   *  Market Rent values on comparable private communications sites.
   *  Potential impacts to existing state park or state forest operations.
   *  Public safety and/or quality of life considerations.

2.  All communication installations on DNCR lands owned by or leased to non-public tenants shall be subject to local taxes, payable by the tenant.

## XIII. AMENDMENTS:

The Policy may be amended from time to time to serve the public interest upon recommendation of the Communication  Site Advisory Committee and approval by the Commissioner.

Approved: _____     Date: 7/27/17
    Jeffrey. J Rose, Commissioner
    Department of Natural and Cultural Resources

<u>**Exhibit B**</u>

STATE OF NEW HAMPSHIRE
DEPARTMENT OF NATURAL AND CULTURAL RESOURCES



**TECHNICAL REQUIREMENTS
FOR USE OF COMMUNICATION SITES**

Adopted  <u>June 30, 1995</u>
Reviewed <u>April 27, 2005</u>
Revised  <u>February  , 2014</u>
Formatting/Name Revised  <u>July 24, 2017</u>

Jeffrey J. Rose, Commissioner
172 Pembroke Road
Concord, N.H. 03301

State of New Hampshire
Department of Natural and Cultural Resources
Technical Requirements
For Use of Communication Sites

**Introduction**

The following outlines technical requirements for installation, operation and maintenance of communication equipment and appurtenances at Department of Natural and Cultural Resources (DNCR) communication sites as required by Item III.H.6 of the DNCR "Policy On Use and Management of Mountaintops for Communication Facilities". As stated in the policy, all requests for new communication equipment installations or modifications of existing equipment require review by the Communication Site Advisory Committee and approval by the Commissioner.

The Commissioner, with counsel from the Communication Site Advisory Committee, shall be the final authority in resolution of any conflicts between site users or in interpretation of these technical requirements and may require testing of user's equipment to determine compliance or to investigate possible sources of interference.

These requirements are in addition to any standards or conditions contained in the lease/use agreement.

These requirements shall apply to all new communications facilities and to existing facilities that are upgraded or expanded. The requirements may be waived or modified by the DNCR Site Manager for facilities and/or users in existence at the date of adoption, as communication site conditions warrant.

**Transmitters and Associated Equipment**

A.    Transmitters shall be equipped with isolators to provide the following minimum isolation to reduce the possibility of intermodulation interference.
       25 db (70 MHz to 220 MHz)
       50 db (220 MHz to 1000 MHz)
       75 db (1000 MHz to 76 GHz)

B.    A Bandpass cavity shall be used between each antenna and associated transmitter or combiner. A combiner, or duplexer will satisfy this requirement.

C.    R.F. Devices including duplexers, isolators, cavities, switches, etc. shall be located inside grounded cabinets where physically possible. Open racks may be permitted on a site by site basis to fit specific needs.

D.    Grounding to each cabinet and device shall be installed and comply with current Standards and Guidelines for Communication Sites (R56), NFPA 780: Standard for the Installation of Lightning Protection Systems, and NFPA 70: National Electrical Code® when applicable.

E.    Transmission lines entering enclosed equipment cabinets shall do so via bulkhead connectors. Type "N" bulkhead connectors shall be used above 54 MHz.

F.    Power, telephone, network, or control lines shall be protected by grommets where they enter enclosed radio cabinets. Where high R.F. fields exist, telephone lines and control lines shall enter radio cabinets via RFI filtration devices.

G.  The use of RG\8, RG\58, braided shield, single shield coax cable or aluminum shielded cable is not permitted.  This includes cables located within cabinets or racks. PTP, Microwave, or GPS systems whose manufacturer requires the use of LMR-400 or similar cable will be exempt providing the manufacturer's documentation is submitted to the DNCR site manager prior to installation. Double shielded RG\58 (Belden 8268, etc.) may be used in external frequency reference and 1 PPS launch timing applications.

H.  Ethernet cable (CAT5e, CAT6, etc.) shall be routed to not interfere or receive interference from RF equipment.

I.  Ethernet cable (CAT5e, CAT6, etc.) shall be plenum rated for in shelter use and shielded/ outdoor rated when used outside of the shelter or on the tower.

J.  Ethernet cable (CAT5e, CAT6, etc.), and telephone lines shall be grounded upon entry into the shelter from an outside source (tower mounted equipment, or telco lines) using a UL listed surge suppressor and shall be installed in accordance with current Standards and Guidelines for Communication Sites (R56), NFPA 780: Standard for the Installation of Lightning Protection Systems, and NFPA 70: National Electrical Code® when applicable.

K.  Microwave or PTP transceivers shall be secured to an open rack or mounted within an enclosed cabinet. Unsecured devices will not be permitted.

L.  At no time will any equipment be mounted to an ice bridge or its support structure.

M.  Microwave or PTP ODU (Outdoor Units) should be mounted as close to the antenna as possible.

**Antenna System Requirements**

A.  Antenna systems must be approved by the DNCR Site Manager prior to the commencement of installation work.  The cost of any changes to the existing tower including structural work, tower painting, tower lighting, etc. will be paid for by the site user.  Rearrangements of existing antennas will not be considered except under unusual circumstances.

B.  The design of each proposed antenna systems shall take into account the following:

*Antenna location will be assigned by the DNCR Site Manager based on available space, required radiation pattern, transmitter power and frequency, antenna type, mounting restrictions and interference considerations.

*Only antennas which provide a direct dc path to ground may be utilized.

*Antennas shall be equipped with coaxial lightning protectors meeting ANSI standard 62.1.   Lightning protectors shall be connected to site ground system in accordance with current Standards and Guidelines for Communication Sites (R56) and NFPA 780: Standard for the Installation of Lightning Protection Systems.

*R.F. link antennas, control antennas, and Microwave Antennas will be assigned mounting positions as low on the tower as possible.

\*Metal antenna mounting hardware and falling ice protection hardware will be hot dipped galvanized or stainless steel.

\*Only solid copper jacketed coax cable will be permitted for antenna cable runs. PTP, Microwave, or GPS systems whose manufacturer requires the use of LMR-400 or similar cable will be exempt providing the manufacturer's documentation is submitted to the DNCR site manager prior to installation.

\*Coax cable shall be individually attached to the tower legs or waveguide hangers. The location of coax cable runs will be assigned by the DNCR Site Manager.

\*Attachment of coax cable will be by stainless steel clamps or hangers spaced a maximum of three feet apart.

\*The use of plastic " tie wraps " to support coax cable in any location is not permitted. The use of coating products that emit acetic acid are not permitted. Use of ultra-violet protected "tie wraps" are allowed on a temporary basis during construction or for temporary installations.

\*Grounding kits with solid copper straps and mechanical compression shall be installed at top of tower, at point where coax cable departs the tower, and at the building entrance point. These clamps will be properly sealed to prevent corrosion at the coax cable connection. Stainless steel connectors will be used from the grounding kit to the tower. Grounding kits and procedures must comply with current Standards and Guidelines for Communication Sites (R56).

\*Horizontal runs of coax cable shall be protected by ice shields and supported every three feet with stainless steel clamps or hangers.

\*Coax cable shall enter buildings via weatherproof cable entrance ports or cable mounting plates. Positions will be assigned by the DNCR Site Manager. Ground Clamps will be used on both sides of this connection and will be connected to the site ground system.

\*Coax cable runs located inside buildings will utilize existing cable racks or will be supported overhead by hangers.

**Power Requirements**:

A.   Each site user will be responsible for the cost of installation of separately metered electrical service when such metering is required unless otherwise specified in the lease/use agreement.

B.   The provisions of backup power by DNCR will require approval of the DNCR Site Manager.

C.   Emergency generating equipment or battery backup units shall not be installed without approval of the DNCR Site Manager.

D.   Each new transmitter and equipment cabinet will be connected to a separately fused AC outlet in accordance with current Standards and Guidelines for Communication Sites (R56), NFPA 70: National Electrical Code®, and State Electrical codes.

E.   Under no circumstances will one station be plugged into the accessory outlet of another cabinet.

F.     All electrical installation work shall be in full compliance with current Standards and Guidelines for Communication Sites (R56), NFPA 70: National Electrical Code®, and State Electrical codes.

**Administrative Items**

A.     A frequency compatibility study must be performed prior to installation; it shall be done by an independent consulting firm, which has been approved by DNCR.  The cost of this study is the responsibility of the site user. A subsequent study may be required each time the site user proposes an additional frequency at the site.

B.     The site user shall immediately cease operation if notified by the DNCR that they are causing harmful interference.

C.     The DNCR Site Manager shall be provided with copies of all FCC license applications, current FCC licenses and equipment specifications.

D.     The site user shall make no changes after the initial installation without prior written approval from the DNCR Site Manager.

E.     Equipment shall be maintained in such a manner as to prevent it from becoming a source of interference or a safety hazard.

F.     Equipment shall have an ID tag attached, which shows licensee's name, address, call sign, frequency, tone squelch frequency and telephone number of person or organization responsible for maintenance work.  Radio station licenses shall be posted for each transmitting station as required by FCC rules.

G.     Speakers will be turned off except during periods of maintenance work.

H.     Areas in and around the site user's equipment shall be kept clean and neat at all times. In addition, exterior areas including access roads, trails, and parking area shall be kept clean.  Trash and unused materials shall be immediately removed from the site and not stored on the premises in any manner.

I.     Smoking, open flame, or welding will not be permitted inside buildings.

J.     Should the site user cause discharge of any Fire Protection System, they will be responsible for all costs associated with recharging the system, cleaning the building and repairing damaged equipment.

K.      If the building has an alarm system installed, the site user will notify designated Alarm Center when entering or leaving building in accordance with posted instructions.

L.     Site access shall be as designated in and subject to restrictions as described in the lease\use agreement. The DNCR will not be responsible for plowing of access roads or trail entrances to the site unless specified in lease/use agreement.

M.     Prior to the signing of any lease, a joint visit of the site will be made by the proposed site user and the DNCR Site Manager.  Any additional special technical requirements not covered in this document will be determined at this meeting.

N.    When a lease is terminated for any reason, the site user will remove all equipment including antennas and feed lines within thirty days and will be responsible for any work necessary to return site to its previously existing condition. Should the site user fail to do so, then DNCR will arrange to have work completed and will bill the site user for this work.

EXHIBIT "C"

<u>Notice of Lease</u>

Notice of the following Lease is hereby given in accordance with the provisions of the New Hampshire Revised Statutes Annotated, Chapter 477, Sections 7 and 7-a: and as per Chapter 72, Section 72:1, failure of the Lessee to pay the duly assessed personal and real estate taxes when due, or failure to record this Notice of Lease, shall be cause to terminate the Lease by the State.

|  |  |
|---|---|
| LESSOR: | **STATE OF NEW HAMPSHIRE**, Department of Natural and Cultural Resources, having a mailing address of 172 Pembroke Road, Concord, New Hampshire 03301 |
| LESSEE: | **UNITED STATES DEPARTMENT OF AGRICULTURE, FOREST SERVICE**, an agency of the United States Government being located in the White Mountain National Forest 71 White Mountain Drive, Campton, New Hampshire 03223 |
| TERM EFFECTIVE DATE: | 1-Oct-2017 |
| DESCRIPTION: | Communications Lease at Mount Washington State Park – Sargent's Purchase , NH |

<u>LEASED PREMISES</u>

The STATE, for and in consideration of the covenants and agreements hereinafter contained and made on the part of LESSEE, does hereby grant, demise and lease to LESSEE:

a) Designated space within the Yankee Building for placement of radio equipment
b) Designated spaces on the rooftop of the Yankee Building for antennas

TERM: One (1) five (5) year

RIGHTS OF EXTENSION OR RENEWAL: None

EXECUTED as an instrument under seal on the dates indicated below.

LESSOR:

**STATE OF NEW HAMPSHIRE**
**DEPARTMENT OF NATURAL AND CULTURAL RESOURCES**

By: _____
       Sarah L. Stewart
       Commissioner

STATE OF NEW HAMPSHIRE
COUNTY OF MERRIMACK

The foregoing instrument was acknowledged before me this 17th day of April _____, 2019, by Sarah L. Stewart, in her capacity as Commissioner of the Department of Natural and Cultural Resources.

_____
NOTARY PUBLIC/JUSTICE OF PEACE
My Commission expires:

LISA M. CONNELL
NOTARY PUBLIC
State of New Hampshire
My Commission Expires
March 22, 2022

LESSEE:

**UNITED STATES DEPARTMENT OF AGRICULTURE, FOREST SERVICE**

By: _____
       Sarah Petroff
       Duly Authorized

THE STATE OF *Montana*
COUNTY OF *Missoula*

On this 21 day of *march* _____, 2019, before me, the undersigned officer, personally appeared, who acknowledged to being authorized to do so, executed the foregoing instrument for the purposes contained therein, by signing under the name of the company as such officer.

LINDSEY A CHRISTIANOBERQUELL
NOTARY PUBLIC for the
State of Montana
Residing at Missoula, MT
My Commission Expires
January 09, 2022.
SEAL

_____
NOTARY PUBLIC/JUSTICE OF PEACE
My Commission expires: 1/9/22

Notice of Lease                                                                                   Page 2 of 2

**EXHIBIT D**

## EQUIPMENT INVENTORY

_Mt Washington
**Site**

**USDA Forest Service
Organization**

**812-489-3391
Contact Phone #**

**TOWER MOUNTED EQUIPMENT:**
**(Antenna Make, Model, Feed-line Type)**
**(Tower Make, Model and height)**
_Roof mounted Telewave ANT150F2 _
_1/2 LDF4 through attic_____
_App. 20' above ground level_____
_____
_____
_____
_____

**LOCATION:**
**(Mounted Elevation and Bearing on
Structure)**
_____
_____
_____
_____
_____
_____
_____

**HOUSED EQUIPMENT:**
**(Make, Model, Serial Number,
Tx/Rx Frequencies) Also List Back-up
Power (Batteries or UPS)**
_Codan/Daniels Repeater_MT4E____
__SN 254930_____
**Installing rack mount APC backup this
year**_____
_Tx171.525/Rx164.15_____
_____
_____

**LOCATION – SHELTER:**
**(Rack or Cabinet Mounted)**

Top floor / labeled cabinet_____
_____
4 sq ft of floor space
_____
_____
_____
_____

Copy of FCC Licenses and ASR # _____

**Signed:**

2/19/2019
**Date:**

24 foot missoula Road
missoula, MT 59804
**Address**

406-329-3602
**Phone Number**

**SUBMIT TO:** **Justin Bellen
Division of Forests and Lands
172 Pembroke Road
Concord, NH 03301**