**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

STATE OF MISSOURI,
STATE OF NEBRASKA,
STATE OF ALASKA,
STATE OF ARKANSAS,
STATE OF IOWA,
STATE OF MONTANA,
STATE OF NEW HAMPSHIRE,
STATE OF NORTH DAKOTA,
STATE OF SOUTH DAKOTA,
STATE OF WYOMING,

       *Plaintiffs*,

  v.

JOSEPH R. BIDEN, et al.,

       *Defendants*.

No. 4:21-cv-01300

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN
<u>SUPPORT OF PERMANENT INJUNCTION</u>**

## INTRODUCTION

Does a law centralizing management of procurement in the President allow the federal government to require an employee to get a COVID-19 vaccine because that employee may share a parking lot with a coworker who is in some way working on a federal contract?  It does not.  There is no textual or contextual reason to believe that Congress, when it passed the Procurement Act to centralize and rationalize the procurement process, also empowered the President to mandate vaccines for people who do not even work on federal contracts—all in the name of public health.  Such a reading is unconstitutional and contrary to established principles of statutory interpretation.  Yet the Government ignored all those principles in issuing the unprecedented contractor mandate.  It also ignored procedural requirements that would have flagged those issues, which simply underscores that the mandate cannot withstand scrutiny.  Two courts have already issued preliminary injunctions barring enforcement of the mandate, for essentially the same reasons laid out here.  Courts around the country have blocked this administration's other vaccine mandates for similar reasons as well.  This Court should do the same

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff States incorporate the relevant factual history and documentation set out in their memorandum in support of a motion for a preliminary injunction, ECF 9, at 2–15, and the parties' Joint Statement of Material Facts, ECF 27, including the Declaration of Michael E. Talent and attached exhibits, ECF 27-1.[1]  This Court has allowed supplemental briefing on Plaintiff States' request for a permanent injunction on certain claims.  *See* ECF 26, at 2.  Plaintiff States understand this to include all claims that do not require the administrative record.  Those claims fall into one of three categories: (1) that the Procurement Act does not authorize the contractor mandate (Counts

---

[1] Citations of exhibits refer to the exhibits attached to the Talent Declaration.  Because Exhibit H is not separately paginated, page number citations reference the declaration's pagination.

One, Six (¶ 132), Seven, and Eight); (2) that Defendants failed to respect the required procedures

in issuing the contractor mandate (Counts Two, Five, and Nine (¶ 157));[2] and (3) that the contractor

mandate is unconstitutional (Counts Three, Four, Six (¶ 132), Ten, Eleven, and Twelve).

## ARGUMENT[3]

### I.     There are no jurisdictional or other barriers to reaching the merits.

**Standing**:  The Government has not questioned Plaintiff States' standing in this case.  Nor

can it reasonably do so.  The facts readily show that Plaintiff States have standing.  *See Georgia v.*

*Biden*, 2021 WL 5779939, at *6–7 (S.D. Ga. Dec. 7, 2021); *Kentucky v. Biden*, 2021 WL 5587446,

at *3–5 (E.D. Ky. Nov. 30, 2021).

Standing requires (1) an injury in fact (2) fairly traceable to the defendants' conduct and

(3) likely to be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–

61 (1992).  Only one plaintiff "needs to have standing" to permit judicial review.  *Massachusetts v.*

*EPA*, 549 U.S. 497, 518 (2007).  Standing is plainly satisfied here because the Government admits

that the mandate has already been applied to at least one of Plaintiff States' contracts.  *See* ECF

20, at 37 n.16 (discussing ECF 9-7); *Georgia*, 2021 WL 5779939, at *6 (finding standing because

mandate applied to one contract a State was pursuing).

In addition, Plaintiff States have standing because some of their contracts are set to renew

"sometime in the relatively near future."  *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211

(1995).  Plaintiff States are parties to many federal contracts subject to the mandate, and several

of those are scheduled to renew in the next nine months.  *See*, *e.g.*, ECF 9-6, ¶ 4; ECF 9-10, ¶¶ 3–

5; ECF 9-11, ¶¶ 4, 6, 8–11 (contracts renewing in December 2021, May 2022, and August 2022);

---

[2] To the extent the Court believes the notice requirements turns on factual records before the agency, Plaintiff States request the Court refrain from ruling on them here.

[3] Plaintiff States also incorporate by reference the arguments in their memorandum in support of a preliminary injunction, ECF 9, and their reply in support of a preliminary injunction, ECF 23.

ECF 9-12, ¶ 5 (expecting $100 million in "multi-year federal contracts" in "the coming months"); ECF 9-13, ¶¶ 4–7; ECF 9-14, ¶ 3; ECF 23-4, ¶ 5.  Those facts further demonstrate Plaintiff States' standing.  *See Georgia*, 2021 WL 5779939, at *7 (finding standing because "the State Plaintiffs … routinely enter into contracts that would be covered by" the mandate and they "have current contracts that could easily fall under the requirements of [the mandate] (if, for instance, they are renewed, modified, or have options that are exercised)").

And to the extent the Government has demanded modifications to existing contracts with Plaintiff States, *see, e.g.*, ECF 9-12, ¶¶ 9–31, that too confers standing.  "[T]he fact that governmental agencies are already requesting that current contracts … comply with the vaccine mandate indicates a threat of future harm to the Plaintiffs" since "it stands to reason that contractors who do not comply will likely be blacklisted."  *Kentucky*, 2021 WL 5587446, at *4.

Standing also exists since Plaintiff States will have to implement the mandate for thousands of state employees, *see* ECF 9-6, ¶¶ 5–6, thus imposing substantial administrative and financial burdens, *see, e.g.*, ECF 9-6, ¶ 9; ECF 9-10, ¶¶ 3–5; ECF 23-4, ¶¶ 10–11, and the anticipated loss of unvaccinated state employees, *see, e.g.*, ECF 9-6, ¶¶ 7–8, 10–11; ECF 9-14, ¶¶ 5–8; ECF 27, ¶ 31.  Those harms are legally cognizable.  *See Georgia*, 2021 WL 5779939, at *4 (discussing the "undertakings" needed "to comply").  Also, some Plaintiff States may forego their contracts and the accompanying federal funds rather than accept the mandate.  *See, e.g.*, ECF 9-13, ¶¶ 8–12.  That, too, is a sufficient injury for standing.  *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (loss of "federal funding" supports standing).

Lastly, Plaintiff States are "entitled to special solicitude in the standing analysis" and may "litigate as *parens patriae* to protect quasi-sovereign interests—*i.e.*, public or governmental interests that concern the state as a whole."  *Massachusetts*, 549 U.S. at 520 & n.17.  In 2020 alone,

over $27 billion in federal contracts featured Plaintiff States as the place of performance.  ECF 27, ¶ 29.  Thus, countless businesses and workers in those States will be subject to and harmed by the mandate, and Plaintiff States have standing to raise those interests.  *See Kentucky*, 2021 WL 5587446, at *3–4 (concluding that these kinds of facts establish standing).

**Mootness**:  Nor are there mootness issues because of the November rationalization.  "[T]he voluntary repeal of a regulation does not moot a case if there is reason to believe the agency will reinstitute it."  *Akiachack Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016).  Likewise here:  The Task Force Guidance OMB approved in November is substantively *the same* as the one approved in September.  *See* ECF 27, ¶ 25 (noting two minor differences between the two); *see also* ECF 23, at 7 (noting that the Government's arguments about whether OMB's determination was arbitrary and capricious supports this position).  OMB admits as much. The November rationalization's title says it includes a "Revised Economy & Efficiency Analysis." 86 Fed. Reg. 63,418, 63,418.  That implies that the original rule is still in force and only the supporting analysis has changed.  Thus, the contractor mandate exists now in essentially the same form as it did at the start of the litigation.  This Court can provide Plaintiff States with the same type of relief they sought at the outset, and so the case isn't moot.  *See*, *e.g.*, *Knox v. Serv. Emp. Int'l Union, Local 1000*, 567 U.S. 298, 307–08 (2012).[4]

---

[4] That the Southern District of Georgia issued a nationwide *preliminary* injunction does not moot Plaintiff States' requests for a declaration that the contractor mandate is invalid, vacatur of OMB's September determination and November rationalization and the FAR Memorandum, and a permanent injunction against the mandate.  That relief is different in kind from a preliminary injunction, which is necessarily "of *limited duration*" and will expire after a ruling on the merits. *California v. U.S. Dep't of Health & Hum. Servs.*, 941 F.3d 410, 423 (9th Cir. 2019), *judgment vacated on other grounds*, 141 S. Ct. 192 (2020).  Moreover, the nationwide preliminary injunction might soon be stayed or limited in scope on appeal, thus invoking the "capable-of-repetition yet evading review" exception to mootness.  *See United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018).  Indeed, the Eleventh Circuit held that a State's request for an injunction against the federal CMS vaccine mandate for healthcare workers was not moot because a different district

**Final Agency Action**:  Finally, OMB's and FAR's actions are final agency action.  That OMB's determination may be an exercise of the President's Procurement Act authority, *see* ECF 20, at 17–18, is irrelevant—especially where the issue is the legality of OMB's actions.  "It is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.' … [R]eview of the OMB Determination is appropriate in this case."  *Kentucky*, 2021 WL 5587446, at *11 (quoting *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in judgment)); *see also Hagemeier v. Block*, 806 F.2d 197, 203 (8th Cir. 1986).

While the *Kentucky* court said the FAR Guidance (which contains the contract clause incorporating the contractor mandate) did not constitute final agency action, *see id.*, its conclusion is incorrect.  The *Kentucky* court relied, first, on the fact that the guidance was an initial step under EO 14,042.  *See id.*  But "interim agency resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency."  *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).  And the *Kentucky*'s court view that FAR's action "constitutes nonbinding guidance," 2021 WL 5587446, at *11, ignores that EO 14,042 generally requires agencies to include it, *see* § 2(a), and thus "alters the legal regime to which [another] agency is subject" and "has a powerful coercive effect" on agencies.  *Bennet v. Spear*, 520 U.S. 154, 169 (1997).  Indeed, the guidance says that civilian agencies that incorporate the provided clause are "presumed to have consulted with the" CAAC "as required by FAR 1.404(a)(1)," Ex. F, at 3, which clearly "alter[s] the legal

court preliminarily enjoined that mandate nationwide.  *See Florida v. Dep't of Health & Human Servs.*, 2021 WL 5768796, at *6–*11 (11th Cir. Dec. 6, 2021).

regime to which" agencies are subject and establishes finality.  *Bennett*, 520 U.S. at 178.

**Tucker Act**:  Contrary to Defendants' prior suggestion, *see* ECF 20, at 38, Plaintiff States need not bring their claims in the Court of Federal Claims.  As the Federal Circuit has repeatedly affirmed, "the proper method" for a federal contractor "to challenge the validity of a regulation governing a procurement ... is to bring an action in federal district court under the Administrative Procedure Act," just as Plaintiff States have done here.  *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1135 (Fed. Cir. 1998); *see also Land Shark Shredding, LLC v. United States*, 842 F. App'x 589, 593 (Fed. Cir. 2021).

## II.    The Contractor Mandate is unlawful, procedurally defective, and unconstitutional.

### A.    The Procurement Act does not authorize the contractor mandate.

Per EO 14,042 (Exhibit C), the contractor mandate is an exercise of the President's authority under the Procurement Act (also called the Federal Property Administrative Services Act, or FPASA), 40 U.S.C. § 101 *et seq*.  *See* EO 14,042 § 2(a); *see also* 86 Fed. Reg. at 63,418; 86 Fed. Reg. at 53,692.  The question, then, is whether a law "designed to centralize Government property management and to introduce into the public procurement process the same flexibility that characterizes such transactions in the private sector," *AFL-CIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc), authorizes a regulation mandating that a contractor's workforce (and their subcontractors' employees) get vaccinated.  As two district courts have recently said, it does not.  *Georgia*, 2021 WL 5779939, at *8–*10; *Kentucky*, 2021 WL 5587446, *5–*10.

#### 1.    Other laws bar the contractor mandate.

EO 14,042 and the contractor mandate cannot stand because they conflict with two other laws.  *See Reich*, 74 F.3d at 1332.  The first is the Procurement Policy Act, which permits *only* the FAR Council to "issue and maintain" procurement regulations.  41 U.S.C. § 1303(a)(1)–(2). Individual agencies, by contrast, can only issue "regulations essential to implement Government-

wide policies and procedures *within the agency*." § 1303(a)(2)(A) (emphasis added). EO 14,042, however, gives OMB power to determine whether federal agencies "shall" incorporate the contractor mandate in federal contracts. § 2(a). That is power reserved to the FAR Council, and the President cannot give it to OMB.

The other law is the Competition in Contracting Act (CICA). The CCIA requires "full and open competition" in procuring services. 31 U.S.C. § 3301(a)(1). Agencies cannot preclude "full and open competition by effectively excluding an offeror from winning an award," particularly offerors that "represent[] the best value to the government." *Nat'l Gov't Servs, Inc. v. United States*, 923 F.3d 977, 990 (Fed. Cir. 2019). But the contractor mandate does exactly that— "contractors who 'represent[] the best value to the government' but choose not to follow the vaccine mandate would be precluded from effectively competing for government contracts." *Kentucky*, 2021 WL 5587446, at *8 (quoting *Nat'l Gov't Servs*, 923 F.3d at 990).

## 2.    The Procurement Act does not authorize the contractor mandate.

**1.** The Procurement Act does not authorize the President to issue regulations—that is, to impose conditions that "address [contractor] conduct unrelated to the employer's performance of contractual obligations to the Government." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 36 (D.C. Cir. 2002) (alterations omitted) (quoting *Building & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 228–29 (1993)). That is because 40 U.S.C. § 121(a), which purportedly authorizes EO 14,042, does not allow for that. Section 121(a) provides that "[t]he President may prescribe policies and directives that [he] considers necessary to carry out this subtitle." But prescribing "policies and directives" is different from issuing regulations—as the statutory context shows. Section 121(c), for example, authorizes the GSA Administrator to "prescribe regulations to carry out this subtitle." The words thus have different meanings; "where Congress includes particular language in one section of a statute but omits it in

another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Daifullah*, 11 F.4th 888, 894 (8th Cir. 2021) (quotations and alterations omitted).  That was not an oversight.  Elsewhere in the Procurement Act (§ 603) and in the U.S. Code (18 U.S.C. § 3496 and 32 U.S.C. § 110), Congress expressly provided the President power to issue regulations, proving that it did not do so in § 121. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004).

That conclusion is consistent with the traditional distinction in administrative law between regulations and policies—a distinction predating the Procurement Act.  *See*, *e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (discussing 1941 and 1947 materials from the Attorney General relating to the APA).  Thus, that distinction applies to § 121(a).  *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (reading new statutory language that repeats language with well-settled interpretations as including those interpretations).  It is also consistent with the fact that "directive" is akin to "policy," *see Directive*, Webster's 3d New International Dictionary (2002) ("something that serves to direct, guide, and usu. impel toward an action, attainment, or end"), and the statutory linkage (they appear close to each other) between the two, *see* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 196–98 (2012) (applying *noscitur a sociis* when "terms [are] conjoined in such a way to indicate that they have some quality in common").

The law's history underscores all this.  Prior to 2002, the Procurement Act gave the President authority to prescribe policies and directives that "shall govern the Administrator [of the GSA] and executive agencies *in carrying out their respective functions*" under the Procurement Act.  40 U.S.C. § 486(a) (2001) (emphasis added).  "Congress added [that section] to guarantee that Presidential policies and directives shall govern not merely guide the agencies under the FPASA."  *Kahn*, 618 F.2d at 788 (quotations omitted).  But that is a supervisory, not regulatory,

role, *see id.*, and thus vests the President only with "authority to direct" agencies in performing their "functions under FPASA provisions." *AFL-CIO v. Carmen*, 669 F.2d 815, 822 (D.C. Cir. 1981); *see also Reich*, 74 F.3d at 1333. Since Congress re-enacted that provision into 40 U.S.C. § 121(a) "without substantive change," Pub. L. No. 107-217, § 1, 116 Stat. 1062, 1062 (2002), § 121(a) carries forward that supervisory authority—and no more.

EO 14,042 and the contractor mandate, however, are not exercises of supervisory authority directing agencies' implementation of the Procurement Act; they are regulations supervising health and safety by demanding that those who "want to do business with the federal government vaccinate [their] workforce." ECF 27, ¶ 12 (quoting Pres. Biden). That much is clear from their breadth. Employers with covered contracts effectively must ensure that *all* their employees are vaccinated. For example, "[e]mployees who perform duties necessary to the performance of the covered contract, but who are not directly engaged in performing the specific work … such as human resources, billing, and legal review" are covered as those working "in connection with" a federal contract. Ex. H, at 75. And employees who do not work on a federal contractor but may interact with those who do in "common areas such as lobbies … and parking garages" must also be vaccinated. *Id.* 70–71. Thus, merely saying "hello" to a coworker in a parking garage brings an employee under the contractor mandate. That is on top of mandating vaccination of employees who pose little COVID-19 risk such as those who recovered from a prior infection, *see id.* at 68,[5] those who work outdoors, *id.* at 70,[6] and those who work from home, *id.* at 71.

That clearly amounts to a health and safety regulatory scheme. *See Reich*, 74 F.3d at 1338

---

[5] Infection-mediated immunity is "as robust and durable (or more) as that acquired through vaccination." ECF 9-5 ¶ 31.

[6] People are less likely to get COVID-19 outdoors. *See* CDC, *Participate in Outdoor and Indoor Activities*, https://bit.ly/3GurciW (last visited Dec. 9, 2021).

(noting the potential regulatory nature of such broad rules).  That the mandate appears in federal contracts is irrelevant to that conclusion; its "manifest purpose and inevitable effect" is the regulation of health and safety so it is not "a legitimate response to [federal] procurement constraints or to … economic need." *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 291 (1986).  It is thus no different from the OSHA mandate, and like that mandate, its sole purpose is to "ramp up vaccine uptake by any means necessary." *BST Holdings L.L.C. v. OSHA*, 17 F.4th 604, 615, 616 (5th Cir. 2021).  Indeed, that OSHA imposed basically the same requirement as a workplace safety rule proves that the contractor mandate is about health and welfare, not procurement.  *See Kentucky*, 2021 WL 5587446, at *8.

2.  Nor is the contractor mandate "consistent with" the Procurement Act's purpose of providing "the Federal Government with an economical and efficient system" of procurement.  40 U.S.C. §§ 101, 121; *see also United States v. Oseby*, 148 F.3d 1016, 1018 (8th Cir. 1998).  That statutory requirement limits presidential authority to those actions that "achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency." *Kahn*, 618 F.2d at 789.  The Procurement Act "was not intended to achieve a wide variety of economic and social goals." *Comm. for Auto Responsibility (C.A.R.) v. Solomon*, 603 F.2d 992, 999 n.23 (D.C. Cir. 1979).  Presidents, and their delegates, cannot use the law "to impose their notions of desirable social legislation on the states wholesale." *Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159, 171 (3d Cir. 1971).

Thus, the Procurement Act's reach, however broad, *see*, *e.g.*, *UAW-Labor Employment and Training Corp. v. Chao*, 325 F.3d 360, 367 (D.C. Cir. 2003), is "*not* intended to operate as a 'blank check for the President to fill in at his will.'" *Georgia*, 2021 WL 5779939, at *10 (quoting *Kahn*, 618 F.2d at 793).  Instead, the presidential prescriptions "must be '*reasonably* related' to the

purposes of the Procurement Act."  *Id.* (quoting *Liberty Mut. Ins. Co. v. Friedman*, 939 F.2d 164, 170 (4th Cir. 1981)).  Only when "the President prescribes policies and directives bearing an actual and logical relationship to [procurement], [has] he lawfully exercise[d] his powers under" the Act. *Kahn*, 618 F.2d at 800 (MacKinnon, J., dissenting).  In other words, there must be a "sufficiently close nexus between" economy and efficiency and a purported Procurement Act policy.  *Id.* at 792; *see also id.* at 797 (Bazelon, J., concurring); *id.* (Tamm, J., concurring).

The contractor mandate fails that requirement—as two courts have said.  *Georgia*, 2021 WL 5779939, at *10; *Kentucky*, 2021 WL 5587446, at *7.  President Biden was quite clear about the mandate's goal:  "I'm announcing tonight a new plan to require more Americans to be vaccinated. … [W]e must increase vaccinations among the unvaccinated with new vaccination requirements." Ex. B, at 3–4.  The contractor mandate's incredible reach, as discussed above, highlights this by requiring employees with little to no connection to federal contracts or little to no risk of spreading COVID-19 to vaccinate.  It is hard to see how that has anything to do with ensuring an "economical and efficiency system for … procurement and supply."  40 U.S.C. § 101(1).  To the contrary, the mandate will impose "extensive and costly administrative work by employers and will force at least some individuals to choose between getting medical treatment that they do not want or losing their job." *Georgia*, 2021 WL 5779939, at *10; *see also* Ex. K; ECF 9-6, ¶¶ 5–8; ECF 9-10, ¶¶ 3–5; ECF 9-12, ¶¶ 32–45; ECF 9-14, ¶¶ 4–8; ECF 23-4, ¶¶ 8–12; ECF 27, ¶ 31; *cf.* 86 Fed. Reg. at 63,422 (providing anecdotes showing less than 100% of workers comply with vaccine mandates).  Even by its own terms, the mandate is not closely related to procurement.  The purported justification for the mandate's economy and efficiency is reducing the spread of COVID-19.  *See*, *e.g.*, EO 14,042, § 1; 86 Fed. Reg. at 53,692.  But the vaccine's ability to do that is unknown and imperfect, as the Government admits.  *See* ECF 27 ¶ 9.  And the

purported link between the vaccine and procurement rests on a series of conclusory, inferential chains.  *See* EO 14,042 § 1; 86 Fed. Reg. at 63,423; 86 Fed. Reg. at 53,692.

That inferential, basically hypothetical, "downstream connection" is "markedly different from" ensuring efficient procurement.  *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2488 (2021) (discussing the CDC's COVID-19 eviction moratorium).  The nexus between the contractor mandate and federal procurement is thus not close; the mandate "radiate[s] too far beyond the purposes of the Procurement Act and the authority it grants to the President." *Georgia*, 2021 WL 5779939, at *10.  Indeed, it radiates so far beyond the Procurement Act that the Government's rationale "could be used to enact virtually any measure at the president's whim." *Kentucky*, 2021 WL 5587446, at *7.

Well-settled principles of statutory interpretation confirm that the Procurement Act does not reach this far.  Absent a clear statement from Congress, courts should not read laws to allow the executive branch to upset the federal-state balance, push the outer bounds of constitutional power, or address issues of major economic and political significance.  *See* ECF 9, at 21–24.  Those principles apply here.  The *Georgia* court noted this concerning both the contractor mandate and EO 14,042.  *See* 2021 WL 5779939, at *9.  And the *Kentucky* court pointed out the constitutional concerns en route to enjoining the contractor mandate.  *See* 2021 WL 5587446, at *8–*10.

Those same principles are also ubiquitous in court rulings enjoining the administration's other mandates.  *See BST Holdings*, 17 F.4th at 616–18 (limits of constitutional power and major questions); *id.* at 619 (Duncan, J., concurring) (major questions); *Louisiana v. Becerra*, 2021 WL 5609846, at *11, *15–*16 (W.D. La. Nov. 30, 2021) (similar).  Indeed, a court in this district enjoined the CMS vaccine mandate in part because Congress had not clearly authorized CMS "to exercise powers of vast economic and political significance," alter "the balance between federal

and state power," and make "an administrative interpretation of a statute that invokes the outer limits of Congress' power." *Missouri v. Biden*, 2021 WL 5564501, at *2–*4 (E.D. Mo. Nov. 29, 2021) (Schelp, J.) (quotations omitted).  And the U.S. Supreme Court stayed a CDC moratorium on evictions since it was an exercise of power of "vast economic and political significance" and altered "the balance between federal and state power and the power of the Government over private property" without a clear statement from Congress. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.[7] *See also Gonzales v. Oregon*, 546 U.S. 243, 267–68, 270–75 (2006) (applying similar principles in rejecting the federal government's claim that the Attorney General could use the Controlled Substances Act to prohibit state physicians from prescribing drugs for assisted suicides).

This Court should not deviate from those opinions.  Given how far it reaches beyond activities related directly to federal procurement, the contractor mandate plainly intrudes on areas of traditional state power and pushes constitutional limits. *See*, *e.g.*, *infra* Section II.C; ECF 9, at 21–23.  And "the amount of money involved … , the overall impact on the economy, the number of people affected, and the degree of congressional and public attention" on vaccination confirms that the mandate is an attempt to exercise power over an issue of great economic and political significance. *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 422–23 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc).  But absent from the Procurement Act is *any* indication—much less a clear statement—that Congress authorized such a mandate. *See id.* at 421.

In fact, there is evidence that Congress does not authorize vaccine mandates.  The National Vaccine Program requires the Department of Health and Human Services to create a plan to provide "*assistance* to States, localities, and health practitioners in the distribution and use of

---

[7] An Eleventh Circuit motions panel rejected application of the major questions rule to the CMS mandate.  *See Florida*, 2021 WL 5768796, at *12–*13 & n.1.  But its analysis is wrong as the dissent persuasively explains. *See id.* at *24–*25 (Lagoa, J., dissenting).

vaccines, including efforts to *encourage* public acceptance of immunizations ... ."   42 U.S.C. § 300aa-2(a)(6) (emphases added); *see also* 42 U.S.C. §§ 247d(b)(2)(A), 247d-1(a)–(b) (involving vaccines and public health generally).   "Assistance" and "encouragement" are quite different from a mandate, and they suggest a congressional preference for suasion.   That is consistent with the fact that where Congress did impose vaccine-related requirements, it spoke clearly.   *See* 42 U.S.C. § 1396u-7(b)(8) (requiring States to include COVID-19 vaccinations as part of their benchmark coverage under Medicaid).   It did not do so in the Procurement Act—and its silence is telling.

* * *

There is thus no textual, contextual, or other reason to conclude the Procurement Act authorizes the contractor mandate—and, until this administration, no one has ever thought it did. *See Georgia*, 2021 WL 5779939, at *10.   "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism."   *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation omitted).   That skepticism is justified here.

### B.   The Defendants failed to follow the necessary procedures.

OMB and the FAR Council also failed to follow the proper procedure (whether under the APA, 5 U.S.C. § 553, or Procurement Policy Act, 41 U.S.C. § 1707) when issuing the contractor mandate.   Whether the Government complied with procedural requirements is reviewed *de novo*. *See Citizens Telecomms. Co. of Minn. v. FCC*, 901 F.3d 991, 1001 (8th Cir. 2018).   And since "[n]otice and comment procedures secure the values of government transparency and public participation," exceptions "must be narrowly construed."   *Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013) (quotations omitted); *see also Missouri*, 2021 WL 5564501, at *4.

As Plaintiff States showed, OMB and FAR needed but failed to comply with § 1707 or § 553 in issuing the mandate.   *See* ECF 9, at 31–33; ECF 23, at 12–13.   The *Kentucky* court's

14

contrary conclusion as to OMB's determination is incorrect.  The court said that OMB's November rationalization mooted challenges to the September determination and that the rationalization complied with § 1707(d)'s waiver requirement.  *See* 2021 WL 5587446, at *11–*12.  But the former ignores that OMB's November rationalization was not new agency action.  *See supra* Section I; ECF 23, at 13.  And the latter ignores that OMB's November rationalizations are facially implausible and insufficient.  *See* ECF 23, at 13.  To the extent OMB claims a compelling need to ensure regulatory certainty and consistency, *see* 86 Fed. Reg. at 63,423–24, those interests "reflect[] a generalized concern that exists any time an act requires further substantive rulemaking" and do not justify avoiding notice and comment.  *United States v. Brewer*, 766 F.3d 884, 889 (8th Cir. 2014).  To the extent the justification is the threat from COVID-19, *see* 86 Fed. Reg. at 63,423, "an agency's conclusion that bypassing notice and comment requirements is necessary to protect the public safety" is not an automatic excuse.  *Missouri*, 2021 WL 5564501, at *6 (citing, *inter alia*, *Brewer*, 766 F.3d at 889).  The agency must "point to something specific that illustrates a particular harm that will be caused by the delay required for notice and comment." *Brewer*, 766 F.3d at 890.  The Government has failed to make that particularized showing here.

The *Kentucky* court also ignored "the unprecedented, controversial, and health-related nature of the mandate."  *Missouri*, 2021 WL 5564501, at *6.  That is a compelling justification *for* notice and comment.  Ignoring procedural rules "undermines the democratic process that [they] are intended to protect" and the rule's legitimacy.  *See id.* at *7.  Thus, "[f]ar from [justifying] circumventing the normal rulemaking requirements, the unprecedented and controversial mandate affecting personal health constitutes a compelling reason to utilize those procedures."  *Id.*

### C.    The contractor mandate is unconstitutional.

Multiple courts "have either expressed agreement with or at least concern about" Plaintiff States' claims that the contractor mandate violates the Tenth Amendment, falls outside the power

conferred by the Spending Clause or Commerce Clause, and violates the non-delegation doctrine. *Georgia*, 2021 WL 5779939, at *11 (citing *BST Holdings*, 17 F.4th at 616–18, and *Kentucky*, 2021 WL 5587446, at *9). A law empowering the federal executive "to make sweeping pronouncements on matters of public health affecting every member of society in the profoundest of ways" is unconstitutional. *BST Holdings*, 17 F.4th at 611. Because the contractor mandate does exactly that, reading the Procurement Act to authorize the mandate renders the Act unconstitutional. *See* ECF 9, at 33–37; ECF 23, at 15–18.

That the contractor mandate is imposed through federal contracts doesn't alter the conclusion. As explained above, the contractor mandate is, in reality, a health and safety regulation for federal contractors. *See supra* Section II.A. Such regulations, however, "are, in the first instance, for" the States and "do not ordinarily concern the national government." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905).

But to the extent the contract context matters, all it does is underscore that the Spending Clause does not authorize the federal government to impose the mandate. Conditions on federal spending must "relate[] to the federal interest in particular national projects or programs." *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (quotations omitted). They do not when they regulate "conduct outside the scope of the" federal contract. *Rust v. Sullivan*, 500 U.S. 173, 197 (2000) (discussing grants). Requiring contractors to vaccinate everyone who works in the same general location as those working on a federal contract, including those with little risk of spreading COVID-19, is certainly that. *Cf. Georgia*, 2021 WL 5779939, at *10 (The mandate "radiate[s] too far beyond the purposes of the Procurement Act.").

The contractor mandate also violates the Spending Clause for another reason: the federal policy embodied in the mandate can change on a moment's notice. The updated Guidance requires

compliance with the ever-changing FAQs the Task Force lists on its website.  *See* 86 Fed. Reg. at 63,421 (providing the link in a copy of the Guidance).  And EO 14,042 authorizes OMB, the Task Force, and FAR to make binding alterations to the Guidance at any time.  The ability to alter contract terms mid-performance, with no guidance as to what those alterations may be, is not the kind of unambiguous contract condition that passes constitutional muster.  *See Van Wyhe*, 581 F.3d at 650; *see also Ohio v. Yellen*, 2021 WL 2712220, at *15 (S.D. Ohio July 1, 2021).

## III.    The Court should vacate the OMB Determination and FAR Memorandum and enjoin enforcement of the contractor mandate.

Because Counts Five, Six, Seven, Eight, and Nine allege that the OMB Determination—that is, the September determination and November rationalization—and the FAR Memorandum are unconstitutional, lack a statutory basis, and are procedural defective under the APA, 5 U.S.C. § 706(2), "[t]he ordinary practice is to vacate" them.  *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).  And since the contractor mandate's problem is its illegality, there is no reason to depart from ordinary practice.  *See United Food & Commercial Workers Union, Local No. 663 v. U.S. Dep't of Agric.*, 532 F. Supp. 3d 741, 778 (D. Minn. 2021).

A permanent injunction is also appropriate.  Besides actual success on the merits, a permanent injunction issues after consideration of the "threat of irreparable harm to the movant," the balance of harms between the movant and other parties, and "the public interest."  *Laredo Ridge Wind, LLC v. Neb. Pub. Power Dist.*, 11 F.4th 645, 654 (8th Cir. 2021) (quoting *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003)).  The last two factors merge where the party opposing the injunction is the federal government.  *See*, *e.g.*, *Missouri*, 2021 WL 5564501, at *14.  All these factors justify injunctive relief here.

**Irreparable Harm**:  Plaintiff States have suffered a number of irreparable harms.  One is sovereign harms.  "State[s] … suffer irreparable harm" when they are "precluded from applying

17

[their] duly enacted legislation." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020).  Plaintiff States have many laws addressing vaccines and compulsory vaccination, *see* ECF 9, at 38–39, that the mandate purports to preempt or arguably preempts, *see* Ex. H, at 79.  That establishes irreparable harm.  *See BST Holdings*, 17 F.4th at 618 ("The States … have an interest in seeing their constitutionally reserved police power over public health policy defended from federal overreach.").  So, too, does the unlawful commandeering of State employees and policies.

Another set of irreparable harms are those Plaintiff States have and will experience in their roles as federal contractors.  Plaintiff States and their agencies "are now having to make tough choices about whether they will choose to comply with the vaccine mandate or lose out on future federal government contracts."  *Kentucky*, 2021 WL 5587446, at *13.  Some of their agencies have already seen the Government unilaterally impose the mandate on them, *see*, *e.g.*, ECF 9-7, ¶ 6; others have been coerced into modifying their contracts to include the mandate, *see*, *e.g.*, ECF 9-7, ¶ 5; ECF 9-12, ¶¶ 9–31, 39–45; and others are quickly approaching contract renewals that include the mandate, *see*, *e.g.*, ECF 9-11, ¶¶ 4, 6, 8–11; ECF 9-12, ¶ 5.  All of that has caused or will cause Plaintiff States to undertake compliance efforts that entail substantial administrative, planning, and financial burdens.  *See*, *e.g.*, ECF 9-6, ¶ 9; ECF 9-10, ¶¶ 3–5; ECF 23-4, ¶¶ 10–12.  Such "nonrecoverable compliance costs" and "the diversion of resources" constitute "irreparable harm."  *BST Holdings*, 17 F.4th at 618; *accord Georgia*, 2021 WL 5779939, at *11 (finding "the irreparable harm of nonrecoverable compliance"); *Kentucky*, 2021 WL 5587446, at *13 (same).

Plaintiff States have also shown irreparable quasi-sovereign harm.  When States assert their own rights against the federal government, as Plaintiff States do here, they may also "litigate as *parens patriae* to protect quasi-sovereign interests" of a substantial segment of their population.  *Massachusetts*, 549 U.S. at 520 n.17.  Thus, Plaintiff States may raise the "irreparable injury"

facing their millions of citizens who are "put to a choice between their job(s) and their jab(s)," *BST Holdings*, 17 F.4th at 618; *see also* ECF 27, ¶ 31, and the harms facing federal contractors within their borders that are threatened with economic ruin, *Kentucky*, 2021 WL 5587446, at *3.  This also establishes the irreparable "negative effect" that the contractor mandate would have "on the economies" of Plaintiff States.  *Missouri*, 2021 WL 5564501, at *13.

Furthermore, remedies at law are inadequate for these injuries.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).  "Irreparable harm," by definition, "occurs when a party has no adequate remedy at law."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  Even assuming Plaintiff States could sue the Government for damages, no amount of monetary relief could compensate Plaintiff States for suspending enforcement of their public-health laws, incurring nonrecoverable compliance costs, or allowing the Government to dictate their citizens' private medical decisions.

**Balance of Harms and Public Interest**:  The balance of hardships and public interest also weigh strongly in favor of issuing a permanent injunction.  "[A]ny abstract 'harm' [an injunction] might cause the [Government] pales in comparison and importance to the harms the absence of [an injunction] threatens to cause countless individuals and companies."  *BST Holdings*, 17 F.4th at 618; *accord Georgia*, 2021 WL 5779939, at *12; *Kentucky*, 2021 WL 5587446, at *13 (same).  The requested injunction would "do nothing more than maintain the status quo."  *Georgia*, 2021 WL 5779939, at *12.  In contrast, denying the injunction "would force Plaintiffs to comply with the mandate, requiring them to make decisions which would significantly alter their ability to perform federal contract work … critical to their operations."  *Id.*; *see*, *e.g.*, ECF 9-6, ¶ 4 (University of Missouri has 230 contracts); ECF 9-7, ¶ 4 (Iowa universities receive $1.3 billion); ECF 9-12, ¶ 5 (one Alaska university receives $200 million).  "Additionally, requiring compliance

with [the mandate] would likely be life altering for many of Plaintiffs' employees [and employees of other contractors in Plaintiff States] as Plaintiffs [and other contractors] would be required to decide whether an employee who refuses to be vaccinated can … be reassigned … or whether the employee instead must be terminated." *Georgia*, 2021 WL 5779939, at *12.

The Government, by contrast, has no legitimate interest "in enforcing an unlawful" mandate. *BST Holdings*, 17 F.4th at 618; *see also Ala. Ass'n of Realtors*, 141 S. Ct. at 2490.  Nor will an injunction "harm the public interest in slowing the spread of COVID-19." ECF 20, at 40. The Government admits that "[t]he duration of vaccine effectiveness in preventing COVID-19, reducing disease severity, reducing the risk of death, and the effectiveness of the vaccine to prevent disease transmission by those vaccinated are not currently known." ECF 27, ¶ 9.  That fatally "undercut[s] this argument." *Missouri*, 2021 WL 5564501, at *14.

## CONCLUSION

For those reasons, Plaintiff States respectfully request that the Court: (1) declare the contractor mandate, and all similar orders, unlawful and unconstitutional; (2) vacate the OMB September determination and subsequent November rationalization; and (3) enjoin enforcement of the contractor mandate and all similar orders.

Dated:  December 10, 2021

Respectfully submitted,

**DOUGLAS J. PETERSON**
**Attorney General of Nebraska**

*/s/ James A. Campbell*
James A. Campbell
  *Solicitor General of Nebraska*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2686
Jim.Campbell@nebraska.gov
*Counsel for Plaintiffs*

**ERIC S. SCHMITT**
**Attorney General of Missouri**

*/s/ Justin D. Smith*
Justin D. Smith, #63253MO
  *Deputy Attorney General of Missouri*
Michael E. Talent, #322220CA
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(573) 751-0304
Justin.Smith@ago.mo.gov

*Counsel for Plaintiffs*

**TREG R. TAYLOR**
**Attorney General of Alaska**
*/s/ Cori Mills*
Cori M. Mills
Deputy Attorney General of Alaska
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501-1994
(907) 269-5100
Cori.Mills@alaska.gov
*Counsel for State of Alaska*

**LESLIE RUTLEDGE**
**Arkansas Attorney General**
*/s/ Vincent M. Wagner*
Vincent M. Wagner
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas  72201
(501) 682-8090
vincent.wagner@arkansasag.gov

JEFFREY S. THOMPSON
Solicitor General
SAMUEL P. LANGHOLZ
Assistant Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
jeffrey.thompson@ag.iowa.gov
sam.langholz@ag.iowa.gov
*Counsel for State of Iowa*

**AUSTIN KNUDSEN**
**Attorney General of Montana**
KRISTIN HANSEN
Lieutenant General
DAVID M.S. DEWHIRST
Solicitor General
CHRISTIAN B. CORRIGAN
Assistant Solicitor General
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406-444-2026
David.Dewhirst@mt.gov
Christian.Corrigan@mt.gov
*Counsel for State of Montana*

**JOHN M. FORMELLA**
**New Hampshire Attorney General**
*/s/ Anthony J. Galdieri*
Anthony J. Galdieri
Solicitor General
NEW HAMPSHIRE DEPARTMENT OF JUSTICE
33 Capitol Street
Concord, NH 03301
Tel: (603) 271-3658
Anthony.J.Galdieri@doj.nh.gov
*Counsel for State of New Hampshire*

**WAYNE STENEHJEM**
**Attorney General of North Dakota**
*/s/ Matthew A. Sagsveen*
Matthew A. Sagsveen
Solicitor General
State Bar ID No. 05613
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
masagsve@nd.gov
*Counsel for State of North Dakota*

**JASON R. RAVNSBORG**
**South Dakota Attorney General**
*/s/ David M. McVey*
David M. McVey
Assistant Attorney General
1302 E. Highway 14, Suite 1
Pierre, SD  57501-8501
Phone: 605-773-3215
E-Mail: david.mcvey@state.sd.us
*Counsel for State of South Dakota*

**BRIDGET HILL**
  **Wyoming Attorney General**
*/s/ Ryan Schelhaas*
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Telephone: (307) 777-5786
ryan.schelhaas@wyo.gov
*Attorneys for the State of Wyoming*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 10, 2021, a true and correct copy of the foregoing and any attachments were filed electronically through the Court's CM/ECF system, to be served on counsel for all parties by operation of the Court's electronic filing system and to be served on those parties that have not appeared who will be served in accordance with the Federal Rules of Civil Procedure by mail or other means agreed to by the party.

*/s/ Justin D. Smith*