UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STATE OF MISSOURI, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) No. 4:21 CV 1300 DDN |
| JOSEPH R. BIDEN, in his official Capacity as President of the United States, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on plaintiff-States' motion for preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, to enjoin the enforcement of the COVID-19 vaccine mandate for certain federal contractors and subcontractors. (Doc. 8.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the following reasons, plaintiffs' motion for preliminary injunction is sustained.

**BACKGROUND**

On January 20, 2021, President Biden ("the President") signed Executive Order 13,991, 86 Fed. Reg. 7045, which established the Safer Federal Workforce Task Force ("Task Force"). The Task Force is charged with providing "ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID–19 pandemic." 86 Fed. Reg. at 7046 (§ 4(a)). On September 9, 2021, the President announced that he had signed Executive Order 14,042 ("EO 14,042"), requiring the Task Force to issue Guidance regarding adequate COVID-19 safeguards.

On September 24, 2021, the Task Force issued Guidance implementing EO 14,042. The Guidance required that federal contractors ensure that their covered employees were vaccinated against COVID-19, subject to legal accommodations; in addition, the Guidance required masking and physical distancing in covered contractor workplaces.  Also on September 24, the Acting Office of Management and Budget ("OMB") Director published in the Federal Register her determination that the Task Force Guidance will improve economy and efficiency.

To implement EO 14,042 and the Task Force's Guidance, as approved by OMB, on September 30, 2021, the Federal Acquisition Regulatory Council ("FAR Council") issued a memorandum to "agencies that award contracts under the Federal Acquisition Regulation with initial direction for the incorporation of a clause into their solicitations and contracts to implement" the Guidance. This included allowing a sample clause that may be included in contracts via a deviation.[1]

On November 10, 2021, the Task Force updated the Guidance, changing the date contractors' employees were required to be fully vaccinated from December 8, 2021, to January 18, 2022.  Also on November 10, the Acting Director of OMB filed for publication in the Federal Register her determination that the updated Guidance "will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors."  Federal agencies have issued agency-specific class deviations directing procurement officers to include the COVID-19 safety clause in contracts until the FAR Council issues its final government-wide regulation.

Plaintiff-States maintain significant contracts with the federal government. According to the System for Award Management, in calendar 2020, federal contracts

---

[1] A federal government contract deviation has been described thus:  "Where a government contract is awarded under competitive bidding, deviations from advertised specifications may be waived by the contracting officer, provided that the deviations do not go to the substance of the bid or work an injustice to other bidders.  A substantial deviation is defined as one which affects either the price, quantity, or quality of the article offered." *Monument Realty LLC v. Washington Metropolitan Area Transit Authority*, 540 F. Supp.2d 66, 78 (D.D.C. 2008) (quotation marks and citations omitted).

performed in plaintiff-States were worth billions of dollars, ranging from $386 million in Wyoming to $16 billion in Missouri.  (Doc. 27-1 at 98-99.)

On October 29, 2021, plaintiffs – the States of Missouri, Nebraska, Alaska, Arkansas, Iowa, Montana, New Hampshire, North Dakota, South Dakota, and Wyoming – commenced this judicial action to challenge the mandate.  (Doc. 1.)  Plaintiffs allege in their complaint that the mandate violates the U.S. Constitution, the Administrative Procedures Act ("APA"), and federal procurement law.[2]  On November 4, plaintiffs moved for preliminary injunction.  (Doc. 8.)  Defendants filed their response in opposition on November 18, and plaintiffs filed their reply on November 22.  (Docs. 20, 23.)  The parties also filed supplemental briefing on December 10.  (Docs. 28, 29.)

## **RELEVANT LEGAL PRINCIPLES**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  In determining whether to issue a preliminary injunction, the Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

None of the four factors "is determinative," and each must be examined "in the context of the relative injuries to the parties and the public."  *Id*. at 113.  District courts have discretion to apply the *Dataphase* test in a pragmatic, "flexible" way. *Richland/Wilkin Joint Powers Auth. v. United States Army Corp of Eng'rs*, 826 F.3d 1030, 1036 (8th Cir. 2016) (citations omitted).  Whether to grant a stay or injunction "militates against a wooden application" of probabilities, because "[a]t base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Sys.*, 640 F.2d at 113.

---

[2] Plaintiff-States' claims are listed in the Appendix to this Memorandum and Order.

## DISCUSSION

### A. Standing

In their supplemental briefing, defendants raised the issue of standing. They argue that plaintiffs lack standing to bring *parens patriae* claims against the federal government for any claim and that they cannot claim irreparable injury for any purported harms to their citizens. (Doc. 29 at 15.) They also contend that plaintiffs have failed to show standing based on their status as federal contractors. (*Id*. at 16.) Lastly, they argue that plaintiffs' claim of direct sovereign injuries cannot create standing. (*Id*. at 19.)

Standing is a threshold inquiry in every federal case that determines whether the court has the power to decide the case. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975). "To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted). Plaintiffs' injury-in-fact must be both particularized and concrete. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545 (2016) (citing *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* at 1548 (internal quotation marks omitted). Further, a "concrete" injury is a de facto injury that actually exists. *Id.* Finally, "a plaintiff must also establish, as a prudential matter, that he or she is the proper proponent of the rights on which the action is based." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1275 (6th Cir. 1988) (citations omitted). "[W]here one plaintiff establishes standing to sue, the standing of other plaintiffs is immaterial." *Nat'l Wildlife Fed'n v. Agric. Stabilization and Conservation Serv.*, 955 F.2d 1199, 1203 (8th Cir. 1992) (quoting *Bowen v. Kendrick*, 487 U.S. 589, 620 n.15 (1988)).

The Court concludes that plaintiffs do not have standing with regard to their quasi-sovereign *parens patriae* interests. Despite plaintiffs' argument that they seek the federal

government's compliance with federal statutes and the Constitution, their claims are best understood as challenges to the operation of the federal vaccine mandate. Plaintiffs do not have standing to make such a claim. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 176 (D.C. Cir. 2019) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rice, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982)); *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007).

Missouri, Alaska, Arkansas, and Montana have alleged sufficient injuries to establish standing for their sovereign interest claims. Each state alleges that the contractor mandate ostensibly preempts state statutes regarding vaccine mandates. (Doc. 9 at 38-39.) Preemption of a validly enacted state statute is an injury in fact, such that the state will not be able to enforce the statute,[3] and the injury is fairly traceable to EO 14,042. The injury is redressable because EO 14,042 does not preempt state statutes if it is not enforced.

In support of their motion for preliminary injunction, plaintiffs submitted ten declarations from state officials in Missouri, Iowa, New Hampshire, North Dakota, Wyoming, Alaska, and Nebraska. (Docs. 9-6 through 9-15.) Defendants argue that all but the Wyoming declaration fail to provide evidence sufficient to show standing. As defendants argue, several of the declarations provide the total number and/or value of federal contracts but fail to identify contracts with sufficient specificity to establish that they are subject to EO 14,042. (Docs. 9-6, 9-8, 9-9, 9-12, 9-13, 9-15.)

Defendants concede that Wyoming has standing with respect to its status as a federal contractor. (Doc. 29 at 19; Doc. 9-11.) The Court also concludes that Iowa has standing as a federal contractor to challenge the mandate. The United States Department of Energy ("DOE") made a unilateral modification to an Iowa State University contract pursuant to agency-specific authority. (Doc. 29 at 18; Doc. 9-7 at ¶ 6.) Because the agency's authority did not depend on EO 14,042, defendants contend that the modification is not "fairly traceable" to the EO and cannot confer standing. (Doc. 29 at 18-19 n.9.) The DOE order,

---

[3] Defendants' challenge to plaintiffs' sovereign interests standing merges the standing and preliminary injunction analyses. (Doc. 29 at 19.) While plaintiffs' claim of sovereign injuries may be insufficient to establish irreparable injury, it is sufficient to establish injury in fact.

though, states as its purpose: "To ensure the continued operation of DOE sites and facilities under health and safety emergencies as designated by the President and implement Executive Order 14042, *Ensuring Adequate COVID Safety Protocols for Federal Contractors*." U.S. DEPT. OF ENERGY, DOE O 350.5, COVID SAFETY PROTOCOLS FOR FEDERAL CONTRACTORS (2021) (italics in original). The text of the order shows that it was issued to implement the challenged EO, so the modification is fairly traceable to the challenged conduct.

Missouri also has standing as a federal contractor. It identifies three contracts between the federal government and its Department of Health and Senior Services that would be subject to EO 14,042. (Doc. 9-14.) When a claim involves a challenge to a future contracting opportunity, the pertinent question is whether plaintiffs have "made an adequate showing that sometime in the relatively near future [they] will bid on another Government contract." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995). The declaration states that at least 24 employees receive all or part of their salaries under one federal contract, and at least 22 employees receive all or part of their salaries under another. (Doc. 9-14.) Although the declaration does not provide the date of renewal, given its reliance on the contracts to pay its employees' salaries, it is likely that Missouri will continue to bid on federal contracts.

The Court concludes that at least three states, Wyoming, Iowa, and Missouri, have standing as federal contractors to challenge the mandate. Because Missouri has standing with regard to both sovereign interests and federal contractor status, its standing is sufficient to permit review. *Massachusetts v. EPA*, 549 U.S. at 518.

**B.  Likelihood of Success on the Merits**

In support of their motion for preliminary injunction, plaintiffs argue that the contractor vaccine mandate (1) exceeds the President's statutory authority under the Federal Property and Administrative Services Act (FPASA); and (2) is unconstitutional

because it exceeds the limits of Congress's enumerated powers and infringes on traditional areas of state authority.  (Doc. 9 at 15-16.)[4]

### 1. Authority Under the FPASA

Plaintiffs argue that the federal contractor vaccine mandate is inconsistent with the FPASA's purpose and outside of its scope.  They contend that there is no nexus between the mandate and likely savings to the government, that the mandate impermissibly delegates power to OMB and the Task Force, and that rules of statutory construction establish that the FPASA does not authorize the mandate.  (Doc. 9 at 18-24.)  In response, defendants argue that Congress authorized the President to direct federal procurement, that EO 14,042 satisfied the "lenient" nexus standard, and that the President can delegate his policymaking authority to the OMB director.  (Doc. 20 at 10-17.)

The purpose of the FPASA "is to provide the Federal Government with an economical and efficient system" for federal procurement, including contracting.  40 U.S.C. § 101.  It gives the President the authority to "proscribe policies and directives that the President considers necessary to carry out" the Act.  40 U.S.C. § 121(a).  The FPASA "was designed to centralize Government property management and to introduce into the public procurement process the same flexibility that characterizes such transactions in the private sector." *AFL-CIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc).  "'Economy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." *Id.* at 789.

Through the FPASA, Congress granted to the president a broad delegation of power that presidents have used to promulgate a host of executive orders.  *See, e.g.*, *UAW-Labor Employment and Training Corp. v. Chao*, 325 F.3d 360, 366 (2003) (holding that FPASA authorized the president to require contractors to post notices at all facilities informing

---

[4] Upon agreement by the parties during the status conference on November 24, 2021, the Court defers consideration of plaintiffs' APA claims.  The FAR Council is currently in the process of promulgating a regulation through notice-and-comment rulemaking.  The deferral will allow defendants to prepare an administrative record for review by the Court.

employees of certain rights); *Kahn* at 793 (holding that FPASA authorized the president to require contractors to comply with price and wage controls); *Albuquerque v. U.S. Dept. of Interior*, 379 F.3d 901, 905 (10th Cir. 2004) (holding that FPASA authorized executive order setting out priorities "for meeting Federal space needs in urban areas"). For decades, "the most prominent use of the President's authority under the FPASA [was] a series of antidiscrimination requirements for Government contractors." *Kahn*, 618 F.2d at 790.

The FPASA "does vest broad discretion in the President." *Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996). However, the President's powers under the Act are not "a blank check to fill at his will." *Reich* at 1330 (quoting *Kahn* at 793). "The procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power." *Id*. at 1330-31. Any order based on the President's FPASA authority must be based on a "sufficiently close nexus" to "the values of 'economy' and 'efficiency.'" *Kahn* at 792 (quoting 40 U.S.C. § 471 (1976) (now codified as amended at 40 U.S.C. § 101).

There is no dispute in this case that the FPASA authorizes the President to direct federal procurement. Rather, plaintiffs argue that the vaccine mandate exceeds the President's statutory authority under the FPASA. The Court concludes that plaintiffs are likely to succeed on this issue.

On the record currently before the Court, plaintiffs are likely to succeed on the issue of whether there is a sufficiently close nexus between efficiency and economy in procurement and the vaccination mandate. Defendants argue that EO 14,042 and its implementing guidance sufficiently establish the nexus by stating that the mandate "will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." EO 14,042 § 1. (Doc. 20 at 14.) However, if the statement in EO 14,042 establishes a sufficient nexus, then the President would be able to mandate virtually any public health measure that would result in a healthier contractor workforce. The Court concludes plaintiffs are likely to succeed on their argument that such an interpretation of the President's powers under the FPASA is not consistent with the structure and purposes of the statute.

Defendants assert that "[p]ast [presidential] practice does not, by itself, create power, but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent.'" (Doc. 20 at 12, quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981).)  As discussed above, past presidential uses of power under the FPASA include requiring contractors to post notices of certain rights; requiring contractors to comply with price and wage controls; setting out priorities for selecting office space in urban areas; and requiring contractors to comply with certain nondiscrimination provisions.  *Chao* at 366; *Kahn* at 793; *Albuquerque v. U.S.* at 905; *Kahn* at 790.  The mandate at issue in this case diverges, both in scope and in kind, from the past practice which defendants argue Congress implicitly endorsed.

First, the Task Force Guidance defines "covered contractor employee" as "any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor workplace."  (Doc. 27-1 at 30-31.) "This includes employees of covered contractors who are not themselves working on or in connection with a covered contract."  (*Id*. at 31.)

Second, the vaccine mandate is not analogous to past presidential uses of FPASA power.  As the parties stipulated in their joint statement of material facts, the FPASA has never been used to require contractors to ensure that their employees were vaccinated against any disease.  (Doc. 27 at ¶ 18.)  The uses of presidential power under the FPASA cited above relate to the interactions between contractors and their employees in the workplace, e.g. notification of employee rights, wage controls, and nondiscrimination.  The vaccine mandate would reach beyond the workplace and into the realm of public health. The Court concludes that plaintiffs are likely to succeed on the issue of whether the mandate exceeds the scope of the power granted to the President by the FPASA.

    2.    *Congress's Enumerated Powers and Authority of the States*

Plaintiffs argue that the federal contractor vaccine mandate exceeds Congress's enumerated powers and unconstitutionally infringes on the authority of the States.  They contend that the mandate usurps power belonging to the States and that the mandate is not justified by the Spending Clause, Const. Art. I, § 8, cl. 1.  (Doc. 9 at 33-37.)  Defendants

respond that the mandate was a valid exercise of the President's authority under the FPASA, which was a valid exercise of Congress's power under the Spending Clause. They further argue that the mandate does not commandeer state officials or violate the Spending Clause or nondelegation doctrine. (Doc. 20 at 26-35.)

As analyzed above, the President did not have authority to mandate vaccination under the FPASA. Therefore, the mandate cannot be regarded as a valid exercise of the President's authority under the FPASA, as granted to the President by Congress's power under the Spending Clause.

Plaintiffs argue that the mandate fails to "unambiguously" establish the contract terms and that the mandate is not "related to the federal interest in particular national projects or programs," citing *Pennhurst State School & Hospital v. Halderman* and *Van Wyhe v. Reisch*. (Doc. 9 at 35); 451 U.S. 1, 17 (1981); 581 F.3d 639, 650 (8th Cir. 2009). Defendants argue that adopting plaintiffs' position would make imprecisions in federal procurement contracts matters of constitutional magnitude. (Doc. 20 at 31.)

Plaintiffs cite no authority for the proposition that the *Pennhurst* or *Van Wyhe* standards apply to federal contracts. As defendants point out, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). The Court concludes that plaintiffs are not likely to succeed on the issue of whether the mandate violates the Spending Clause.

The Tenth Amendment "restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which . . . is essentially a tautology." *New York v. United States*, 505 U.S. 144, 156-57 (1992). Rather, it "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *Id*. at 157. Because the Court has concluded that the mandate likely does not violate the Spending Clause, one of Congress's enumerated powers, it also concludes that plaintiffs are not likely to succeed on their claim of Tenth Amendment violation.

### C. Threat of Irreparable Harm

The Court must next determine whether plaintiffs have shown that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs must show more than a mere "possibility," but they need not show a certainty; rather, they need to demonstrate "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

Plaintiffs allege irreparable harm to their sovereign, quasi-sovereign, and proprietary interests. Plaintiffs argue that the mandate is an attempt by the President to supersede and preempt any State policies that differ from federal policies. (Doc. 9 at 37.) They also contend that they face injuries to their proprietary interests in the form of compliance costs and economic disruption due to resignations. (Doc. 9 at 40-41.)

Defendants argue that plaintiffs have not alleged irreparable harm to their position as federal contractors, and their declarations supporting the claim of harm to contractors are insufficient. (Doc. 20 at 35.) Defendants also contend that the mandate preempts conflicting state laws, so there is no harm to plaintiffs' sovereign interests. (*Id.* at 38.)

Because the Court has found that plaintiffs are not likely to succeed on their claim of Spending Clause or Tenth Amendment violation, they are not likely to suffer irreparable harm to their sovereign interests.

In support of their claim of irreparable injury to proprietary interests, plaintiffs submitted declarations from officials in the States that describe the extent of their federal contracts and the likely effect that the mandate will have on their operations. (Docs. 9-6 through 9-15.) Plaintiffs also offer a survey wherein 72 percent of respondents indicated that they would give up their jobs rather than comply with a vaccine mandate. Kaiser Family Foundation Survey (Oct. 28, 2021), https://www.kff.org/coronavirus-covid-19/press-release/1-in-4-workers-say-their-employer-required-them-to-get-a-covid-19-vaccine-up-since-june-5-of-unvaccinated-adults-say-they-left-a-job-due-to-a-vaccine-requirement/. Even if the number of unvaccinated workers that resign rather than comply

with the mandate is less than 72 percent, the survey indicates that it is likely that federal contractors subject to the mandate will face significant disruption due to resignations.

In conceding that Wyoming has standing to challenge the mandate, defendants assert that Wyoming cannot claim irreparable injury because it may seek compensation under the Contract Disputes Act, 28 U.S.C. § 1491. (Doc. 29 at 19.) If a contractor, such as Wyoming, were to challenge the procurement regulation as suggested by defendants, the court may award declaratory or injunctive relief, but "any monetary relief shall be limited to bid preparation and proposal costs." *Id*. § 1491(b)(2). Wyoming, and other similarly situated federal contractors, would still incur the business and financial effects of a lost or suspended employee, as well as nonrecoverable compliance and monitoring costs. *See BST Holdings, LLC v. Occupation Safety and Health Admin.*, 17 F.4th 604, 618 (5th Cir. 2021). The Court concludes that plaintiffs will suffer irreparable harm in their capacity as federal contractors.

### D. Balance of Harms and Public Interest

Lastly, the Court must determine whether plaintiffs have shown that the "balance of equities tips in [their] favor" and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24. When the party opposing the injunction is the federal government, the balance-of-harms factor "merge[s]" with the public-interest factor. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs argue that the public interest favors an injunction because the mandate implicates important principles of federalism. (Doc. 9 at 42.) Defendants contend that an injunction would hamper the efficiency of federal contractors and harm the federal government's efforts to slow the spread of COVID-19. (Doc. 20 at 40.)

"It is indisputable that the public has a strong interest in combatting the spread of" COVID-19. *Ala. Ass'n of Realtors*, 141 S. Ct. 2485, 2490 (2021). However, the government may not "act unlawfully even in pursuit of desirable ends." *Id*. (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 585-86 (1952)). The Court recognizes that the world is entering the third year of the COVID-19 pandemic and that

slowing the spread of the virus is critical.  Still, there is no public interest in the enforcement of an unlawful action.  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Circuit 2016).  It will not harm the federal government to maintain the status quo while the courts decide the issues of the President's authority and the implications for federalism.  The Court concludes that, on balance, consideration of the harms and the public interest weigh in favor of a preliminary injunction.

### E. Scope of Injunction

"Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit."  *Dep't of Homeland Sec. v. New York*, 140 S.Ct. 599, 600 (Gorsuch, J., concurring).  Only the injuries alleged by the plaintiff-States are properly before the Court.  Therefore, the Court's injunction applies to plaintiff-States: Missouri, Nebraska, Alaska, Arkansas, Iowa, Montana, New Hampshire, North Dakota, South Dakota, and Wyoming.

### CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that plaintiffs' motion for a preliminary injunction **(Doc. 8) is sustained.**  Defendants are enjoined from enforcing the vaccine mandate for federal contractors and subcontractors in all covered contracts in Missouri, Nebraska, Alaska, Arkansas, Iowa, Montana, New Hampshire, North Dakota, South Dakota, and Wyoming.

**IT IS FURTHER ORDERED** that plaintiffs' motion to expedite preliminary injunction briefing **(Doc. 10) is denied as moot.**

      /s/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 20, 2021.

# APPENDIX
## Claims considered in sustaining the motion for preliminary injunction

Count 1: Violation of the Federal Property and Administrative Services Act: *plaintiffs likely to succeed on the merits*

Count 2: Violation of the Procurement Policy Act: *not determined*

Count 3: Unlawful Usurpation of the States' Police Powers: *plaintiffs not likely to succeed on the merits*

Count 4: Violation of the Anti-Commandeering Doctrine: *plaintiffs not likely to succeed on the merits*

Count 5: Procedural Violation of the APA: *not determined*

Count 6: Substantive Violation of the APA: *not determined*

Count 7: Substantive Violation of the APA, Agency Action not in Accordance with Law and in Excess of Authority: *not determined*

Count 8: APA Violations – Agency Action that is not in Accordance with Law and is in Excess of Authority: *not determined*

Count 9: APA and Statutory Violations – Arbitrary and Capricious Agency Action and Violation of Notice-and-Comment Requirements: *not determined*

Count 10: Separation of Powers: *plaintiffs not likely to succeed on the merits*

Count 11: Violation of the Tenth Amendment and Federalism: *plaintiffs not likely to succeed on the merits*

Count 12: Unconstitutional Exercise of the Spending Power: *plaintiffs not likely to succeed on the merits*